**WEYERHAEUSER COMPANY AND SUBSIDIARIES, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 393–89T.**

United States Court of Federal Claims.

Sept. 1, 1994.

Robert L. Moore II, Washington, DC, attorney of record, for plaintiff.

George L. Squires, Washington, DC, with whom was Asst. Atty. Gen. Loretta C. Argrett, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

### INTRODUCTION

Plaintiff, Weyerhaeuser Company, and its subsidiaries (Weyerhaeuser), filed the instant suit on July 14, 1989, seeking a refund of corporate income taxes in the amount of $29,573,572 allegedly erroneously assessed and paid, plus any assessed and statutory interest thereon for the taxable years 1977 through 1983, inclusive. The deficiency was assessed by the Internal Revenue Service because—(i) the Commissioner disallowed certain casualty losses claimed and allegedly sustained by plaintiff during the taxable years 1980 through 1983; and (ii) the Commissioner also refused to allow deductions for certain Domestic International Sales Corporation (DISC) commissions allegedly payable by plaintiff to its wholly-owned subsidiary, Weyerhaeuser Export, Inc. (Export), during taxable years 1980 through 1983. The taxable years 1977 through 1979 are in issue solely due to the residual or collateral effect of various carryback and carryover items flowing from other years at issue herein. Similarly, the tax year 1982 is in issue, solely, because deductions taken in that year create carrybacks and carry forwards to 1979 and 1983, respectively. Thus, no overpayment of tax with respect to the taxable year 1982 is alleged.

Jurisdiction is premised on § 6532(a) and § 7422(a) of the Internal Revenue Code of 1954, 26 U.S.C. §§ 6532(a) and 7422(a), and the Tucker Act, 28 U.S.C. § 1491, *infra*.

### PROCEDURAL HISTORY

Plaintiff's complaint averred two (2) extensive primary claims. First, plaintiff alleged that it sustained numerous casualty losses to mature timber, immature timber, and other forest-related assets during the taxable years 1980 through 1983 as a result of—(i) the Mt. St. Helens volcanic eruption on May 18, 1980; (ii) 319 fires; and (iii) a southern pine beetle infestation. Second, plaintiff further claimed that during those same years it incurred DISC commission expenses payable to Export, for which it is also entitled to certain deductions. In both cases, the Commissioner disallowed plaintiff's claimed deductions, either in full or in part. Consequently, plaintiff filed this action alleging six (6) counts with respect to the casualty losses claimed, and eight (8) counts with regard to the DISC claims.

While proceeding with a trial on the merits, the parties definitively settled all of the substantive issues relating to the DISC claims.[1] Accordingly, the only substantive issues remaining for decision before this court are those relating to the aforementioned casualty losses claimed. The parties have also agreed to stipulate to the precise dollar amount of the tax refund (taxes and interest) due plaintiff, if any, based on the court's findings and substantive opinion herein on the casualty loss issues. Given the foregoing, we shall now address only the operative facts relevant to plaintiff's claimed casualty losses.

### FACTS

A. *General Facts*

Weyerhaeuser is a corporation organized under the laws of the State of Washington, with its principal place of business in Tacoma, Washington. During the years in issue, it owned and operated timberlands in the States of Washington, Oregon, California, North Carolina, Virginia, Alabama, Mississippi, Arkansas, and Oklahoma. As one of the world's largest fully integrated forest products companies, Weyerhaeuser not only grows and harvests its own timer, it also processes said timber into salable products such as lumber, plywood, various kinds of

---

1. *See* Order of Partial Dismissal With Jurisdiction Retained For Enforcement Of Settlement dated May 31, 1994.

wood panels, pulp wood, paper products, logs, and wood chips. During the years in question, Weyerhaeuser's annual sales ranged between $3 billion and $5 billion; its total assets approached $6 billion,[2] which included approximately 6 million acres of industrial timberlands in the United States, and 17 wood-products manufacturing facilities in 17 states.

The record facts show that Weyerhaeuser organized its operating units into geographic regions, each managed by a vice-president who reported to a vice-president at corporate headquarters. During the years in issue, Weyerhaeuser had 12 such regions.[3] Each of these regions is "an integrated forest products enterprise," which supplies raw materials to associated manufacturing facilities within its own region. The industrial timberlands of each region are managed under a policy of "sustained yield forestry,"[4] which utilizes the concept of the "fully regulated forest." This concept is based upon the existence of a "target forest" which has an even distribution of age classes of timer and where annual harvest equals annual growth. In this respect, plaintiff avers that its management objective, as to each region, is to approximate a fully regulated forest which is consistent with the requirements of the associated manufacturing facility located in that region, while also attempting to achieve the highest rate of return on its investment.

Plaintiff contends that these regions bear a relationship to Weyerhaeuser's depletion blocks.[5] From 1920 to 1946, plaintiff maintained approximately 42 separate depletion blocks. These blocks were, according to plaintiff, delineated in harmony with the market for standing timber, and along natural topographical lines showing the logical way for the timber to be handled. In its 1946 income tax return, Weyerhaeuser informed the Commissioner of Internal Revenue that it had regrouped its timber holdings as follows:

> Effective January 1, 1946 the Company has regrouped its 42 timber blocks into 11 "regions". [sic] This was done so that timber accounting would conform more logically to the physical operations of the Company.

> Each new "region" is a geographical area containing all our timber which should logically go to one of our existing or planned points of manufacture. The reclassification is not a change in method of accounting, but is merely a consolidation of blocks.

PX 131. After the consolidation, plaintiff occasionally combined, separated, or eliminated depletion blocks, changed the geo-

---

**2.** In 1900, Weyerhaeuser made its first purchase of timberlands in the State of Washington, acquiring 900,000 acres at $6.00 per acre from the Northern Pacific Railroad.

**3.** Those regions were: 1) Northern Washington Region—Cascade; 2) Northern Washington Region—Everett; 3) Southwest Washington Region—Columbia Region No. 7; 4) Willamette Region—Springfield; 5) Southwest Oregon Region—Coos Bay; 6) Twin Harbors Region; 7) Eastern Oregon Region—Klamath Falls; 8) Central Arkansas Region; 9) Southwest Arkansas Region; 10) Oklahoma Region; 11) Mississippi & Alabama Region; and 12) North Carolina Region.

The Southwest Washington region includes a manufacturing and shipping complex at Longview, Washington, as well as the Mt. St. Helens Tree Farm, which consists of approximately 475,000 acres. The Mississippi/Alabama region, although treated as a single timber region, is separated into two distinct depletion blocks, one for each state, for tax purposes. *See* Appendix B (map showing land and timber regions) attached.

**4.** Plaintiff defines "sustained yield forestry" as a "method or plan of management implying continuous production, with the aim of achieving, at the earliest practicable time, an approximate balance between net growth and harvest, either by annual or by somewhat longer periods." Pltf's Glossary # 43. Defendant defines the same term as "a flow, however uneven, of raw materials over a long period of time from the timberland to a related manufacturing facility." Deft's Glossary # 49.

**5.** A depletion block is an aggregation of standing timber situated on various "timber stands," created for purposes of valuation and accounting. The block can be defined along geographical, political, or operational lines, or any other logical or reasonable basis. Treas.Reg. § 1.611–3(d). Once the physical boundaries are established, the cost basis of the block and volume of timber contained therein are used to calculate the unit depletion deduction to be taken upon the cutting and/or sale of the timber. 26 U.S.C. § 611; Treas.Reg. §§ 1.611–1, 1.611–3; *see also* 26 U.S.C. § 631.

graphical borders, or removed timber from blocks, in order to reflect changes in the company's operations. Plaintiff maintains its adjusted tax basis records for its timber in its timber depletion block account. During more than 40 years of audits, the Commissioner has never made any adjustments concerning the configuration of plaintiff's timber depletion blocks or timber accounts.

In the years in issue, each Weyerhaeuser region had a management team which was headed by a regional manager[6] who was responsible for all activities within the region, including land management, forest operations and forestry, harvesting, raw materials management, and product manufacturing. Under the region manager, a woods manager was responsible for the timberlands and raw material operations. Each regional team drew up an annual "Woods Operating Plan" and budget, utilizing the guidelines provided by corporate headquarters.[7] Accordingly, all specific timber management decisions, such as harvesting, silvicultural treatments, and the creation of the road infrastructure, were implemented at the regional level.

To aid the regional management teams in achieving their high-yield "fully regulated forests" program, Weyerhaeuser developed computer models that simulate the biological and financial performance of the timberlands. In essence, these compute models figuratively "grow" and "harvest" the entire forest according to a specific set of management assumptions. The biological model optimally projects each timber property 120 years into the future based on the timber inventory data and various assumptions entered into the model. These include such items as age, stocking, species, site class, growth and yield

tables, and the expected results of silvicultural treatments, such as fertilizing or thinning. The financial model converts the 120–year forest management and harvest plan into financial terms, calculating a net cash flow for each year and discounting the cash flows to their present value. In this process, the program computes sales revenues based on the biological model's harvests, capitalizes the costs of establishing timber stands, builds roads for transportation, replaces equipment according to a fixed schedule, and calculates depletion, depreciation and amortization. Inputs into the financial model include anticipated product sales prices, estimated costs of all projected capital expenditures and normal operating expenses. These long-term simulations form the basis for the woods operating plans in each region.

In addition to the biological and financial simulation models, Weyerhaeuser developed a computerized inventory system which tracks the actual biological characteristics of its timber properties, such as age, stocking and species of timber, and the site quality of the land. The system, styled the "Forest Inventory and Regeneration System" or "FIRS II,"[8] provides the timber input information necessary for the operation of the computer simulation models. The FIRS system itself is set up as a series of data "overlays." These overlays allow the computer to sort and organize the necessary input data for its later use in the computer simulation models and, as plaintiff indicates, can best be envisioned as a series of transparent maps laid atop one another in various layers.[9] The layers consist of (1) a stand overlay, separating the property into timber stands, which describes the timber by species, height, vol-

---

6. Each region manager reported to both the region vice-president and to the senior vice-president of region operations at corporate headquarters.

7. In Southwest Washington, the Woods Operating Plan (WOP) was the annual 3–year short-range plan. There were also two other plans. The "Timberlands 1970: High Yield Forest Plan and Mid–Term Plan" was a long-term 30–year plan, and the "Analysis of Longview 15–year Woods Operating Plan—Sequence # 1" was a 15–year mid-term plan, as indicated by the title.

8. The FIRS II system is an improvement upon the original FIRS system. It has greater power and capacity than FIRS and is a key tool in Weyerhaeuser's management of its properties.

9. The concept of the overlays is most analogous to the use of multiple transparencies on an overhead projector. Each has a different piece of a puzzle. When laid one on top of the other, the entire picture can be seen on the screen as a whole.

ume, and other identifiable characteristics;[10] (2) a legal overlay, which identifies the legal description of the property by section, township, and range; (3) a "ribbon" overlay, which identifies long narrow areas such as roads, streams, and railroads; (4) a site overlay, which maps the site index of the soil for the predominant species; (5) a treatment overlay, which records past silvicultural treatments such as fertilization and thinning; (6) a "management" overlay, that gives operating information such as slope, elevation, and haul distance; and (7) a general purpose overlay, which may be created for specific situations.

Taxpayer operates on a 52–53 week taxable year, ending on the last Sunday of each year and files a consolidated federal income tax return annually. For the years in issue, 1977–1983, taxpayer timely filed its consolidated federal income tax returns with the District Director of the Internal Revenue Service (Service) in Seattle, Washington. On September 6, 1988, and June 9, 1989, taxpayer timely paid the deficiencies assessed by the Commissioner, plus statutory and assessed interest for the taxable years 1977 through 1983, respectively. Said amounts were as follows:

| TAX YEAR | DEFICIENCY (OVERPAYMENT) | NET INTEREST | TOTAL |
|---|---|---|---|
| 1977 | $ 4,334,857 | $ 4,731,934 | $ 9,066,791 |
| 1978 | 59,266 | 126,086 | 185,352 |
| 1979 | (745,020) | 3,237,051 | 2,492,031 |
| 1980 | 1,654,659 | 2,309,318 | 3,963,977 |
| 1981 | (1,205,583) | 0 | (1,205,583) |
| 1982 | 58,753 | 46,967 | 105,720 |
| 1983 | 9,889,095 | 7,249,703 | 17,138,798 |
| TOTAL | $14,046,027 | $17,701,059 | $31,747,086. |

Following thereon, Weyerhaeuser timely filed its refund claims with the District Director for all aforementioned taxable years on October 12, 13, and 14, 1988, and June 23, 1989.[11] The Service denied said claims for refund on April 6, 1989, and June 23, 1989, respectively.

### B. *The Mt. St. Helens Casualty—Facts*

Located east of Weyerhaeuser's Southwest Washington timberlands is the Mt. St. Helens volcano. In this century's most violent volcanic explosion in the continental United States, Mt. St. Helens erupted on Sunday,

10. Defendant contends that this computerized management information system is "stand-based," whereby all the information about standing timber, such as forest and non-forested land, logging roads, regeneration, and related forestry activities, are assembled by stand. *See infra* note 57, for the definition of "stand." Plaintiff contends, on the other hand, that defendant's position is incorrect. John Wilkinson, vice-president of Weyerhaeuser (Tr. 95), testified that the stand information in FIRS is merely one "overlay" used in conjunction with six others, with the system having the potential to employ an additional 51 different overlays.

11. The amended return filed on October 14, 1988, also included a protective refund claim involving additional tax and interest owed by plaintiff for the taxable years 1979 and 1981, as a result of deductions taken in 1980 through 1983 on the refund claims filed on October 12 and 13, 1988, which tentatively caused an increase in plaintiff's tax liabilities for 1979 and 1981. The Service, therefore, assessed the following amounts, which plaintiff paid on October 12 and 13, 1988:

| DATE ASSESSED | TAX YEAR | ADDITIONAL TAX | INTEREST | TOTAL |
|---|---|---|---|---|
| 10/12/88 | 1979 | $ 611,160 | 0 | $ 611,160 |
| 10/12/88 | 1981 | 374,862 | 443,705 | 818,567 |
| 10/13/88 | 1979 | 343,481 | 0 | 343,481 |
| TOTAL | | $1,329,503 | $443,705 | $1,773,208. |

May 18, 1980. At 8:32 a.m., on that day, the eruption sequence began with an earthquake which set off an avalanche of material from the northern slope of the volcano that travelled into the valley of the North Fork of the Toutle River. A lateral blast of erupting gases blew out of the volcano within 20 or 30 seconds. Consequently, the valley of the North Toutle River was filled with an avalanche of debris to a depth of 600 feet, which flowed westward 14 miles down the canyon of the North Fork of the Toutle River to plaintiff's Camp Baker.[12] To the north of the crater, the lateral blast formed nearly a 180–degree arc, which measured 23 miles from east to west and extended from the mountain crest north-westward for about 18 miles. Almost all life was destroyed within that area which was nearly six miles wide. On the rim of that zone, and extending out to the near edge of the blast area, trees were substantially denuded and toppled; however, on the outer rim of the blast zone, trees were left standing but seared and killed by the heat. The eruption and subsequent lava flow melted the glacial ice and snow on the mountain and buried or disrupted stream channels, producing dozens of severe mud flows. In turn, these mud flows generated floods in both the North and South Forks of the Toutle River, flooding the Cowlitz River below it and carrying mud and silt into the Columbia River. The mud flows tore down and carried away stream-side trees and stored logs, swept up buildings and automobiles, washed away miles of roads, destroyed bridges, and severely damaged three of plaintiff's logging camps.

In short, the record shows that Mt. St. Helens' eruption and its aftermath had a devastating physical affect on plaintiff's Southwest Washington Region, damaging approximately 68,000 acres of the Mt. St. Helens Tree Farm. More specifically, the eruption damages or destroyed significant amounts of plaintiff's mature and immature timber, logging roads and Woods Railroad systems. Following the eruption, Weyerhaeuser obtained aerial photographs of the damaged area. Mr. Peck, the Longview region's inventory forester at that time, used these photographs in conjunction with the FIRS system when he mapped the location and quantity of damaged timber. A special "overlay" was then created in the FIRS system to track the timber affected by the eruption and to stratify the different types of damage. This technique enabled Mr. Peck to obtain a precise view of the timber damages or destroyed by the eruption. Of the 68,227 acres directly affected by the volcano, 60,466 acres contained timber one-year-old or older. Completely buried by the avalanche and mud flows were 10,268 acres of timberland. Another 20,185 acres were killed or knocked down by the blast. The balance of the affected acreage was either non-stocked timberland, non-forested land, or "ribbon" acres, such as roads, lakes, and streams. In total, 1,671 stands of timber were affected by the eruption, either by the blast, mud flows, water or other related events.

Plaintiff's initial inclusive damage report to its board of directors stated that the actual volume of timber adversely affected was 3,033,000 cunits (CCF).[13] The largest impact in terms of acreage occurred in the young growth, or reproduction timber, consisting of timber 1–15 years of age. Timber 90 years of age or older was the largest volume damaged or destroyed (*i.e.*, 2,461,000 CCF); in that connection, over 30 percent of this age class of timber was directly affected by the eruption. To compensate for the damage done to its timber and transportation systems, plaintiff increased its harvest production in the southern district of the Southwest Washington region, shifting a number of its crews or logging groups from the north,

12. Weyerhaeuser was the largest private property owner affected by the eruption. The balance of the major destruction occurred on acreage owned by the National Forest Service and the Washington State Department of Natural Resources.

13. A cunit is a measure of the solid cubic volume of wood in logs or timber, expressed in terms of cubic feet. One cunit equals 100 cubic feet of wood and is usually abbreviated as "CCF" (where C = 100). Large volume measurements are sometimes expressed in thousands of cunits, abbreviated "MCCF" (where M = 1,000). One MCCF equals 1,000 CCF, which equals 100,000 cubic feet of wood.

which had been substantially affected by the volcano, to the south, which had not been affected by the eruption. For the most part, salvage logging began in September of 1980 and continued through 1982. However, some salvage operations commenced as early as the day of the eruption. Forthwith salvage operations of the area were critical to prevent further deterioration of the directly affected timber. As a result, plaintiff retrieved more than 600 truckloads of salvaged timber each day during peak summer months.

Taxpayer initially estimated that the total loss in value of timber due to the eruption,[14] net after salvage, was approximately $240 million. A more precise valuation, allegedly, was later done by Ed Van Zandt, plaintiff's timber valuation expert. In his expert opinion testimony, he averred that Weyerhaeuser suffered a loss, i.e., a decline in fair market value (FMV), of its timber in the southwest Washington region (Mt. St. Helens Tree Farm) of 229,727,000 due to the volcanic eruption. Plaintiff, therefore, claimed a casualty loss deduction in the amount of $16,663,340, an amount equal to the total adjusted basis of the southwest Washington region.[15] The Service, however, allowed Weyerhaeuser a casualty loss deduction of only $2,071,235 for the damages sustained by the Mt. St. Helens Tree Farm as a result of the volcanic eruption in 1980. Of the total deduction allowed, $730,778 and $13,680 was allowed for old growth timber and regrowth timber, respectively. These amounts were calculated by multiplying the volume of timber lost by the 1908 per unit depletion amount determined under § 611 of the Code.[16] The remaining $1,326,777 deduction was for reproduction timber lost, computed by multiplying the acres of reproduction timber destroyed by an "allocated basis" figure representing Weyerhaeuser's average planting costs per acre for the region in the year the affected timber had been planted.[17] The Commissioner did not allow any casualty loss deduction for old growth and regrowth timber which was damaged but not destroyed by the eruption.[18] Given the foregoing, plaintiff contends that it is entitled to the difference between the $16,663,340 claimed as a casualty loss on its original return, and the $2,071,235 allowed by the Service, or $14,592,105.[19]

14. Mr. Peck testified that by using the FIRS II inventory data system and aerial photographs of the blast area, Weyerhaeuser was able to estimate the volume of standing timber in the old growth and regrowth stands, and acres of reproduction timber in each stand destroyed or damaged.

15. Under I.R.C. § 165, a taxpayer's deduction is limited to the *lesser* of the decline in fair market value and the adjusted basis of the property damaged or destroyed by casualty. § 1.165-7(b)(1).

16. For old growth timber, the 715,747 MBF destroyed was multiplied by the $1.02 depletion unit used in 1980 for old growth timber in the Mt. St. Helens block; for regrowth timber, the 95,000 CCF destroyed was multiplied by the $0.14 depletion unit used in 1980 for regrowth timber. "MBF" is defined in plaintiff's glossary to mean 1,000 board feet of timber. A "board foot" is a volume of wood equal to a 12 inch by 12 inch square, one inch thick, and M equals 1,000.

17. The foregoing computations made by the revenue agent with respect to volume of timber lost were the same as those done by Weyerhaeuser with respect to its write down of its old growth, regrowth and reproduction non-current asset accounts for financial reporting purposes. Taxpayer removed from (or adjusted) its non-current

asset account for depletion of Columbia Region No. 7 depletion block, the product of the depletion unit for said block times the volume of unsalvageable damaged or destroyed standing timber in the old growth and the regrowth account, respectively. With respect to reproduction, Weyerhaeuser removed from its non-current asset account for reproduction, the product of the number of acres lost times the average capitalized planting cost per acre.

18. However, on October 3, 1980, Weyerhaeuser sent a letter to the Service requesting a ruling on whether it could apply the provisions of § 1033 of the Code (deferral of gain from involuntary conversions) to dispositions of timber damaged by the May 18, 1980 eruption of Mt. St. Helens and subsequent activities of the volcano. The Service replied by letter on December 6, 1981, granting Weyerhaeuser's ruling request.

19. Both parties acknowledge that the casualty loss deductions claimed by plaintiff for losses to mature timber due to the eruption of Mt. St. Helens resulted in reduced deductions for cost depletion of mature timber in 1980 and subsequent years, and corresponding increases in gain under § 631(a) of the Code. These related adjustments are strictly mathematical results of Weyerhaeuser's claimed casualty loss deduction and will be taken into account in the parties' calculation and stipulation of the amount of the refund due, if any.

The amounts in issue with respect to the Mt. St. Helens casualty are summarized as follows:

| Item | Adjusted Basis | Casualty Loss Claimed | IRS Allowed | Amount At Issue |
|---|---|---|---|---|
| Old Growth | $ 2,789,908 | $ 2,789,908 | $ 730,778 | $ 2,059,130 |
| Regrowth | 1,104,684 | 1,104,684 | 13,680 | 1,091,004 |
| Subtotal | $ 8,894,592 | $ 3,894,592 | $ 744,458 | $ 3,150,134 |
| Reproduction | 12,768,748 | 12,768,748 | 1,326,777 | 11,441.971 |
| Totals | $16,663,340 | $16,663,340 | $2,071,235 | $14,592,105. |

---

## C. *Logging Road systems/Woods Railroad Casualty—Facts*

In order to provide access to its marketable timber for the purpose of removing it, Weyerhaeuser constructed logging roads on its timberlands in anticipation of harvest. The logging road systems are tracked in connection with the harvest settings as part of the Woods Operating Plan process. To the extent that a harvest is planned in a particular geographic area, Weyerhaeuser takes into account the topography of the area, the timber to be harvested, and the kind of equipment required in the harvesting when planning where and how to construct the necessary logging roads. Such roads in the Longview region (Southwest Washington), designated as "primary" and "secondary" road systems, are assigned four digit numbers roughly associated with the geographic areas they serve. Generally, a "primary" road system consists of a primary haul road or mainline road, and the "secondary" logging road systems interconnect or feed into the primary road systems.

The eruption of Mt. St. Helens damaged or destroyed approximately 640 miles of logging roads that were a part of the Mt. St. Helens Tree Farm logging road systems. Affected were the 3500 primary system, the 3500 secondary system, the 2500 primary system, the 2500 secondary system, the 1900 secondary system, the 4100 primary system, and the 4100 secondary system. The damage to these road systems was caused by avalanche debris, mud flows, ash, and blown-down timber. The adjusted tax bases for these primary and secondary road systems as of May 18, 1980, for purposes of computing the limitation on the claimed casualty loss deduction under Treas.Reg. § 1.165–7(b), totalled $12,369,346. Aggregate diminution in fair market value for the seven (7) primary and secondary road systems was $9,902,545, determined by plaintiff on the basis of cost of repairs as permitted by Treas.Reg. § 1.165–7(a)(2)(ii). After applying the § 1.165–7(b)(1) limitation with respect to each separate road system, the aggregate deduction claimed by taxpayer for the seven (7) roads in 1980 was $6,426,348.

■ On audit, the Commissioner allowed only $5,163,926 of Weyerhaeuser's claim for casualty losses to its logging roads. In computing this amount, the revenue agent determined the percentage of miles of each road system that was directly damaged or destroyed by the eruption and multiplied the adjusted tax basis of the particular system by the same percentage. The amount allowed was the *lesser* of the diminution in fair market value of the system (which here was measured by the cost of repairs or to restore pursuant to Treas.Reg. § 1.165–7(a)(2)(ii)), established by Kendall Kramer,[20] and the

---

[20] Mr. Kramer was the Assistant Contract Road Supervisor in charge of road construction at the time of the eruption. Mr. Smith, the tax accounting manager for Weyerhaeuser, testified that the revenue agent relied on Mr. Kramer's valuation figures when determining the limit on plaintiff's casualty loss deduction with respect to the logging roads. The court is constrained to observe that a tax refund suit in this court is a trial *de novo*. *Warren Corp. v. United States*, 135

percentage of basis determined by the Service. Given the foregoing, Weyerhaeuser now claims that it is entitled to deduct in 1980 the additional amount of $1,262,422, which was previously disallowed by the Service with respect to the casualty losses to its logging roads.

Similar to the road system, plaintiff's Woods Railroad transported logs within the Mt. St. Helens Tree Farm area from the timber harvesting sites to its manufacturing facilities. At the time of the eruption, the railroad consisted of 51.82 miles of track, including side tracks and spurs, extending out to Camp Baker on the North Fork of the Toutle River. The post-eruption floods damaged or destroyed 18.63 out of 51.82 (*i.e.*, 35.95%) miles of track of the Woods Railroad. In the process, it washed out bridges and covered track with mud up to 20 feet deep. The remaining 33.19 miles of track were left undamaged. The decline in fair market value of the entire railroad was alleged by plaintiff to be $7,339,699. This amount was based on the expert opinion testimony of a railroad construction estimator, premised on cost to repair. Because said diminution in value was in excess of the total adjusted basis of the

Woods Railroad as of May 18, 1980, taxpayer claimed the entire $2,246,682 adjusted basis of the Woods Railroad as a casualty loss deduction in 1980 deeming it to be the single identifiable property (SIP). Treas.Reg. § 1.165–7(b)(2). The Commissioner, however, allowed only $820,039 of plaintiff's claimed casualty loss. Since taxpayer had lost 36.5% of its asset (rounded to whole numbers, 19 miles of track lost out of 52 total miles equaled 36.5% lost), Weyerhaeuser was allowed to deduct only *that* percentage of its basis in the railroad. The remaining $1,426,-643 claimed by plaintiff was disallowed and represents plaintiff's railroad casualty loss 1980 refund claim in issue.

### D. *Fire Casualties—facts*

■ Plaintiff also alleges that it suffered casualty losses to its mature and immature (reproduction) timber as a result of numerous forest fires [21] during the taxable years 1980 through 1983. The parties have stipulated to the occurrence of 319 fires, and plaintiff has waived its right to claim any additional fire casualties with respect to reproduction timber not specifically identified in the stipulation for the specified tax years.[22]

Ct.Cl. 305, 314, 141 F.Supp. 935 (1956); and *Mulholland v. United States*, 28 Fed.Cl. 320 (1993), aff'd, 22 F.3d 1105 (Fed.Cir.1994).

resulting therefrom are deductible as casualty losses within the meaning of those provisions.

**21.** Forest fires may, of course, be casualty events within the meaning of § 165 of the Code and Treas.Reg. § 1.165–7(a). Accordingly, any losses

**22.** The following table depicts the number of fires in each region and the year in which they occurred:

Number of Fire Per Region And Acres* Involved

| Region | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|
| Cascade Region | 0(0) | 1(67) | 0(0) | 1(145) |
| Twin Harbors Region | 1(21) | 0(0) | 1(3) | 0(0) |
| Everett Region | 0(0) | 1(14) | 3(434) | 7(37) |
| Southwest Washington Region/Longview | 1(10) | 0(0) | 2(48) | 2(378) |
| Coos Bay Region | 1(33) | 0(0) | 0(0) | 0(0) |
| Springfield Region | 3(512) | 0(0) | 0(0) | 0(0) |
| Klamath Falls Region | 0(0) | 1(193) | 0(0) | 0(0) |
| Oklahoma Region | 54(3,911) | 3(99) | 2(35) | 6(310) |
| Southwest Arkansas Region | 23(1,263) | 9(199) | 8(204) | 10(182) |
| Central Arkansas Region | 45(970) | 2(3) | 8(296) | 16(314) |
| Mississippi Block | 2(17) | 5(141) | 2(106) | 4(50) |
| Alabama Block | 7(170) | 4(330) | 2(43) | 4(117) |
| North Carolina Region | 35(849) | 21(1,405) | 9(1,830) | 13(375) |
| TOTALS | 172(7,756) | 47(2,451) | 37(2,999) | 63(1,908) |

GRAND TOTAL: 319 FIRES
GRAND TOTAL: 15,114 ACRES ( )
*All acreage figures have been rounded up or down to the nearest whole number.

In said stipulation, the parties have agreed as to the date, year, age, and acreage of the reproduction (immature) timber destroyed by each fire, and to the fact that the losses claimed by plaintiff with respect to regeneration fires were not compensated by insurance or otherwise. In 1980, two of the stipulated fires in the Springfield region, *i.e.*, the Rocky Top fire and the Galena Ridge fire, affected both mature and immature timber.[23] All of the other stipulated fires in the several regions affected only immature timber.

Plaintiff's expert witness, Mr. Van Zandt, in determining the amount of loss deductible pursuant to § 1.165–7(a)(2)(i), respecting damage to mature timber as a result of the Rocky Top and Galena Ridge fires, based said loss on five (5) associated fire casualties as follows: (i) total loss—unsalvageable timber; (ii) total loss—logs in fell and bucked and decked right-of-way; (iii) value loss—salvaged export hemlock/white fir downgraded to domestic; (iv) value loss—domestic burned v. unburned logs; and (v) volume loss—salvage logs. In determining the amount of loss as to each fire-affected scenario, he simply multiplied the volume of timber damaged (*i.e.*, CCF or MBF) by the deemed appropriate rate or value.

On audit, the commissioner allowed only a portion of Weyerhaeuser's claimed fire casualty losses for each year in issue, as follows:

| Rocky Top and Galena Ridge Fires (Mature Timber): Merchantable Timber | Claimed Loss In FMV | Deduction Claimed | Deduction Allowed | Amount At Issue |
|---|---|---|---|---|
| Unsalvageable timber | $ 97,700 | $ 97,700 | | |
| Logs felled & bucked and decked right-of-way | 414,343 | 414,343 | | |
| Salvage export downgrade to domestic (H/WF) | 100,350 | 100,350 | | |
| Domestic burned vs. unburned | 554,645 | 544,645 | | |
| Salvaged logs | 69,734 | 69,734 | | |
| | $1,236,780 | $1,236,780 | $2,931 * | $1,233,849 |

* This figure was computed by multiplying the same figures for timber volume lost that Mr. Van Zandt used in the depletion unit for old growth timber in the Springfield block in 1980 under § 611 of the Code.

| Year | Reproduction Fires No. of Fires | No. of Region Fires | Acres Lost | Aggregate Block Basis | Loss FMV | Allowed By IRS | Amount At Issue |
|---|---|---|---|---|---|---|---|
| 1980 | 172 | 10 | 7,756 | $159.3M | $2,448,450 | $340,646 | $2,107,804 |
| 1981 | 47 | 9 | 2,451 | 158.5M | 992,201 | 184,813 | 807,388 |
| 1982 | 37 | 9 | 2,999 | 156.3M | 1,365,562 | 190,836 | 1,174,826 |
| 1983 | 63 | 9 | 1,908 | 155.9M | 650,998 | 182,131 | 468,867 |
| Total | 319 | 37 | 15,114 | $630.0M | $5,457,211 | $898,426 | $4,558,885. |

With respect to the reproduction fires, *i.e.*, timber ranging from 1 to 20 years of age, regarding amounts allowed on audit, the Service multiplied the total number of acres plaintiff lost by an "allocated basis" figure representing Weyerhaeuser's average reproduction cost per acre for the respective block in the year in which the affected timber had been planted, to arrive at the allowed deduction.[24] The total amount in issue with re-

23. According to plaintiff's records, two stands were affected by the Rocky Top fire and five stands by the Galena Ridge fires, for a total volume of 32,570 CCF of affected timber, and 4,885 CCF of destroyed timber.

24. Initially, when filing its federal income tax returns for the taxable years 1977 through 1983, Weyerhaeuser *did not* report a casualty loss deduction for the reproduction timber destroyed by the 319 fires; instead, it merely deducted from ordinary income the costs to plant replacement reproduction trees. Later, when the Service audited Weyerhaeuser's returns in late 1984 and early 1985, Weyerhaeuser was informed by the Service that it was not allowed to deduct said costs from ordinary income but must instead capitalize that amount. The Service also informed Weyerhaeuser that, in capitalizing its re-

spect to all of the fires, both the mature and reproduction timer is $5,792,734 ($1,233,849 and $4,558,885), respectively).[25] Plaintiff claimed as its loss the decline in fair market value of the fire-affected timber in each block, those amounts being less than the adjusted bases of the corresponding affected blocks (which taxpayer considered to be the single identifiable property) in the respective years of the fires.

### E. Southern Pine Beetle Casualty—Facts

The southern pine beetle is a small insect, dark brown or black in color and about one-eighth inch long, and lives in pine trees, preferring loblolly and shortleaf species. They live inside the bark of the pine tree and feed on the cambium or inner bark layer, usually attacking the main trunk of a tree in the upper two-thirds of the stem. In the process of laying their eggs in "egg galleries" that have a unique S-shaped pattern, they burrow through the exterior bark to the cambium layer. Adult beetles will then exit the tree and proceed to infect other pine trees. When the eggs hatch, the larvae start feeding within the tree and eventually mature and exit the tree to also go on to another. These beetles are always present in southern pine forests at *low* population levels, although the number of affected trees are normally insignificant from a forest management perspective. Southern pine beetles can kill a

tree in a matter of days in the hot summer months. Usually, these dead or dying trees are identified by the discoloration of their needles and by the dust that is excreted by the beetles themselves which accumulates at the base of the infected tree.[26]

Early in 1980, Weyerhaeuser became aware of the potential problem with the southern pine beetles in its Mississippi/Alabama region, and responded by conducting aerial reconnaissance of the area along with modest ground verification. The Mississippi Forestry Commission declared that by June of 1980, "twenty-one counties in east and central Mississippi were experiencing epidemic populations of the [southern pine] beetle." PX 48 at W0196107; Tr. 1175–76. Where possible, Weyerhaeuser began operations to salvage the timber believed impacted by the beetles. What constituted salvageable timber depended on the size and location of the trees infected, the value of those trees, and whether the timber was accessible.[27] In all, plaintiff alleges that, as a result of the southern pine beetle infestations, it lost 50.75 MCCF (50,750 cunits) of merchantable timber, 15.25 MCCF (15,250 cunits) in Mississippi, and 35.50 MCCF (35,500) cunits) in Alabama.[28] The 50,750 cunits were composed of 31,972 CCF of pine saw timber and 18,778 CCF of pine pulp wood with a § 631(a) value[29] of $61 per CCF and $6 per CCF, re-

---

planting costs, it would then be entitled to a casualty loss deduction for the seedlings that were burned and required to be replanted. Accordingly, in its October 1988 claim for refund, Form 1120X, Weyerhaeuser claimed a casualty loss deduction with respect to the fires affecting reproduction for the years 1980 through 1983.

**25.** Both parties acknowledge that the casualty loss deductions claimed by plaintiff for losses to mature timber due to the Rocky Top and Galena Ridge fires in the Springfield region in 1980 result in reduced deductions for cost depletion of mature timber in subsequent years, and corresponding increases in gain under § 631(a) of the Code. These related adjustments are strictly mathematical results of Weyerhaeuser's claimed casualty loss deduction and will be taken into account in the parties' calculation and stipulation of the amount of the refund due, if any.

**26.** Another method by which a forester can identify that southern pine beetles have burrowed into a tree is by locating what is called a "pitch tube." Tr. 1111–12. This is a pocket of resin

excreted from the hole through which beetles enter the tree and onto the outer bark. It is a defense mechanism of the tree.

**27.** Based on the testimony of Mr. Darrel Maddox, it would not be economically feasible to access an area of affected timber where that area was less than 10 acres.

**28.** Defendant objects to these figures because the hard copy records of Weyerhaeuser which support such facts were destroyed some time prior to trial. That is, defendant claims that there are no dot grids from the aerial reconnaissance flights, no aerial photographs, no inventory update sheets, and no identification of affected stands from which the court can determine if plaintiff actually suffered a casualty with respect to the southern pine beetles, and if so, where and what number of trees were affected. The issues arising from this destruction of records shall be discussed *infra*.

**29.** *See* 26 U.S.C. § 631.

spectively, for an aggregate loss of $2,062,-960. The Commissioner, however, did not allow any of plaintiff's claimed casualty losses with respect to the alleged southern pine beetle infestation. Instead, the Service permitted plaintiff to take an ordinary loss deduction in the total amount of only $293,080, *i.e.*, $174,155 (15,250 CCF × $3.35) for Alabama. The Service computed this amount by multiplying the volume of timber allegedly lost by an allocated basis figure per CCF for each depletion block. Therefore, the amount at issue with respect to the southern pine beetle casualty losses is $1,769,880, and may be summarized as follows:

| Unsalvage Timber | Volume CCF | | 1980–§ 631(a) Value | Total |
|---|---|---|---|---|
| Pine Saw Timer | 31,972 | × | $61 | $1,950,292 |
| Pine Pulpwood | 18,778 | × | 6 | 112,668 |
| Total Loss | | | | $2,062,960 |

| | | | |
|---|---|---|---|
| Mississippi Region | 15,250 ccf = 30%– | $619,885 | |
| Alabama Region | 35,500 ccf = 70%– | $1,443,075 | |
| | | $2,062,960 | |

IRS Allowed:

$$15,250 \text{ ccf} \times \$11.42 = \$174,155$$
$$35,500 \text{ ccf} \times \$3.35 = \$118,925$$

293,080

Amount in Issue $1,769,880.

---

## CONTENTIONS

A. *Casualty Events—Mt. St. Helens, The Fires, And The Southern ·Pine Beetle Infestation*

The parties agree that the eruption of Mr. St. Helens and the 319 fires suffered by plaintiff were casualty events within the meaning of § 165 of the Code.

With regard to the beetle infestation, however, the parties are not in agreement that a compensable casualty occurred or has been proven. According to plaintiff, of course, the southern pine beetle infestation which affected its trees in the Mississippi/Alabama region(s) is a casualty event within the meaning of § 165 and Treas.Reg. § 1.165–7 because it was "sudden, unusual, and unexpected." Conversely, defendant avers that "the pine beetle losses [claimed by plaintiff] are not· casualties," in that plaintiff has failed to prove either that the beetles' attack on the trees was sudden and unexpected, or that the alleged casualty even occurred. Primarily, defendant based its contention on the fact that plaintiff destroyed its records as to the situs and the number of trees that were actually affected by the alleged infestation.

B. *The "Single Identifiable Property"—The Subject Matter of the Losses*

1. *Plaintiff*

Taxpayer avers that, for *each* region suffering a casualty event, its *entire depletion block*, established in accordance with I.R.C. § 611 and the regulations thereunder, constitutes *the* "single identifiable property damages or destroyed" referenced in Treas.Reg. § 1.165–7(b)(2) for purposes of determining the diminution in fair market value and, if appropriate, the adjusted basis limitation in any casualty loss deduction. Treas.Reg. § 1.165–7(b)(1). In support of its position, plaintiff cites to *Westvaco Corp. v. United*

*States,* 225 Ct.Cl. 436, 639 F.2d 700 (1980).[30] Plaintiff strenuously contends that the holding therein is controlling and dispositive of the "single identifiable property" (SIP) issue in the case of an industrial timberland owner that manages its timberlands and bases its depletion blocks on "forest level management practices." For the logging road systems and the Woods Railroad, plaintiff also argues that *Westvaco* definitively instructs that each separate asset system *in its entirety* serves as a single identifiable property for purposes of determining the parameters of the casualty loss.

### 2. *Defendant*

The government, on the other hand, vehemently denies that the *Westvaco* decision is dispositive and controlling of the foregoing issues. It alleges that the determination of what constitutes the "single identifiable property" in any particular case is always a question of fact. Accordingly, the government argues that the unique operative facts adduced in this court establish that the *timber stand* constitutes taxpayer's SIP. Defendant further argues that *Westvaco* is distinguishable from this case in several respects, specifically that the *Westvaco* court—(i) neither addressed, nor was presented with, the existence of a *timber stand* argument and the issue of whether it would have been more appropriately considered to be *the single identifiable property* in that case, (ii) did not have to address the issue of whether one casualty event could result in both a casualty gain and a casualty loss, and (iii) did not consider the issue of reproduction timber and related sub-issues. With respect to the logging roads and the Woods Railroad, defendant also contends that the single identifiable property, for purposes of those casualty losses, is some linear or volume unit of each asset and *not* each entire road system and railroad as plaintiff contends.

### C. *Adjusted Basis Of The Properties*

#### 1. *Plaintiff*

Taxpayer alleges that it has established the adjusted tax basis of each of the depletion blocks that it contends constitutes a single identifiable property (SIP) respecting each casualty event. It has similarly established the adjusted bases of the logging road systems and the Woods Railroad in their respective entireties.

With respect to the Mt. St. Helens region only, taxpayer maintains that because the property was purchased prior to March 1, 1913, its adjusted tax basis is the property's fair market value as of that date pursuant to I.R.C. § 1053.[31] In other words, it argues that the requirement of this section, that March 1, 1913 fair market value be used for *gain* calculation, but that pre-March 1, 1913 cost basis be used for *loss* calculation, is not applicable to casualty losses.

#### 2. *Defendant*

Defendant's contends, conversely, that the timber stand, rather than the depletion block, is the single identifiable property. The government, therefore, avers that since plaintiff has failed to offer proof of the adjusted tax basis of the timber stand(s), it has not met its burden of proving either its adjusted bases or its deductible losses respecting the three casualty events.[32] The same holds true with respect to the logging roads and the railroads. The government contends that plaintiff must provide an adjusted basis for each small linear unit of the roads and

---

**30.** Hereinafter, all citations to *Westvaco* will be made solely to the Federal Reporter.

**31.** Section 1053 of the Code provides that basis is the fair market value of the property as of March 1, 1913, instead of the actual cost of the property as of that date, for gain determinations only. *See* § 1053. Conversely, when determining whether a party has suffered a loss, § 1053 requires the taxpayer to use historical cost basis for property purchased prior to March 1, 1913, the date on which the Internal Revenue Code was first adopted.

**32.** Plaintiff, during its oral argument, admitted to the court that it has failed to offer any proof as to fair market value of the SIP (immediately before and after the casualty) or adjusted basis of the *affected timber stands.* Tr. 231–33. *All* of plaintiff's proof with respect to these pertinent issues has been proffered solely on the basis that *the* "single identifiable property" is the *depletion block* and not the smaller but totally affected timber stand unit. *Id.*

railroads, *i.e.*, the mile(s) destroyed or damaged. Plaintiff, however, has set forth only the basis of each logging road by primary and secondary road system and the adjusted basis of the entire Woods Railroad.

Additionally, defendant contends that specifically with regard to the timber damages or destroyed by the Mt. St. Helens eruption, it is critically important to note that the amount indicated by plaintiff as its adjusted tax basis in the Columbia Region No. 7 depletion block should be adjusted down for pre-March 1, 1913 appreciation. In short, defendant rejects taxpayer's hospitable interpretation that § 1053 is inapplicable to casualty losses, and asserts that the proper "adjusted basis" calculation for purposes of determining plaintiff's casualty losses with respect to the eruption should begin with plaintiff's "cost" basis, and not plaintiff's "fair market value" of the property, as of March 1, 1913.

### D. *Insurance Or Other Proceeds, Salvage And § 631 Casualty Gain*

#### 1. *Plaintiff*

Finally, Weyerhaeuser contends that with regard to all the casualty events presently before this court, it has been in no way compensated for any losses in issue as a result of insurance or otherwise. Further, plaintiff avers that with respect to the salvage value remaining in the timber damaged by the volcano, said amount was taken into account in determining the amount of its casualty loss, and was *not* treated as compensation for the loss. Moreover, plaintiff contends that any salvage proceeds received as a result of a casualty are to be treated as *separate* taxable events that occur *after* the loss transaction is closed and does not affect the determination of the loss in the first instance. Accordingly, the *proceeds* later received by plaintiff, which amounted to a § 631 gain, and were subsequently deferred by the IRS under § 1033[33] of the Code, did not affect the amount of the casualty loss deduction taken by plaintiff with regard to the eruption. According to plaintiff, given these circumstances, there was no "casualty gain" as alleged by defendant.

#### 2. *Defendant*

Although defendant, in essence, concedes that plaintiff was not reimbursed by "insurance or some other form of compensation" with respect to the 319 fires, defendant does aver that plaintiff was in fact partially compensated for the property damaged during the Mt. St. Helens eruption in that plaintiff received salvage proceeds during the taxable years 1980 through 1983 as a result of the sale of eruption timber. In fact, defendant goes so far as to contend that there was *no* casualty loss *at all* with respect to the Mt. St. Helens eruption because plaintiff had a § 631 gain as a result of the sale of the damaged timber in said casualty event, which was then deferred by the IRS under § 1033 of the Code. In defendant's opinion, therefore, plaintiff did not suffer a casualty loss, but in fact realized a "casualty gain."

As to the southern pine beetles incident, defendant contends that although Mr. Maddox, a forest planner for Weyerhaeuser, testified that Weyerhaeuser did not receive any insurance or reimbursement from other sources, there is no way to prove that the timber salvaged from the alleged beetle infestation was not included in the loss amount claimed by plaintiff because neither Mr. Maddox nor Mr. Smith[34] testified to said fact and there are no records to prove otherwise.

### DISCUSSION

### A. *In General, § 165 Burden*

In federal income tax refund suits, there is a *strong rebuttable presumption* of the correctness of the determinations of the Commissioner. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Danville Plywood Corp. v. United States,* 16 Cl.Ct. 584, 593 (1989), *aff'd,* 899 F.2d 3 (Fed. Cir.1990); *Tucker v. United States,* 8 Cl.Ct. 180, 186 (1985); *Snap–On Tools, Inc. v.*

---

**33.** *See* Appendix A for the text of I.R.C. § 1033.

**34.** Mr. Thomas Smith is Weyerhaeuser's assistant director of taxes, quality, and tax accounting. Tr. 46.

*United States,* 26 Cl.Ct. 1045, 1055 (1992), *aff'd,* 26 F.3d 137 (Fed.Cir.1994). Consequently, before the defendant is obligated to go forward with the evidence, the taxpayer first has the *heavy* burden of rebutting said presumption and affirmatively establishing entitlement to a specific deduction by a preponderance of the evidence.[35] *Danville,* 16 Cl.Ct. at 593–94; *Tucker,* 8 Cl.Ct. at 186. Additionally, because it is well settled that deductions under the Internal Revenue Code (Code) are a matter of grace and not of right, unless the taxpayer can specifically show, by a preponderance of the evidence, that a statute or regulation unquestionably entitles it to a deduction on the adduced proof, the taxpayer will not be allowed the deduction sought. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934).

At issue at bar, of course, is plaintiff's entitlement to casualty loss deductions under § 165 of the Code and applicable regulations stemming from a volcanic eruption, 319 fires, and the alleged infestation of a portion of its forest by southern pine beetles. That section of the Code provides, in pertinent part, as follows:

(a) General Rule—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) Amount of Deduction—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

In addition to the foregoing statutory provision, the deductions, at bar, implicate several sections of related Treasury Regulations and, in view of such circumstance, those several regulations are contained in Appendix A attached hereto, and will be appropriately discussed, *infra.* In short, and to prevail on each claimed casualty loss deduction, it is imperative that plaintiff establish each of the following elements by a preponderance of the evidence:

 (i) that a casualty event occurred within the taxable year and within the contemplation of Code § 165 and applicable regulation § 1.165–7(a)(1);

 (ii) that certain single identifiable property was damaged or destroyed (§ 1.165–7(b)(2)(i));

 (iii) that the loss is measured by the difference between the fair market value of the SIP before and after the event (§ 1.165–7(a)(2)(i));

 (iv) that the amount of the loss deductible shall be the *lesser* of—

 (a) the diminution in the fair market value of the SIP before and after the casualty,

 and

 (b) the adjusted basis of "the property involved," *i.e.,* the SIP (§ 1.165–7(b)(1), § 1.165–7(a)(2)(ii), and § 1.165–1(c)(1)); and

 (v) the loss must be bona fide (§ 1.165–1(b)).

### 1. *The Casualty Events: Mt. St. Helens Volcanic Eruption, The Fires, And The Southern Pine Beetle Infestation*

■ Both parties are in agreement as to the existence of a casualty event with respect to the volcanic eruption of Mt. St. Helens on May 18, 1980. Likewise, based on the literal language of Treas.Reg. § 1.165–7(a), it is patently clear to the court that the 319 fires suffered by plaintiff constituted a compensable casualty event within the meaning of § 165(a). While, initially, in the Stipulation of June 19, 1992, defendant contended that said fires were *not* a casualty under § 165 of the Code, it later reversed its position, and conceded that the 319 stipulated fires were in fact a casualty event within the contemplation of § 165. Reply Brief for the United States at 9. This court agrees.

On the other hand, defendant strenuously contends that the southern pine beetle infes-

---

**35.** A preponderance of the evidence standard is defined in *Black's Law Dictionary* 1064 (5th ed. 1970) as that quantum of probative "evidence which as a whole shows that the fact sought to be proved is more probable than not," or "evidence which is more credible and convincing to the mind" or "that degree of proof that is more probable than not."

tations alleged by plaintiff *do not* constitute a casualty event within the meaning of § 165(a).

■ Given the foregoing, the only issue before this court with respect to the occurrence of the casualty event then is—whether an infestation of southern pine beetles at *epidemic* proportions constitutes a "casualty" under § 165(a) of the Code. We find, generally, that, based on pointed case law, an infestation of southern pine beetles, particularly in epidemic proportions, does constitute a casualty event under § 165. Specifically, Treas.Reg. § 1.165–7(a) provides that a taxpayer may deduct "any" losses to property sustained as a result of "fire, storm, shipwreck, *or other casualty.*" 26 U.S.C. § 165(a) (emphasis added). The term "other casualty" is not defined in either the statute [36] or in the Treasury regulations; nor does the legislative history of § 165 provide any guidance as to its meaning. *Maher v. Commissioner,* 76 T.C. 593, 596, 1981 WL 11360 (1981), *aff'd,* 680 F.2d 91, 92 (11th Cir.1982). As a result, courts have applied the canon of statutory construction, *ejusdem generis,*[37] to limit its meaning to a "loss proximately caused by a sudden, unexpected, or unusual event." *Id. See Matheson v. Commissioner,* 54 F.2d 537, 539 (2d Cir. 1931); *Krahmer v. United States,* 9 Cl.Ct. 49, 52 (1985), *aff'd in part, rev'd in part on other grounds,* 810 F.2d 1145 (Fed.Cir.1987); *Martin Marietta Corp. v. United States,* 3 Cl.Ct. 453, 455 (1983); *Nelson v. Commissioner,* 27 T.C.M. (CCH) 158, 161, 1968 WL 1157 (1968).

Infestations of southern pine beetles have been found, as a factual matter, to satisfy the "sudden, unexpected or unusual" test for a deductible casualty as set forth by the *Matheson* court. *Nelson,* 27 T.C.M. at 159–

162; *Black v. Commissioner,* 36 T.C.M. (CCH) 1347, 1351, 1977 WL 3159 (1977). Moreover, the United States Tax Court has held, as a matter of law, in *Smithgall v. United States,* 81–1 U.S.T.C. (CCH) ¶ 9121, at p. 86077 (N.D.Ga.1980), that "[a] mass attack of southern pine beetles *in epidemic proportions* is a sudden and unexpected occurrence causing an identifiable loss and is thus a deductible casualty within the meaning of § 165(c)(3) of the Internal Revenue Code." *Id.* (emphasis added).

We recognize, of course, the explicit language with regard to the holding in *Smithgall, Nelson,* and *Black* applies to cases involving individual taxpayers, and not corporations such as Weyerhaeuser. However, the operative language in § 165(c)(3) relating to individuals—"losses aris[ing] from fire, storm, shipwreck or other casualty"—is not significantly different from the language in Treas.Reg. § 1.165–7(a)(1)—"loss arising from fire, storm, shipwreck, or other casualty"—for persons other than individuals. This circumstance compels us to hold that, on the facts presently at bar, the distinction is not sufficiently significant to warrant a contrary holding. As in these cited cases, Weyerhaeuser contends that it allegedly suffered a loss of timber from the infestation of southern pine beetles in its Mississippi/Alabama region, which killed some and significantly reduced the value of others. Although it is true that the mere presence of *some* southern pine beetles is "normally expected" in a vast tract of timberland such as Weyerhaeuser's, the presence of such beetles in *epidemic* proportions therein is not.[38] Nor is such an occurrence expected or gradual. The *Nelson* court held that because death may

36. Section 165(c)(3) of the Code, which applies solely to individuals, contains similar language to that of Treas.Reg. § 1.165–7(a), namely, that a casualty loss shall be allowed as to property not connected to a business, "if such losses arise from fire, storm, shipwreck, or other casualty, or from theft."

37. The term *"ejusdem generis"* means "of the same kind, class or nature." *Black's Law Dictionary* 464 (5th ed. 1979). It is used as an aid in construing or interpreting statutes—
[W]here general words follow an enumeration of persons or things, by words of a particular

and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class of those specifically mentioned.
*Id.*

38. We note that it is probative that the Mississippi Forestry Commission declared that the infestation of southern pine beetles reached epidemic proportions in 21 counties in east and central Mississippi by June of 1980.

occur within 5 to 10 days from infestation, said event is significant enough to warrant a finding of "suddenness" within the meaning of "casualty" as prescribed by § 165 and its accompanying regulations. *Nelson*, 27 T.C.M. at 159. Moreover, even the *Black* court, which more conservatively approximated the death of a southern pine beetle infested tree to be approximately 30 days, held that said fact was "sufficiently sudden to be classed as a casualty under section 165(c)(3)," *Black*, 36 T.C.M. at 1351. Treas.Reg. § 1.165-7(a).[39] Given the foregoing, it is clear to this court, and we hold, that, based on the relevant law and the evidence in the record, the southern, pine beetle infestation in epidemic proportions constituted a "casualty" within the meaning of § 165 of the Code of Treas.Reg. § 1.165-7(a). Thus, since we hold that each of the three events constitutes a deductible casualty, the operative issue for the court to now decide is—what are *the proven deductible losses*, if any, stemming from said casualties.

B. *Determination Of The Allowable Deduction*

1. *General Principles*

"[T]he amount of the loss deduction allowable under [I.R.C. § 165] is [generally] limited to the lesser amount of either the decrease in market value of the property [the SIP] as a result of the casualty [except as provided in § 1.165-7(a)(2)(ii) ] or the taxpayer's basis in the property." *Rosenthal v. Commissioner*, 416 F.2d 491, 497 (2d Cir. 1969); Treas.Reg. § 1.165-7(b)(1). The determination of the allowable deduction, therefore, begins with the calculation of the loss itself with respect to *the SIP*. *Westvaco*

*Corp. v. United States*, 639 F.2d at 704; *see* Treas.Reg. § 1.165-7(b)(1)(i); *Helvering v. Owens*, 305 U.S. 468, 59 S.Ct. 260, 83 L.Ed. 292 (1939). Such amount is determined by subtracting the fair market value of the property (the SIP) immediately after the casualty from the fair market value of the property (the identical SIP) immediately before the casualty. Treas.Reg. § 1.165-7(b)(1)(i); *Alcoma Assoc. v. United States*, 239 F.2d 365, 367 (5th Cir.1956) (citing *Helvering*, 305 U.S. at 471, 59 S.Ct. at 262). The diminution in the property's (the SIP's) value is then compared to the adjusted basis of the *identical* property which was valued.[40] If the amount of the reduction in fair market value is *less* than the adjusted basis of the property, then, of course, the full amount of the decrease is allowed as a casualty loss deduction.[41] Treas.Reg. § 1.165-7(b)(1); *see Westvaco*, 639 F.2d at 702; *Rosenthal*, 416 F.2d at 493-94. On the other hand, if the decrease in the fair market value of the property *exceeds* the adjusted basis of the property, then the maximum deduction allowable as a casualty loss is the adjusted basis of the property affected by the casualty. *Id.*

The rationale for establishing adjusted basis as the ceiling above which a casualty loss deduction may not exceed is manifest and eminently logical.

Where the taxpayer suffers a loss from a destruction of market value greater than the cost of the property to him, that excess of value destroyed represents unrealized appreciation. And he may not claim a deduction for such loss because he has never recognized or paid a tax on the gain.

39. *See also Notter v. Commissioner*, 50 T.C.M. (CCH) 614, 616, 1985 WL 15011 (1985). There the Tax Court held that bark beetles do not constitute a casualty where plaintiff is unable to prove suddenness. The *Notter* court went on to compare its own case with that of the *Nelson* case, 27 T.C.M. at 159, wherein plaintiff was able to supply "ample evidence to establish that the time between the attack and the deaths of the trees was short—up to 30 days." *Id.*

40. The adjusted basis used is that "prescribed in § 1.1011-1 for determining the loss from the sale or other disposition of the property involved." Treas.Reg. § 1.165-7(b)(1)(ii).

41. While in this situation, the amount of the loss in value normally also serves as a limitation on the amount of the deduction, an exception exists. If the subject property is totally destroyed in the casualty event, the entire amount of the property's adjusted basis is allowed as the loss deduction even if the fair market value of the property immediately before the casualty is less than its adjusted basis. Treas.Reg. § 1.165-7(b)(1). This exception applies only to loss of property used in a trade or business, or held for the production of income. *Id.*

*Ward v. United States,* 192 Ct.Cl. 710, 716, 428 F.2d 1288, 1292 (1970), *cert. denied,* 400 U.S. 1008, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971) (quoting *Rosenthal,* 416 F.2d at 497). Indeed, "the purpose of § 165 is not to allow the taxpayer a full deduction for every loss in market value his property suffers by reason of a casualty." *Id.* Rather, § 165 allows merely the recovery of the cost of property when its value has been reduced by a casualty even in excess of historical cost. "In the extreme case, [however,] where the taxpayer's basis in the property damaged is zero, and its entire market value represents unrealized appreciation, he is entitled to no deduction despite the size of the loss, large as it may be." *Id.* (emphasis omitted). "Plaintiff cannot deduct future profits, nor can it deduct paper losses." *Westvaco,* 639 F.2d at 707. This restriction is explicitly manifest by the prohibition of § 1.165–1(b), which provides, in pertinent part, that—"Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss."

But of critical importance is the fact that *before* a taxpayer can determine the pre- and post-casualty fair market values *of the affected property* and the adjusted basis thereof (*i.e.,* the identical property), it must first define and know what constitutes the precise parameters of the "single identifiable property damaged or destroyed," because the regulation clearly limits the "loss incurred" to such "SIP." § 1.165–7(b)(2)(i).

### 2. The "Single Identifiable Property"— General Principles

■ The requirement that the taxpayer *must* specifically identify the "SIP" damaged or destroyed, for purposes of determining the diminution in fair market value of such property and the amount of the related adjusted basis *of same,* limits a casualty loss deduction. The effect is that "[a] taxpayer may not borrow basis from his unharmed

property in order to increase the amount of his loss deduction for an injury to his [damaged] property." *Rosenthal,* 416 F.2d at 497–98; *see Westvaco,* 639 F.2d at 708. The regulations specifically address the issue of aggregation of property for computing loss, stating that not only must loss be bona fide, § 1.165–1(b), but also "[a] loss incurred in a trade or business or in any transaction entered into for profit shall be determined ... by reference to the *single identifiable property damaged or destroyed."* Treas.Reg. 1.165–7(b)(2)(i) (emphasis added).[42] The rationale for construing narrowly the noun "property," so that the asset affected is defined in terms of the least common denominator involved in the casualty, is that "the identify of 'the property,' the loss of which will generate the deduction, must be reasonable in relation to the loss." *Westvaco,* 639 F.2d at 708. Furthermore, the propriety of such narrow construction is made apparent by the very language of the regulation. Therein, the term "property" is clearly adjectivally *defined and limited* by the phrases "single identifiable" and "damaged or destroyed." Treas.Reg. § 1.165–7(b)(2). These descriptives or modifiers unmistakably constrict the permissible interpretation of "property," rather than broaden it.

■ What constitutes *the* single identifiable property ("the SIP") damaged or destroyed in any particular casualty event, of course, is necessarily a question of fact.[43] *See Westvaco,* 639 F.2d at 704, 720 (stating that to determine what the SIP is, "it is necessary to consider the nature and extent of timber damaged ... [*i.e.,* the facts of the case]"); *Rosenthal,* 416 F.2d at 498, 500 (finding that the amount of a casualty loss shall be determined solely with reference to *the* property destroyed). Since a concept such as SIP is not susceptible of universal definition, that circumstance undoubtedly explains the refusal of Congress to provide one statutorily. In fact, even the term itself

---

**42.** The example provided in the regulations is that of business assets consisting of a building and ornamental fruit trees both affected by a casualty. The fair market values and loss calculations are to be considered *separately* for each. Treas.Reg. § 1.165–7(b)(2)(i). Treas.Reg. § 1.165–7(b)(2)(ii) applies to property not used in

a trade or business or in a transaction entered into for profit, and is not relevant to this discussion.

**43.** At the very least, we conclude that it is a mixed question of law and fact.

evinces its case-by-case determinative nature. Lastly, and because of such circumstance, the conclusion is inescapable that the regulations, by not defining the SIP, *implicitly*, if not emphatically, regard the issue to be one requiring an *ad hoc* determination, *i.e.*, case by case.

■ The only source or flicker of guidance as to what constitutes a SIP in a specific set of circumstances comes from the various court decisions on the issue. The usefulness of those decisions, of course, is limited by the degree of explicit factual similarity existing between the earlier opinions and the case to which their application is sought. Appellate resolution of a *prior purely factual matter* is not binding upon inferior courts in subsequent cases, *except, of course, upon facts that are identical in all material particulars.* Such is the nature of the resolution of a question of fact. *See Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557 (Fed.Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994). The antecedent precedent most relevant to the case at bar will, of course, be analyzed contemporaneously with the discussion of each casualty or issue. But first, it may be helpful to examine the rationale behind the allowable deduction(s) from which this case evolves in the context of other permissible deductions.

### C. *Purpose Of The Depletion And Casualty Loss Deductions*

Congress has long allowed taxpayers a deduction for the depletion of natural resources. "[That deduction] is permitted in recognition of the fact that [natural resources] are wasting assets and is intended as compensation to the owner for the part used up in production." *Parsons v. Smith,* 359 U.S. 215, 220, 79 S.Ct. 656, 660, 3 L.Ed.2d 747 (1959) (quoting *Helvering v. Bankline Oil Co.*, 303 U.S. 362, 366, 58 S.Ct. 616, 617, 82 L.Ed. 897 (1938)). "[The depletion] exclusion is designed to permit a recoupment of the owner's capital investment in the [natural resources] so that when [those

assets] are exhausted, the owner's capital is unimpaired." *Id.* (quoting *Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 312, 76 S.Ct. 395, 398, 100 L.Ed. 347 (1956) (first modification in original)). "In short, the purpose of the depletion deduction is to permit the owner of a capital interest in [a natural resource] to make a tax-free recovery of that depleting capital asset." *Id.* In the case of timber, the appropriate portion of the taxpayer's capital venture is generally and normally recovered *either* at the time the timber is cut or at the time of sale.[44]

The casualty loss deduction, on the other hand, serves a different purpose, *i.e.*, the correction of an abnormality, but its economic effect is not entirely dissimilar. While the depletion allowance gives back to the owner his monetary investment in the natural resource as he sells it, the § 165 loss deduction returns to the taxpayer his capital investment when his property is impaired before he has a chance to sell it. Thus, where a taxpayer suffers a loss of his property through no fault of his own,, and he is not compensated, such as through insurance recovery, etc., § 165 furnishes him a measure of *limited recompense* by excluding the amount of his out-of-pocket loss or his investment in the lost property from his taxable income in the year that the loss is sustained. *Miller v. Commissioner,* 733 F.2d 399, 406 (6th Cir.1984). Although the taxpayer "receives" proceeds from a sale prior to taking a depletion deduction but not before taking a loss deduction, the result in both cases is that he deducts only up to the amount of his investment in that asset, except, if course, in § 613 percentage depletion, from his income, in the specific property sold, cut, or damaged.

As stated previously, the loss deduction is limited to the cost of *the* specific property damaged to the taxpayer because that amount is all that is bona fide as having been actually lost. The value of *the* property may have increased, through growth or appreciation, and the owner may have been deprived of the chance to profit from this, but he has

---

**44.** Depletion actually takes place at the time of cutting, Treas.Reg. § 1.611–3(b)(1), but, in order to clearly reflect income, the depletion deduction is taken only when income or gain is recognized.

*Westvaco,* 639 F.2d at 712. Whether that recognition occurs at the time of cutting or sale depends upon whether the taxpayer has elected § 631 treatment of his timber property.

not truly economically *lost* may have been deprived of the chance to profit from this, but he has not truly economically *lost* anything other than *the* out-of-pocket cost incurred in obtaining the property in the first instance. Therefore, to allow a loss deduction over and above *the* related adjusted basis of *the SIP* damaged or destroyed would be tantamount to allowing impermissible deductions for anticipated profits or paper losses not contemplated by § 165. Similarly, and in such circumstance, to allow a deduction of the amount of adjusted basis in *undamaged* property (*i.e.*, outside of the SIP) would be to allow a deduction with respect to which a loss was *not* actually incurred, *i.e.*, a tax windfall. Therefore, by specifically limiting the deduction, as required, to the adjusted basis of *the* "single identifiable property damaged or destroyed," the taxpayer is made whole, without unjustly enriching him by conferring a windfall (by permitting the previously untaxed appreciation in undamaged property to be claimed as a casualty loss without ever having been previously realized and recognized for tax purposes). This process properly limits the deductible loss to "substance and not mere form" as required by § 1.165–1(b). Against this background, we address the operative issues in dispute with respect to each casualty event.

### D. *The Merits Of The Claims*

This case simply involves three types of alleged deductible casualty losses, *i.e.*, (i) loss from the eruption of Mt. St. Helens (which includes the damage, destruction, and the loss of mature and immature forest, several logging roads, and the Woods Railroad); (ii) timber losses resulting from numerous (319) forest fires; and (iii) timber losses resulting from the infestation of southern pine beetles at epidemic levels.

Code § 165, as previously noted, merely provides for and permits generally a deduction for "any loss sustained ... and not compensated for by insurance or otherwise." It gives no guidance as to how said loss is to be determined. Such light, *i.e.*, the indispensable elements for determining the deductible casualty loss, can only be found in the applicable regulations. *See* Appendix A.

For the sake of brevity, we shall discuss the various losses claimed by plaintiff according to the type and the manner by which the property was damaged or destroyed, rather than by its geographic juxtaposition.[45] Therefore, we will address all aspects of determining the allowable deduction, first with respect to the depreciable capital assets affected in the Mt. St. Helens region, then with respect to the depletable timber properties damaged by the Mt. St. Helens eruption and the forest fires (explicating the claimed amount, the amount disallowed, and the amount in issue). For each, we will consider, seriatim, what constitutes the SIP, the valuation of the loss, and the amount of deduction ultimately allowable. Because the existence of alleged timber losses resulting from the southern pine beetle infestation is in dispute, it will be discussed separately.

#### 1. *The Logging Road And The Railroad Casualties*

The volcanic eruption on May 18, 1980, damaged or destroyed 640.93 miles that were part of the Mt. St. Helens Tree Farm logging road systems. The primary and secondary road systems affected were as follows:

| ROAD SYSTEM | TTL MILES | TTL MILES AFFECTED = | MILES DESTROYED + | ACCESS MILES LOST + | MILES DAMAGED |
|---|---|---|---|---|---|
| 3500 primary | 12.60 | 12.60 | 12.60 | 0 | 0 |
| 3500 secondary | 435.10 | 392.58 | 92.30 | 45.70 | 254.58 |
| 2500 primary | 11.90 | 4.66 | 1.20 | 0 | 3.46 |
| 2500 secondary | 253.20 | 152.19 | .30 | 0 | 151.89 |
| 1900 secondary | 152.70 | .30 | .30 | 0 | 0 |
| 4100 primary | 23.5 | 5.75 | 5.75 | 0 | 0 |
| 4100 secondary | 408.30 | 72.85 | 10.70 | 21.91 | 40.24 |
| TOTALS | 1,297.30 | 640.93 = | 123.15 + | 67.61 + | 450.17. |

---

**45.** It is indisputable that the starting point for any non-personal casualty loss claim must commence with a determination of the SIP. *See* Treas.Reg. § 1.165–7(b)(2)(i). The evidence presented at trial shows that *the SIP* is of the same character or nature for the timber damaged or destroyed in all three alleged casualty events; therefore, examining taxpayer's claims along these lines will avoid redundancy.

In its claim for refund for taxable year 1980, plaintiff sought as a deduction the lesser of the diminution in fair market value (*i.e.,* the cost to repair or restore all road systems pursuant to § 1.165–7(a)(2)(ii)) and the adjusted tax basis for each separate road system ($6,426,348). The Commissioner allowed only the lesser of the diminution in fair market value (the cost to repair or restore, *supra*) and the *proportion* of the adjusted basis equal to the percentage that the miles of damaged tracks bear to the total miles of track of each road system ($5,163,926). The following chart summarizes, as to each road system, the diminution in fair market value, the adjusted tax basis, the amount of casualty deduction claimed, the deduction previously allowed, and the amount in issue:

| ROAD SYSTEM | ADJUSTED BASIS | DIMINUTION IN FMV | DEDUCTION CLAIMED | DEDUCTION ALLOWED | AMOUNT IN ISSUE |
|---|---|---|---|---|---|
| 3500 primary | $ 24,572 | $ 651,420 | $ 24,572 | $ 24,572 | $ 0 |
| 3500 secondary | 4,034,774 | 6,690,755 | 4,034,774 | 3,640,577 | 394,197 |
| 2500 primary | 85,629 | 68,650 | 68,650 | 33,532 | 35,118 |
| 2500 secondary | 1,517,201 | 689,350 | 689,350 | 689,350 | 0 |
| 1900 secondary | 2,447,331 | 10,200 | 10,200 | 4,895 | 5,305 |
| 4100 primary | 166,582 | 359,950 | 166,582 | 40,763 | 125,819 |
| 4100 secondary | 4,093,257 | 1,432,220 | 1,432,200 | 730,237 | 701,983 |
| TOTALS | $12,369,346 | $9,902,545 | $6,426,348 | $5,163,926 | $1,262,422 |

The total amount in issue, at first blush, for the seven road systems is $1,262,422. The ultimate amount deductible is, of course, affected by the proven SIP and the adjusted basis thereof, *infra.*

With respect to the Woods Railroad, Weyerhaeuser determined its lost diminution in fair market value based on cost to repair (§ 1.165–7(a)(2)(ii) to be $7,339,699. The adjusted basis on the company's books for the *entire* railroad was $2,246,682. Taxpayer, therefore, claimed as a deduction the entire adjusted basis remaining in the railroad because that amount was less than the diminution in value of the asset. The IRS previously allowed a deduction of only $820,039, computed by multiplying the percentage rate that the damaged track miles bear to the total track miles (*i.e.,* 36.5%) by the adjusted basis of the entire railroad system. The $1,426,643 difference in basis remaining in the railroad account was disallowed by the Service and is at issue. The foregoing facts are summarized as follows:

| Cost to replace/repair railroad: | Amount |
|---|---|
| (1) Undamaged line | $16,822,672 |
| Depreciation | 3,821,404 |
| Market value after eruption | $13,011,268 |
| (2) Destroyed line | $10,037,855 |
| Depreciation | $2,698,156 |
| Diminution in market value | $ 7,339,699 |
| (3) Adjusted tax basis | $ 2,246,682 |
| (4) IRS allowed (18.63/51.82 = 19/52 = 36.5% × $2,246,682) | 820,039 |
| Amount in issue | $1,426,643. |

### a. *The Single Identifiable Property.*

██ The real crux of the matter at bar, insofar as whether plaintiff is entitled to an additional deduction of $1,262,422 as to the several road systems and $1,426,643 as to the railroad, turns on the question of what the appropriate SIP is with respect to which each of the incurred losses shall be determined. Treas.Reg. § 1.165–7(b)(2)(i). In each instance, *supra*, plaintiff utilized the estimated cost of repairs approach, based on

expert opinion testimony, in arriving at the approximate *diminution* in fair market value. We find on this record that such evidence reasonably and proximately satisfies Treas.Reg. § 1.165–7(a)(2)(ii), and that defendant adduced no probative evidence to the contrary. Therefore, the dispositive issue to be resolved respecting plaintiff's entitlement to the additional deductions, *supra*, is— whether each *entire* separate road system is the SIP, or whether it is some *lesser* unit, *i.e.*, mileage, etc., as contended by defendant.

Based on the evidence presented by plaintiff, with particular consideration of the unique nature of these assets, and the rationale of prior relevant cases, we hold that *each* of the seven road systems and the *entire* Woods Railroad constituted separate single identifiable properties for casualty loss limitation purposes. Consequently, Weyerhaeuser may claim as a deduction the *lesser* of the diminution in fair market value and the adjusted basis of each separate road system and the railroad as a casualty loss.

Defendant's contention that the single identifiable property with regard to each of the logging roads and the Woods Railroad is some linear unit of measurement, such as a mile of road or track, is, on this record, untenable. Weyerhaeuser did not merely construct segments or miles of road and track as a viable asset; but rather, it built integrated road systems and a unitary railroad whose utility as assets derive from their functioning *as a whole*. A segment (*i.e.*, mile) of either system would generally have no significant utility. Those road systems were built and maintained as long-term assets to be used indefinitely in the business of facilitating the growing and harvesting of timber. While an entire road system or every mile of track might not be used each time plaintiff has to haul timber, the utility of each stems from the availability of the entire asset to Weyerhaeuser in operating its business. Regardless of the capacity to use less than the complete asset at any one time, they are each identified and truly valuable only as a whole.

The concept of these road assets is similar to that of a large edifice. If a commercial entity erects one building, the whole structure would be considered as one unit, *i.e.*, the SIP, notwithstanding the fact that one or more different groups or functions of the corporation occupy separate floors or sections of the building. If, for example, a casualty destroyed one portion of the structure, it could not be argued that the business should only be allowed to deduct the amount of basis attributable to that section of the building. Neither the fact that each function of the corporation operated independently nor the fact that the groups residing in the unaffected areas of the building continued in their performance of duty unimpeded by the casualty should affect the status of the structure as a single identifiable property. The entity constructed and maintained a single asset to be used as such in the conduct of its operations, and that is how it should be recognized.

To justify the propriety of treating the entire building as a single asset, we need only examine the alternative in its most extreme situation. If, instead of one section being destroyed, one floor or even one office was lost to a casualty, would it be reasonable and comporting with either logic or economic reality to limit the allowable deduction to the basis attributable to that one office out of an entire building? We think not, because the casualty loss deduction is designed to afford relief to a taxpayer who has suffered a loss of capital by making him, to the extent of such investment, reasonably whole.

The purpose of limiting the deduction to that of the adjusted basis remaining in *the* "single identifiable property" is to ensure that *only* the investment truly lost is used to offset income and to prevent the borrowing of basis from other assets to unreasonably increase the deduction. The regulation's purpose is manifestly *not* to enable the IRS to squeeze the deduction down to the smallest conceivable molecule of the taxpayer's venture, but rather to allow a loss that is reasonable and *bona fide*. Such a negative interpretation would be in direct conflict with the objective of the Code and the regulations. *See National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476–77, 99 S.Ct. 1304, 1306–07, 59 L.Ed.2d 519 (1979); *United*

*States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967).

Thomas Smith, plaintiff's tax accounting manager, testified that Weyerhaeuser identified each of its road systems and the Woods Railroad as individual capital assets and maintained separate accounts for each. Workpapers created in the maintenance of the accounts showed all costs accumulated and depreciation taken for each asset individually, and its adjusted basis at the end of each year. No subdivision of these systems was made by plaintiff for any reason related to *identification of the assets by the company.*[46] While a taxpayer's accounting for and hospitable identification of its own assets is certainly neither dispositive nor necessarily determinative of the tax treatment that they will ultimately receive, such things *may* be considered in determining the true identity of the single identifiable property.

Within the logging road systems and the Woods Railroad, plaintiff has also constructed bridges where necessary. On cross-examination, defendant elicited from Mr. Smith that only one of the bridges serving the Woods Railroad was capitalized and depreciated as a separate asset. The others within the railroad were considered to be part and parcel of the whole system and, accordingly, their costs were capitalized and depreciated in the one account maintained for the railroad. Mr. Smith could not explain why the one bridge was maintained separately on the company's books.[47] With respect to the bridges associated with the logging road systems, plaintiff's witness testified that each bridge was considered a single identifiable property separate from the logging road system which it served.[48] But regardless of the inconsistency of Weyerhaeuser's treatment of these assets, we hold that defendant's proposed determination of the single identifiable property on a unit of mileage basis, on this record, is unsupported by reason or logic.

The Woods Railroad and the road systems are not utilitarian assets that are commercially segmentable.[49] They cannot be indiscriminately broken into pieces and sold off in the marketplace in the ordinary course of business as a system. Rather, such systems were used in their entirety and depreciated in the same fashion. In fact, were they to be sold at all, they would undoubtedly be sold intact, and even then, only with the surrounding timberland, for therein lies the source of their true nature and value. In this connection, Mr. Smith testified that the timberlands could not be sold without selling the logging roads also, although he did state that under certain circumstances, a purchaser might use only a portion of the roads and abandon others. Assuming this to be true, that possibility would apply to a different

**46.** Government counsel regards as significant the fact that Weyerhaeuser reported its loss in the road and rail assets to its shareholders and the SEC by the mile unit. Counsel concludes that this evinces the segmentability of the road systems and the railroad. What defendant neglects to realize is that, with limited exceptions, companies must conform their financial reporting to generally accepted accounting principles (GAAP). In addition, publicly-traded companies, such as Weyerhaeuser, must adhere to additional reporting requirements promulgated by the SEC. Kenneth Stancato, Weyerhaeuser's vice-president and corporate controller, testified that the company's financial statements are prepared in accordance with GAAP. There are many differences between financial and tax accounting, and compliance with one cannot be bootstrapped into a determination of such method's propriety for the other. *See Old Colony R.R. Co. v. Commissioner,* 284 U.S. 552, 562, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932) (holding that "the rules of accounting enforced upon a carrier by the Interstate Commerce Commission are not binding upon the Commissioner, nor may he resort to the rules of that body, made for other purposes, for the determination of tax liability under the revenue acts").

**47.** That bridge was destroyed as a result of the eruption, so presumably its entire adjusted basis was claimed by plaintiff as a loss anyway.

**48.** Very small bridges (ones costing less than $15,000), however, were included in the account with the road system to which it belonged for the sake of convenience.

**49.** *Cf. Rosenthal v. Commissioner,* 416 F.2d at 500 ("[A]n automobile is both functionally and commercially a single unit. It cannot be divided into smaller parts without destroying both the utility and value of the whole."). Obviously, the assets at issue here are more susceptible to functional division in the sense that less than the whole may be used at any one time. However, similar to the automobile, these assets cannot be commercially divided, while at the same time maintaining the economic utility of the system.

owner, not plaintiff, with whom we are here concerned. For taxpayer's purposes, each asset system was used and recognized *in toto.*

The government also noted, in its attempt to establish recognition of the segmentability of the roads and railroad, that portions of these assets were destroyed, while others remained useful and operational. Specifically, defendant made much of the fact that sections of the railroad were destroyed, while the remainder continued to service the company in its operations. Also, parts of the railroad that were retired by plaintiff were converted into truck roads. Lastly, some sections of logging roads were completely destroyed, while others were either untouched or repaired and remained vital and in use by Weyerhaeuser.

Accepting defendant's argument that less than the whole of the roads and railroad can be useful to taxpayer, it still remains that defendant's characterization of a linear or volume unit as *the SIP* is a herculean leap from the far more natural recognition of a constructed asset as a single property. As we noted previously in our example, a seven-story structure that loses two floors to a fire casualty could not suddenly be converted by the Commissioner from a building into seven one-floor assets simply because the five undamaged floors remained functional.

Defendant also analogizes the treatment of railroad grading casualties by railroads to Weyerhaeuser's loss of track in the Woods Railroad. It cites to *Louisville and Nashville R.R. Co. v. Commissioner,* 54 T.C.M. (CCH) 1352, 1987 WL 27817 (1987), as evidence of the segmentable nature of railroad grading. Since railroads use a volume unit (the cubic yard) to establish the amount of adjusted basis which may be used in claiming a casualty loss, defendant argues, plaintiff should utilize a similar quantity of adjusted basis (a linear unit—the mile) in determining the limitation of its claimed deduction. While this may be entirely appropriate *where the actual business activity is that of operating a railroad,* it is not so suitable to the scenario at bar as defendant would have this court believe.

In the former, the conduct of the railroad is itself the object; the system serves varied and vast areas which do not bear any great relation to or impact upon each other. As a result, there may not be any apparent logical grouping of track area to be considered as a single unit. But in the latter, the creation and use of the railroad is merely a tool in the business of growing and harvesting timber. While the Woods Railroad may also cover a large area, *its function and use are to benefit a discrete realm.* Insofar as it services one area of timberland, each little piece of track bears a direct relationship to every other piece. They are all a part of one functioning unit that serves a specific and limited territory. The Whole Woods Railroad is, therefore, more appropriately viewed in our judgment, as a single, undivided asset.

Defendant also cites *Johnston v. Commissioner,* 41 T.C.M. 258 (CCH), 1980 WL 4305 (1980). It contends that *Johnston* stands for the proposition that "[a] deduction for loss under Code § 165 is limited to the adjusted basis ... attributable to the damaged or destroyed section of logging road." Counsel could not be more wrong. The Tax Court did not decide the issue of linear unit vs. entire road as a SIP, but rather denied the petitioner's casualty loss claim with regard to a damaged road because "petitioner ha[d] not shown the amount of his loss by the decline in the road's value...." *Johnston,* 41 T.C.M. (CCH) at 260. Quite the contrary to defendant's proffered holding, although it did not decide the issue, that court recognized the nature of the entire road as a single asset when it stated:

We do not mean to imply that, if petitioner had proved the decline in the road's value, his loss would be limited to the portion of his adjusted basis in the entire road mathematically attributable to the 200 feet segment damaged. While the record is unclear on this point, if the damaged road section actually crossed the river, it would certainly have been more costly to construct than a section which only ran along the river. Likewise, we recognize that when a portion of a road is destroyed more than the destroyed portion is affected—the entire road may decline in value. We simply do not have before us the type

of proof necessary to apply these principles.

*Id.* at 260–61 n. 5. *Johnston,* rather than supporting defendant's proposition, bolsters plaintiff in its view of the assets' nature. Unlike the situation in *Johnston,* however, at bar, the proof required to apply these principles is before this court, in that Weyerhaeuser has presented evidence of the decline in fair market value (based on cost to repair) of each of its road systems as a result of the casualty. *See infra.*

We believe, on this record, that the presumptive correctness of the Commissioner's findings have been overcome by the evidence proffered by plaintiff, considering the above rationale. Accordingly, we hold that the SIP with respect to the logging roads and the railroad, for purposes of Treas.Reg. § 1.165–7(b)(2)(i), is each of the *entire* road systems. Having specifically determined the subject matter of the casualty, to wit, each of the entire separate road systems and the entire railroad, we next determine the extent of the loss and the limitation thereof, if any.

### b. *Valuation Of The Loss*

▉ Taxpayer's expert on the logging roads, Kendall Kramer, an experienced road engineer, testified with respect to the diminution in fair market value of the seven logging road systems affected by the volcanic eruption. The loss amounts or diminution respecting each road system have been set forth in the table, *supra,* and were taken from his report, admitted into evidence as DX 189. Mr. Kramer based his evaluation of the road system losses on the costs to repair the damaged or destroyed property rather than the diminution in the value of each such properties under § 1.165–7(a)(2)(i). This is a permissible approach inasmuch as Treas. Reg. § 1.165–7(a)(2)(ii) provides that the cost of repairs to a damaged SIP is acceptable as evidence of loss of value if the taxpayer establishes that—

... (a) the repairs are necessary to restore the property to its condition immediately

before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.

All of the above criteria for asserting cost to repair as probative evidence of the amount of the casualty loss were addressed in plaintiff's expert's opinion testimony regarding his evaluation. Mr. Kramer's report and testimony as to the amount of loss suffered satisfied all of the regulatory requirements, and we find his testimony to be credible and probative of the ultimate fact as to the diminution in fair market value of the SIPs. Furthermore, we are mindful of the fact that defendant offered no evidence of its own as to the amount of loss regarding the logging roads, nor did defendant rebut any of plaintiff's proffered evidence as to loss valuation or the amount of adjusted basis remaining in the properties.[50] Since Weyerhaeuser claimed the lesser of the diminution in fair market (cost to repair) value or the adjusted basis remaining in each separate road system, which is what this court finds to be the SIP on this record, plaintiff is entitled to deduct the full $1,262,422 for the year in issue with respect to the logging roads.

▉ For the Woods Railroad, plaintiff retained the Railway Multi–Engineering Company (Railway) to determine the amount of diminution in fair market value suffered by the Woods Railroad as a result of the volcanic eruption. Railway had previously been engaged by plaintiff for maintenance-of-way construction for the railroad and, therefore, was already familiar with that asset system. Edward Stanton was proffered by plaintiff and qualified by the court as an expert in estimating railroad construction costs according to the method used by Railway in its study of the Woods Railroad. Mr. Stanton oversaw the valuation of the railroad, making

---

50. Indeed, defendant has implicitly accepted plaintiff's adjusted basis numbers in that it argued for upholding the Commissioner's determination of the amount of allowable deduction based on the number of miles damaged multiplied by the adjusted basis attributable to those miles. The adjusted basis per mile was calculated using Weyerhaeuser's adjusted basis for the entire asset.

all final decisions as to the amounts ultimately determined.

Railway, as in the case of the logging roads, used a "cost to repair" (§ 1.167–7(a)(2)(ii)) method in determining taxpayer's diminution in fair market value pursuant to Treas.Reg. § 1.165–7(a)(2)(i) for the railroad. Mr. Stanton's testimony established that the cost appraisal satisfied the Secretary's minimum criteria for using the "cost to repair" method. By subtracting the amount of observed depreciation from the total cost to reproduce the rail line, Mr. Stanton arrived at the reasonable cost to put the Woods Railroad back to its *pre*-eruption condition. We are satisfied that his testimony also established that—(i) the repairs were necessary to restore the property; (ii) the repair costs were not excessive; (iii) they relate only to the damage suffered; and (iv) such repair costs will not increase the value of the SIP in excess of the precasualty value. We find Mr. Stanton to be a credible expert witness.

As with the logging roads, defendant offered no probative evidence of its own as to the amount of loss regarding the railroad, nor did defendant persuasively rebut any taxpayer's proffered evidence as to loss valuation *or amount of adjusted basis* remaining in the properties. Plaintiff established that the fair market value of the railroad was $20,340,967 *before* the eruption, $13,001,268 *after* the eruption, and, therefore, that its § 1.165–7(a)(2)(i) and (ii) loss was $7,339,699. We are also satisfied that taxpayer has proven its adjusted basis in the rail asset to be $2,246,682.

In light of our determination as to the SIP, *supra*, with respect to the railroad, we hold that Weyerhaeuser properly claimed its adjusted basis ($2,246,682) remaining in the Woods Railroad, as the permissible § 1.165–7(b)(1) deduction, that amount being less than the proven diminution ($7,339,699) in the value of the asset. Accordingly, since the Commissioner allowed a deduction of only

$820,039,[51] taxpayer is entitled to an additional deduction for 1980 in the amount of $1,426,643, which is the amount disallowed by the Commissioner, *supra*.

### 2. Timber Losses—Eruption of Mt. St. Helens Tree Farm And The Fire Casualties

The second type of plaintiff's property damaged or destroyed due to a casualty and at issue is mature and immature timber. As a result of the Mt. St. Helens eruption on May 18, 1980, and the 319 stipulated wild fires occurring in 1980, 1981, 1982, and 1983, massive amounts of taxpayer's timber was either damaged and/or destroyed. With respect to the volcanic eruption damaging the Mt. St. Helens tree farm, Weyerhaeuser alleged the value of its loss of mature and immature timber to be $229,727,000. However, the adjusted basis of the depletion block in which the lost and damaged timber was situated, considered and averred by plaintiff to be *the SIP*, was only $16,663,340. Taxpayer, therefore, claimed, as previously noted, its entire adjusted basis (*i.e.*, $16,663,-340) in the depletion block as its proper § 1.165–7(b)(1) deduction. Unfortunately for plaintiff, upon audit, the IRS took issue and allowed only $2,071,235 as a casualty loss deduction, computed by multiplying, for each class[52] of timber, the volume lost by the appropriate depletion rate (the *volume unit* being the SIP in the eyes of the IRS). The difference between the claimed ($16,663,340) and allowed ($2,071,235) deductions, *i.e.*, $14,-592,105, is the amount in issue with respect to the Mt. St. Helens timber.

With respect to the 319 stipulated fire casualties, taxpayer claimed $6,733,991, the fair market value of all of the timber lost cumulatively in the 319 fires occurring during the years 1980 through 1983, inclusively. Weyerhaeuser claimed the *full* diminution in fair market value of the timber because none of the losses exceeded the adjusted bases of the region or block in which they occurred,

---

**51.** The Commissioner previously allowed as a deduction that percentage of the adjusted basis as the damaged track miles bore to the total track miles (18.63/51.82 = 19/52 = 36.5% × $2,246,682 = $820,039).

**52.** The $16,663,340 in basis was composed of the following: old growth in the amount of $2,789,-908, regrowth timber of $1,104,604, and reproduction timber of $12,768,748.

the depletion block being what plaintiff considered its SIP. Of the total deduction claimed, the IRS allowed only $898,426 for reproduction timber and $2,931 for merchantable timber.[53] The Commissioner computed the limitation for fire casualty losses of mature timber in the same manner as it did for the Mt. St. Helens eruption. With regard to the plantation (reproduction) timber damaged or destroyed, the Commissioner allowed only an amount equal to the average reproduction cost per acre for the appropriate depletion block multiplied by the number of acres lost. The total amount(s) in issue then, for all of the regions affected by fires, are as follows:

| Fires | Claimed | IRS Allowed | Amount in Issue |
|---|---|---|---|
| Mature timber | $1,236,780 | $ 2,931 | $1,233,849 |
| Reproductions | 5,457,211 | 898,426 | 4,558,885 |
| | $6,693,991 | $901,357 | $5,792,734. |

As with the matter regarding the logging systems and the Woods Railroad, the critical issue which we must first resolve in a refund suit concerning a casualty loss deduction is—what constitutes *the* single identifiable property (SIP) with respect to taxpayer's damaged or destroyed timber. *Westvaco,* 639 F.2d at 708, teaches that "the single identifiable property damaged or destroyed must [first] be ascertained in order to delineate the casualty loss, the fair market value, the adjusted basis, and, ultimately, to determine the allowable deduction, if any." We now address those issues.

a. *The Single Identifiable Property*

Considering carefully the evidence adduced by both parties, we find that the single identifiable property (*i.e.,* the SIP), *on this record,* with respect to the timber owned (mature and immature), is the several timber stands where the specifically damaged and/or destroyed property is situated, as recognized by plaintiff's expert in calculating the loss. That is to say, the SIP is *the timber stand in which damaged and/or destroyed property is situate,* and *not* the larger or expansive area called the depletion block.

Taxpayer has emphatically advocated that *Westvaco,* holding on the facts therein that the depletion block is the SIP, stands for the proposition that the SIP is the depletion block *for all industrial timber owners,* and that *Westvaco* is indistinguishable from the case at bar. Therefore, argues plaintiff, this court is unalterably bound by the Court of Claims' holding that the SIP, for Westvaco with respect to its timber holdings, is its depletion block. To analogize *Westvaco* to the instant case, taxpayer points out that, similar to Westvaco, (1) Weyerhaeuser is an industrial timberland owner engaged in the production and sale of integrated forest products; (2) Weyerhaeuser uses forest-level management for its timberlands in order to provide a continual yield of raw materials for the manufacturing plants related to each regional timberland; and (3) Weyerhaeuser bases its depletion blocks on its forest-level management practices and, to date, the Commissioner has not disturbed said blocks.

Defendant argues, conversely, that the issue of a single identifiable property is, as we have previously stated, necessarily a question of fact or, at the very least, a mixed question of law and fact. If defendant is correct in this regard, which, in light of our previous consideration of the topic, we think it is, then this court would be bound by a previous appellate determination made by the Federal Circuit or its predecessor *only on identical facts* (or identical in all material particulars). In this connection, the government contends, as previously noted, that, unlike in the case at bar, the *Westvaco* court (i) did not have to address the issue of whether a *timber stand* would be an appropriate unit of property for

**53.** The only fires affecting mature timber were the Galena Ridge and Rocky Top fires. The remainder affected reproduction plantations.

purposes of determining the casualty loss because the government never raised that issue there; and (ii) did not have to address the issue of a § 631 gain and § 1033 deferral of said gain resulting from casualty.[54]

Initially, we must reject Weyerhaeuser's blanket contention that *Westvaco* definitively and unequivocally determined what constitutes *the single identifiable property* for *all* vertically integrated industrial timber owners. Taxpayer gives to that decision, we are convinced, an unreasonably expansive vitality and far greater scope than was intended by the authoring judge. As we alluded to earlier, the *Westvaco* court is among one of several that considers the SIP determination to be *a question of fact or a mixed question of law and fact.* After framing as one of the issues before it, *i.e.*, "... What is the identifiable unit constituting the 'property' damaged or destroyed?" (*Westvaco*, 639 F.2d at 704), the court stated:

> In answering these questions it is necessary to consider the *nature and extent* of timber damage and destruction resulting from storm and fires. We also must determine the purposes and interrelationships of the various statutory and regulatory provisions covering losses, basis, depletion, and perhaps other tax incidents. In addition, a consideration of the business practices of the timber industry generally, *and of plaintiff in particular*, is required to determine the extent of their bearing in the central issues of the case.

**54.** In defendant's memorandum of law, counsel avers that there is a third and final reason why this court is not bound by *Westvaco* in making its ruling as to the single identifiable property. The government postures that the *Westvaco* court did not address the issue of reproduction (immature) timber, which represents the majority of timber destroyed or damaged in this case. Plaintiff, on the other hand, contends that the court did in fact address the issue of immature timber, and we agree. The *Westvaco* court specifically found that:

> When Westvaco's immature growth matures, its adjusted basis will be recoverable through depletion; if it is sold, it is recoverable through an offset against sales proceeds; and if it is damaged or destroyed by casualty, such destruction qualifies for an allowance under the term "any loss" used in section 165(a), limited by such adjusted basis.

*Id.* (emphasis added). Rejecting the cases that the government had relied on, Judge Smith again apparently made plain his assessment of the nature of the issue:

> In our opinion, *deficiencies in the facts* and the framing of the issues in *Rosenthal* and *Harper* were factors which took those courts of appeal down the wrong path. *The facts in this case* have been thoroughly and extensively stipulated. *The issues foreclosed by the facts or pleadings in those earlier cases* are before this court. *These facts support the hypothesis of Judge Moore* in his dissent in *Rosenthal.*

*Id.* at 711 (emphasis added) (footnote omitted)[55]. Lastly, the court, finding for Westvaco and against the government, *restricted the reach of its decision,* declaring: "We hold that the single, identifiable property damaged or destroyed *in the case of this plaintiff* was all of the standing timber *in the area of the individual district directly affected by each casualty.*" *Id.* at 720 (emphasis added). The above underscored phrases clearly evidence the Court of Claims' view of this issue as one requiring meticulous factual inquiry and, therefore, by definition, not subject to universal determination. Accordingly, we cannot adopt taxpayer's hospitable interpretation of *Westvaco.*

Given the foregoing, we must decide, as a threshold matter, to what extent we are bound by the Court of Claims' *Westvaco* decision. While there are several similarities between the two cases, as plaintiff points out, the fact that the Court of Claims in *Westvaco*

639 F.2d at 712. Moreover, the court held that:
> [T]he single identifiable property damaged or destroyed in the case of plaintiff was *all* of the standing timber in the area of the individual district directly affected by each casualty.

639 F.2d at 720 (emphasis added).

**55.** *Rosenthal v. Commissioner*, 416 F.2d 491; *Harper v. United States*, 274 F.Supp. 809 (D.S.C. 1967), *aff'd*, 396 F.2d 223 (4th Cir.1968). In both cases, the courts found that the SIP was the *depletion unit* of the affected trees. Judge Smith attributed the "error" in *Rosenthal*, at least partially, to the fact that the taxpayers allocated none of their basis to immature timber and all of it to their merchantable timber, *Westvaco*, 639 F.2d at 720, and the "error" in *Harper* to the taxpayer's failure of proof. *Id.*

was not presented with argument or evidence of a comparable identifiable unit of property that has been proffered to this court is enough to demand that we make an independent determination of the factual issue.[56] As previously stated, and what is critically significant here is the fact that the *Westvaco* court did not have before it the question of whether a *tree stand*[57] would be an appropriate SIP for *that* plaintiff.[58] What that court did have before it, as to the SIP issue, was *a choice between an entire depletion block and the depletion unit used in calculating the depletion deduction.* The depletion block is distinctly a physical grouping, whereas the depletion unit is a creation of the Code and is derived from the adjusted basis and timber volume contained in the block. Conversely, we are asked here at bar to select between the *depletion block* and the *timber stand*— two physical grouping alternatives. In our view, this distinction makes Weyerhaeuser's and Westvaco's respective issues sufficiently and materially dissimilar so that the instant case is removed from the controlling ambit of binding precedent.

As we stated earlier, determinations of factual issues by appellate courts are not binding upon inferior courts in the presence of significant factual distinctions. *Mendenhall*, 5 F.3d 1557. By such circumstance, each such case must, therefore, stand on its own bottom. Against this background, we must perform our own analysis in order to render judgment here on the peculiar facts at bar. That is not to say that we will be working from a clean slate in reaching our decision. Certainly, we will be guided by the principles and rationale espoused by the *Westvaco* court[59] in its resolution of the issue(s) that were before it. But our ultimate conclusion, particularly with respect to the determination of the SIP issue, will be based on the facts presented to *this court.* That being determined, we next consider the facts at bar.

At trial, plaintiff presented a plethora of evidence in support of its contention that it utilizes forest-level management for its timberlands. Expert and lay witnesses testified that Weyerhaeuser manages its timber according to region, under principles of sustained yield forestry. Also adduced were testimony and documentary evidence concerning the existence of management structures in place for each region and their degree of autonomy. Defendant, however, vehemently objects to the notion that taxpayer

---

**56.** To be sure, a trivial or insignificant factual difference between cases or a significant difference with only a modicum of evidence presented to support it would not be enough to remove an issue from the purview of binding appellate authority. However, given the facts at bar, *infra*, we are convinced that the difference is substantial and that there is ample evidence in support the position taken.

**57.** A tree stand is defined by the parties as an aggregation of trees occupying a specific area of land and sufficiently uniform in species, composition, age, density, and other conditions so as to be easily distinguishable from the forest or other growth on adjoining areas. The stand is the smallest homogeneous working unit of the timberland, and its recognition and demarcation are relevant to analysis of the timberland for management purposes.

**58.** It is not clear whether the concept of *stands* was even recognized by Westvaco, or whether the government simply failed to unveil it before the court. Judge Smith briefly discussed a measure called a "unit," which was mentioned in connection with only one of the two woodlands in issue.

Plaintiff's timberlands in the South Carolina portion of the woodlands consisted of at least 65 separately named units ranging in size from 626 acres to 14,165 acres.... Most units are made up of a number of smaller parcels of land, often referred to as "tracts." These tracts generally represent the units in which the timberland was purchased by plaintiff.... The units and tracts contain trees of various species and ages.

*Westvaco*, 639 F.2d at 718. While the description of the units sounds somewhat akin to taxpayer's "stands," they are not identical. Stands generally consist of homogeneous species and age classes of timber. Moreover, Westvaco's "units" were not proffered as a viable SIP and no mention was made of any way that Westvaco used its "unit" information for identifying or tracking its inventory of trees, the way that Weyerhaeuser uses its stand information. While it is possible that the unit was used for such purpose, the tree stand was not before the Court of Claims and, therefore, not addressed.

**59.** The *Westvaco* court clearly acknowledged that "[t]he extent of the loss ... is a fact ..." and we wholeheartedly agree. Moreover, it is indisputable that the SIP damaged or destroyed per § 1.165–7(b)(2)(i) is equally a peculiar fact issue.

utilizes forest-level management in the operation of its timberlands.

The government's expert, Professor Yoho, rendered his opinion that Weyerhaeuser manages based on the existence of its *timber stands*. In that connection, defendant alluded to certain alleged incongruencies in Weyerhaeuser's claim that its operating structure directly coincided with its depletion blocks, such as the fact that logs harvested in one region often were transferred to an entirely different region for processing, rather than keeping the supply of logs within its originating region. The government also contested taxpayer's allegations of regional autonomy, citing certain decision-making functions retained at the corporate level. Notwithstanding the lack of absolute isolation of each region in its actual operations, it may be true that, on an overall basis, taxpayer does to some extent manage each of its timber regions with a view to the whole of an involved area. For plaintiff to plan to grow, harvest, and regrow on its lands indefinitely into the future, it seems only logical that it consider the whole reel of film, rather than one or several frames at a time.

But that self-serving circumstances alone cannot, *ipso facto*, raise taxpayer's management methods to tax omnipotence simply by proclaiming them to be outcome determinative in the resolution of its tax refund claim. The issue, in determining what constitutes a viable SIP, *is one of a focused identification of the specific property damaged or destroyed, and not solely a peculiar management style.*[60] Westvaco, somewhat like Weyerhaeuser—

> group[ed] its timberland into management units, which it call[ed] woodlands. ... Each woodlands ha[d] as its top administrative officer a woodlands manager with responsibility for planning the future development of the tract, sales of stumpage, logging, protection of the tract against fire and trespassers, property tax administration, and preparation of accounting details.

> Where the administrative requirements of a given woodlands warrant[ed], the woodlands [were] divided into several depletion districts in accordance with Treas.[ ] Reg. § 1.611–3(d).

*Westvaco*, 639 F.2d at 718 (footnote omitted). But the Court of Claims in *Westvaco* did not determine the SIP to be the woodlands as such.[61] While the Southern Woodlands was one management unit, it was subdivided into 10 depletion districts, and the court found that the depletion districts in the woodlands were *the* single identifiable properties as contemplated under § 1.16555–7(b)(2)(i). *Id.* at 718, 720. There, Judge Smith did not hold that the block was *the only* possible choice for all SIP scenarios, but that *the only proffered alternative to the depletion block* was the commercial unit, and he did not think the latter a proper measure on those facts for a casualty loss. In selecting from the only options presented to him, Judge Smith reasoned, therefore, but—

> ... natural disasters that befall timber do not impact upon stacked cords of logs or board feet of timber except perhaps in a lumberyard. Thus the single, identifiable property damaged by the casualty is the standing timber ... *in an affected area.* Only a potential for cords and board feet is damaged or destroyed, even in merchantable trees, and those "single" trees have no adjusted basis....

*Westvaco*, 639 F.2d at 717 (emphasis and footnote omitted). Thus, the court there seemed to hinge its conclusion on the existence of a readily verifiable and *recognized* land expanse on which the timber stood, as distinguished from individual pieces of timber.

Judge Smith, in *Westvaco*, determined the SIP to be the "[larger] single identifiable property damaged [*i.e.*] ... the standing timber in an affected area," which was the block. Here at bar, analyzing what is "the standing timber in an affected area" that constitutes

---

60. This is not to say that *Westvaco* did not consider the timberland management as a factor in its holding. To the contrary, it did. *Westvaco*, 639 F.2d at 719. However, on this record, we do not believe that fact to be dispositive of the SIP issue.

61. Westvaco did initially argue that the entire woodlands was the appropriate SIP. Only in the alternative did it contend that each depletion district was a SIP.

the single identifiable property, we believe, on this record, that the SIP is the tree stand.

The depletion district was not the smallest parcel of land cognizable in *Westvaco*. There were also units styled "tracts," many of which combined to make up each block. Rejecting the tract as the appropriate SIP, the court stated:

> It is at least as "logical and reasonable" to assume that the present subdivided district structure of Southern Woodlands represents the present assembly of single, identifiable properties that plaintiff might sell and a purchaser might buy, rather than one of the dozens of smaller tracts originally assembled by plaintiff.

*Id.* at 719. But the fact scenario at bar, we hasten to note, differs from *Westvaco* in two significant respects, to the extent that we are not compelled to conclude that the Court of Claims' reasoning and holding is controlling. First, nothing in that opinion indicates that the government urged the use of the tract as the SIP. To the contrary, its suggestion of the appropriate SIP there was limited to the merchantable units, such as board feet and/or cords, which the court was not willing to accept. In fact, it seems that it was the court, *sua sponte*, that first mentioned the tract at all. Second, there is no evidence that Westvaco ever used "the tract" as a measure of identity of any timber property in its possession.[62] While the plaintiff may have purchased timberland in obscure units, once the acquisition was completed, the property was merged into its respective depletion district, by which Westvaco accounted for its property. The government did not present evidence of any other method of determining the SIP that Westvaco might have had other than "by merchantable units (board feet, cords, etc.)." *Id.* at 708. That court rejected defendant's position because—"we think defendant's rigid adherence to the merchantable unit [board feet and cords] ... as the only acceptable single identifiable property for determining the casualty loss was not legally justified." *Westvaco* at 709.

In contrast to the foregoing, Weyerhaeuser's circumstances are markedly different inasmuch as it identifies and accounts for its timber by the stand, and substantial probative evidence to that effect was adduced at trial. First and foremost, plaintiff's own functional description of its state-of-the-art inventory tracing system, *i.e.*, FIRS II Manual, unequivocally, provides as follows:

> The FIRS II is an in-place forest inventory. The term "in-place" identifies the fact that FIRS II provides information concerning not only the total amount of the forest inventory but also the specific ground locations at which given tree species and size classes can be found.

> \* \* \* \* \* \*

> Overlaps may be envisioned as a series of maps drawn on transparent film, one layer for timberstands, one for legal boundaries, another for roads, streams, etc.

> \* \* \* \* \* \*

> In this way one could look at the resulting composite map and determine that a given *stand* lies in a particular section.

> \* \* \* \* \* \*

> The *timberstands* on the Stand Overlay, *constitute the basic timber inventory units*.

PX 12, pp. 7, 12 (emphasis added).

Notwithstanding the strenuous protestation of plaintiff, we find that FIRS II is the management tool by which it keeps track and control of all of its timber holdings. In that connection, the *timberstand*, as its basic inventory unit, is one of its smallest cognizable measures of information (Except perhaps the parcel). This finding is, on the instant record, inescapable inasmuch as taxpayer's own witnesses confirmed and corroborated said fact to the extent that they testified on direct and cross-examination as to the recognition of the *tree stand* as the most fundamental identification concept Weyerhaeuser has in consideration of its timber assets. Directly contrary, the operating region or block, which plaintiff contends is its single *identifiable* property for purposes of the issues at bar, "is the largest inventory reporting unit available."

---

**62.** *See supra* note 58.

Mr. Terryl Peck, from 1974 to 1987, was the inventory forester for plaintiff's Longview, Southwest Washington region. In such capacity he was responsible for managing and maintaining the forest inventory system therein. Following the eruption, his responsibilities included identifying the casualty event, the blast area, and determining the acreage and volume impacted. We interpret the foregoing charges as being responsible for determining the SIP. On cross-examination, the following colloquy is relevant:

Q. ... You identified the specific stands on which there was damage or destruction and then referred to the FIRS data base from which you got the specie and the volume?

A. Correct [Tr. 1530–31.]

Q. Did you calculate out the volumes of merchantable standing timber that had been destroyed in the Southwest Washington region as a result of the eruption?

A. Yes.

Q. Did you do that on a stand-by-stand basis?

A. Yes. [Tr. 1560.]

Q. And hat 3,033,000 cunits can be attributable or allocated specifically stand-by-stand. Is that correct?

A. Yes. With our FIRS system we used a general purpose overlay to isolate ... the blast area from the rest of the data base and to identify those stands or those parts of stands ... that were specifically in the event area. [Tr. 1561.]

Mr. Peck prepared working papers which showed the stand identification numbers and the respective volume of standing timber before and after the casualty. Tr. 1560, 1563–64. However, Mr. Peck admitted that the destroyed his workpaper notes. Tr. 1567. He estimated that 1500 stands were damaged by the eruption and admitted that he relied on stand data in FIRST II to determine the extent of timber affected by the Mt. St. Helens eruption and that timber stands are important in the overall Weyerhaeuser management system for timber.[63] Tr. 1570, 1582.

In 1978, Mr. Peter Zubowicz obtained a B.S. degree from Auburn University in forest management and industrial management. These areas included a course study in forest inventory and accounting. From 1979 to 1985, embracing the years in issue, he was employed by Weyerhaeuser as an inventory forester in the Mississippi/Alabama region. He too avouched his appraisal of the timber volumes lost (from fires and allegedly southern pine beetles) in the Mississippi/Alabama region in terms of stands. In that connection, he attested that changes in volume of timber, whether from harvest, fire casualties, or southern pine beetle infestation losses, were entered into the FIRS II system according to the specific stands affected. Each year for which timber was destroyed by fire, 1980 through 1983, the effects were recorded in FIRS II with respect to the stand suffering the detriment. For example, we deem the following colloquy to be relevant on the issue of the identification of the SIP:

Q. When you update your FIRS data and change the volume, do you identify the cause for each change in volume?

A. Yes.

Q. When your harvest timber, do you identify the quantity being harvested on your FIRS?

A. Yes.

Q. When you have a fire, do you update the change in volume on your FIRS?

A. Yes.

Q. And when you have southern pine beetle attacks, do you update your changes in volume on FIRS?

A. Yes.

Q. And do you make those changes for specific stands?

A. Yes.

Q. And did you do that in 1980?

A. Yes.

\* \* \* \* \* \*

---

**63.** On redirect, Mr. Peck testified that the eruption overlay created for FIRS II did not delineate damage by stand, but rather crossed stand boundaries and that the lost volume information was available only in the aggregate or summary fashion. Tr. 1587. However, the fact that every overlay in the inventory system did not include stand-by-stand description does not detract from the truth that the company's basic identification unit was the stand.

Q. You made changes on FIRST on a stand-by-stand basis for changes in volume due to fires in the Mississippi/Alabama region in 1981. Is that correct?

A. I believe so; yes.

Q. Is that true in 1982?

A. I believe so; yes.

Q. Is that true in 1983?

A. Yes.

Q. Is that true in 1980, again?

A. ... yes, I believe so.

Q. ... And in all those years, were you the inventory forester?

A. Yes.

Tr. 1608–11.

Q. Are there any records ... that reflect the *stands* in Mississippi/Alabama region that were impacted or affected by fires during any of the years 1980 through 1983?

A. No.

Q. There are no such records?

A. No.

Q. There were such records, and now there are not. Is that correct?

A. Correct.

Q. ... do you know where they went?

A. ... our policy ... was to ... put them in a file after we'd made our updates to the inventory ... keep those files from ... five to seven years. And then we had a destroy date on them at that point.

Tr. 1611.

But Weyerhaeuser's inventory foresters, *supra*, were not the only ones to view the losses in terms of the stands affected. Edward Van Zandt, plaintiff's timber valuation manager, prepared expert opinion reports on the valuation of the timber losses arising from the eruption and the forest fires which were admitted into evidence. PXs 53, 54, 55.[64] In his report concerning the Mt. St. Helens eruption casualty, he valued the area that was *directly affected* by the eruption to arrive at the amount of loss suffered as a result of the event, and made consistent reference to "stands." Describing his procedure and methodology, he wrote as follows:

*Merchantable Timber Valuation Procedures.* As an overview, a value was established for the merchantable timber damaged or destroyed by the eruption ... and for the timber estimated to be salvageable. The difference between the two valuations is the net loss to merchantable timber. *The impact of the eruption on the regional timber supply was not considered in the valuation process. ... the affected area* was examined by aircraft. This examination provided the necessary information to obtain inventory (FIRS) data for the related timber and regeneration *stands.*

PX 55, pp. 1, 2. In explicating his regeneration valuation procedures, Mr. Van Zandt referred to the "[current market value] for a given plantation stand" which was determined by multiplying table values times the *acres*, and he also stated that "[a]s part of the expected salvage volume which was assembled shortly after the eruption, 117 MCCF was expected to come from *plantation stands*" (emphasis added).

Lastly, we find particularly compelling, as noted in the quote *supra*, Mr. Van Zandt's qualification of his report that "[t]he impact of the eruption on the regional timber supply was not considered in the valuation process."[65] We read this unsolicited statement

---

64. PX 55 was offered and received as "an expert report by an expert." Tr. 1404. Mr. Van Zandt, while never previously testifying as an "expert in timber valuation" was qualified accordingly. Tr. 1395. On voir dire, Mr. Van Zandt was asked, regarding pre-merchantable timber, what recognized method of valuation did he use, to which he responded—"a variation of comparable sales." Tr. 1404. But when asked, "Have you ever seen that method described in any treatise on appraisal," he responded, "I have." He was then asked, "Can you identify the treatise?" He responded, "I can't." Tr. 1406–07.

65. Plaintiff apparently also found it so because it retained an outside appraisal expert who valued the entire Mt. St. Helens region and the regions affected by fires on a before and after casualty basis. Weyerhaeuser proffered this expert to opine that each region was a SIP based on the Company's management of the block as the single identifiable property and the entire area's sensitivity to damage inflicted upon a limited area. Dr. William R. Sizemore concluded for taxpayer that Weyerhaeuser manages each timber region as a single, integrated unit consistent with its depletion blocks, and that casualty losses affect the forest as a whole far into the future

to reflect, at the very least, a tacit admission that something other than the district or block is the SIP, and we so find.

Similar references to the "affected area," "inventory stands," and "stands" were made in Mr. Van Zandt's mature timber fires and regeneration fires reports, which were also admitted into evidence. PXs 53 and 54. Additionally, attached to the report on mature timber forest were schedules of timber lost according to stand identification number. Mr. Van Zandt, on direct examination, averred that the underlying information on volume of damaged timber which he used in preparing his valuation report came from the FIRST II system.[66] Tr. 1400, 1402. This is the same system that Mr. Peck and Mr. Zubowicz testified was input with casualty event data on a stand-by-stand basis. Indeed, Mr. Van Zandt's testimony is replete with references to the FIRS II systems and stand identification.[67]

Mr. John Wilkinson also testified for taxpayer. At the time of trial, he was vice-president,[68] manager of Weyerhaeuser's Oregon timberland division, and manager of raw material supply and marketing for its paper company. During the years in issue, he was the Longview regional manager for a period and manager of western regions for the remainder. Tr. 122. His testimony, upon direct examination, also yielded multiple references to the company's use of the timber *stand* as the basic unit of inventory recognition. Early in his testimony, he stated that:

> The High Yield Forestry Program was a program of *management* that Weyerhaeuser Company undertook in the mid and late '60s that intensified beyond what we had previously done, and what other owners had—were doing. Intensified the forestry management activities of the company, and set us on a course of converting many of the lands that were then occupied by old-growth timber into young plantation timber in a fairly rapid period of time, and *intensified the forestry so as to grow these young timber stands at a faster pace, and with a more intensive application* than had been done really anywhere on a commercial scale in North America.

Tr. 105–06 (emphasis added). In response to the court's question, Mr. Wilkinson stated that, in effect, the intensification of the forest "to grow these young timber stands at a faster pace," was simply "to plant every acre,

---

because of its integrated biological character. While we accept that taxpayer manages its timber giving great, but not sole, consideration to the block as a whole, we reject taxpayer's contention that the casualty events had a definitive financial effect on the regions which would evidence each region's alleged unitary nature. In reaching our conclusion, we simply note that Mr. Van Zandt calculated the loss of the affected area (*i.e.*, diminution in fair market value) from eruption to be approximately $229,000,000. Dr. Sizemore opined that this loss was a reasonable estimation and that his evaluation placed the loss amount in a range from $162,000,000 to $263,-000,000. With Mr. Van Zandt's valuation (embracing only the affected and damaged property within the tree stands) falling slightly off the middle of Dr. Sizemore's loss range and the alleged loss to *the entire region* being possibly *lower* than the loss calculated only with respect to the affected area, taxpayer has failed to prove what it set out to prove through its retained expert, *i.e.*, that the loss to the block was greater than the loss to the stands and, therefore, that the entire region or block is the SIP. *See Harper*, 274 F.Supp. at 810, 812.

66. One example of such testimony is:
Q. How did you value the non-merchantable timber?

A. The parameters of the non-merchantable timber was *obtained from FIRS*, and these would be—when I say, "parameters," these would be species type each, site stocking, which would come *from FIRS by stand, by stand number within the affected area of the blast*. The acres were then—of these various parameters were then valued by a look-up in a regeneration value table that was prepared by Weyerhaeuser shortly—shortly before the blast.
Tr. 1402 (emphasis added).

67. Another example of such testimony is:

Q. Could you describe ... the methodology you used, which is set forth on the first page of Exhibit B.
A. The aerial survey made shortly after the blast, outlining the extent of the blast area, also encompassed *pre-merchantable stands*. These were *identified in the same manner as the merchantable stands*. They were processed through FIRS.
Tr. 1413 (emphasis added).

68. Mr. Wilkinson is a graduate of Oregon State University with a bachelor's degree in civil engineering, and he also received a M.B.A. degree in 1965 from Stanford University.

and to plant it within one year of the time that it had been cleared," as opposed to "using seeding or relying on natural seed fall." Tr. 106. Moreover, on cross-examination, Mr. Wilkinson admitted plaintiff's view of the stand as a vital and indispensable unit of measure of its timber assets. The following testimony on cross-examination is probative of the foregoing:

Q. In the FIRS system, does the company attempt to provide a mechanism by which to annually update the volume information and other information *about each of its stands?*

A. It does.

\* \* \* \* \* \*

Q. Does Weyerhaeuser Company through the FIRS system attempt to keep track of, *for each stand,* the number of stems per acre?

A. Yes.

\* \* \* \* \* \*

Q. So that for *stand* 1001, there would be 109 stems per acre. Is that correct?

A. Yes.

\* \* \* \* \* \*

Q. Through the FIRS system or FIRS II, does Weyerhaeuser attempt to keep track of the *gross number of acres in each stand* of standing timber?

A. Yes.

Q. Through the FIRS system II, does Weyerhaeuser Company attempt to keep track, *by each stand, the number of gross cunits of timber volume within each stand,* within each by acre?

A. Yes.

\* \* \* \* \* \*

Q. And does Weyerhaeuser attempt to keep track through FIRS, *on a per-stand basis for each stand,* of the net cunits per acre of standing timber volume?

A. Yes.

\* \* \* \* \* \*

Q. ... Does Weyerhaeuser ... *on a per stand basis* ... keep track of the date in a year ... when it conducted an actual examination of that stand, and then also write down the type of examination that is performed?

A. Yes.

\* \* \* \* \* \*

Q. ... does Weyerhaeuser ... *for each stand,* like to keep track of what ... the specie is, the predominant specie in the stand?

A. Yes

\* \* \* \* \* \*

Q. ... With respect to *each stand,* does Weyerhaeuser ... keep track of the site index?

A. It does.

\* \* \* \* \* \*

Q. ... Now, it is your understanding that information such as wee on page 3666 [Vol. 4, DX 10, re FIRS II Quick Response—Stand Aggregate Summary Report] is kept for *all 10,000 or so stands* in the Longview timberlands, otherwise known as ... the [Mt.] St. Helens tree farm?

A. Yes, it is.

Q. And it is also true that the same type of information in this format is kept *for every standing of standing timber in all 8.9 or so million acres* that Weyerhaeuser owns in the United States?

A. It is. But ... it is not kept in this format.

Q. Is it, in fact, kept in computer files within a computer?

A. It is.

\* \* \* \* \* \*

Q. Does the Weyerhaeuser Company think that the stand is an appropriate tool for keeping track of its standing so as best to manage it?

A. Yes. I'd like to add that *it's the basis of keeping the information.* And the information is used in a number of ways, as we just—as we've discussed previously.

Q. Is the information used for the purpose knowing ... what it has for standing timber?

A. *Yes, that's the information base.*

\* \* \* \* \* \*

Q. Can you explain why the company organized its FIRS database by stand?

A. I think I can.

Q. Would you please do so.

A. It's our understanding that that's *the best and most accurate way to develop, or to gather and maintain information about the timber* that the company has on the land in each of the geographic locations. *It's the most accurate means that we have to describe what the timber is at any given point in time.*

Q. I take it the company thought so during the 1960s, 1970s, 1980s, and even today. Would that be correct?

A. Yes.

Tr. 587–98 (emphasis added).

We find that all of the foregoing (from the descriptions and passages taken from the FIRS II manual; to the testimony of taxpayer's inventory foresters, regional managers, vice-president, and valuation experts concerning the use and import of the stand in *identification* of taxpayer's inventory; and to the fact that Weyerhaeuser's valuation expert, Edward Van Zandt, for the purpose of calculating the loss amount, valued the volume only within those timber stands damaged by the subject casualties (*i.e.,* the affected area)) are probative of the fact, if not admissions, that the single identifiable property(ties) damaged or destroyed, *in the case of this plaintiff,* are the very timber stands repeatedly recognized and utilized in its operations and valuations. To the extent that they may be considered admissions, evidentiary or judicial, such would be indisputably probative on the issue of the SIP, which we find to be the "stand" and not the district or block.

Evidentiary admissions are "statements made [by] a party's agent and which the trier of fact may evaluate as it sees fit." *United States v. Blood,* 806 F.2d 1218, 1221 n. 2 (4th Cir.1986) (citations omitted). Generally, evidentiary admissions can be in the form of witness testimony given in depositions, expert witness testimony, or party exhibits. *See, e.g., Collins v. Wayne Corp.,* 621 F.2d 777 (5th Cir.1980); *Budden v. United States,* 748 F.Supp. 1374, 1378 (D.Neb.

1990), *vacated,* 963 F.2d 188 (8th Cir.1992). Although evidentiary admissions are not binding upon the party asserting them, they can be considered in light of all other evidence offered and ascribed whatever evidentiary weight the trier of fact deems appropriate. *See Budden,* 748 F.Supp. at 1379. A sub-category of an evidentiary admission is a tacit admission, which is "[a]n acknowledgement or concession of a fact inferred from either silence or the substance of what one has said." *Black's Law Dictionary* 1452 (6th ed. 1990).

In contrast, a judicial admission is a "formal act, done in the course of judicial proceedings, which waives or dispenses with the production of evidence, by conceding for purposes of litigation that the proposition of fact alleged by the opponent is true." *Hofer v. Bituminous Casualty Corp.,* 260 Iowa 81, 148 N.W.2d 485, 486 (1967); *see also Guidry v. Sheet Metal Workers Int'l Ass'n Local 9,* 10 F.3d 700, 715–16 (10th Cir.1993); *American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir.1988). Judicial admissions are conclusively binding on the party asserting them. *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 122 (2d Cir.1990); *American Title,* 861 F.2d at 226. Formal acts such as a party's in-court testimony or pleadings can be delineated as judicial admissions. However, only "deliberate, clear and unequivocal" formal acts can be found to constitute judicial admissions. *Anderson Bros. Corp. v. O'Meara,* 306 F.2d 672, 676 (5th Cir.1962).

This court is persuaded that plaintiff's admissions serve as judicial admissions that the stand is its SIP. Taxpayer's exhibits and witnesses clearly, deliberately, and unequivocally avowed the stand to be its basic inventory unit used to *identify* its timber assets. However, the question is a close one, because no statement was made in terms of the ultimate issue—the SIP. *Cf. Fox v. Taylor Diving and Salvage Co.,* 694 F.2d 1349 (5th Cir.1983) (plaintiff was bound by its own expert witness's testimony that he was an onshore worker not covered by the Jones Act and, therefore, barred from seeking recovery under the Jones Act). We are, therefore, inclined to give plaintiff the benefit

of the doubt and regard its admissions as tacit evidentiary admissions to be considered in light of all other evidence presented. But even conceding the nature of taxpayer's admissions to be of the non-binding genre, we find that the great weight of the evidence, predominated by Weyerhaeuser's myriad admissions, leads to the inescapable conclusion that the *single identifiable property* is the timber stand with respect to the volcanic eruption casualty.

Based on the foregoing, particularly the peculiar facts at bar, we also find that *Weyerhaeuser*'s facts are distinguishable from those in *Westvaco*; thus the latter is not binding on the case at bar as to the SIP determination. While this is true, we nevertheless recognize that the rationale of the predecessor Court of Claims is most certainly applicable in light of the fact that we must decide the same issue, albeit on differing facts, and we are, therefore, guided accordingly thereby. In particular, we note that the Court of Claims focused on what it considered to be the relatively unchanging personality of the block, as opposed to the annually fluctuating depletion unit, as an important factor in choosing what measure of property constitutes a SIP.

The *Westvaco* court selected the depletion block over the unit (*i.e.,* board feet/cord) of timber, proposed by the defendant, as Westvaco's single *identifiable* property, at least, in part, because the block, unlike the unit, maintained its *identity* despite the yearly volume increase of timber in the block due to growth, etc. Analyzing its choices, the court observed:

> Trees contain only an estimated and ever-changing volume of merchantable timber, the value of which is merely a factor in determining the value of all of the timber in an area or block. The "cost" of the tree changes from year to year, depending on its growth and upon an annual estimate of volume as well as an imposition of accounting adjustments to the basis of the block. The only unit which remains constant and

identifiable and has a cost or adjusted basis that is not changed except by elimination of an asset or by an injection of capital is the block.... The code and regulations require that [casualty] losses be reflected in the adjustments to basis of each of the timber accounts in [affected depletion] districts. The resulting "adjusted basis for determining gain" on sale, exchange or other disposition of each district, exclusive of the land, will be the basis for adjusting the depletion rate or rates for the year of the casualty, in the account reflecting the immature growth and all other timber accounts in the block. *Thus the block ... remains constantly identifiable as a unit of property,* having an identifiable adjusted basis unaffected by other such units, and, *in the case of this plaintiff,* a reasonable and logical and *identifiable* area affected by the casualty.

*Westvaco,* 639 F.2d at 717 (emphasis omitted and added).

The stand, therefore, similar in all respects to the block, except as to size, is manifestly appropriate, on this record, as the SIP for Weyerhaeuser's timber property, not only because of its acknowledged utility to plaintiff, but because of its relatively stable nature as the *bedrock* of the FIRS II inventory system. Moreover, the tree stand, despite being smaller than the block, is similar to the block to the extent that it possesses the same constancy as the block, *supra.* No probative evidence was presented to indicate that the individual stands would change in boundary, content, or description during normal growth periods any more than would the blocks.[69] Of course, a sale or a timber harvest may change perhaps all three, but the same may very well be said of the block. For if the stand is altered, so too *must* the block be altered, since the block is made up of an aggregation of stands. In short, based on the evidence presented, we hold that the stand cannot possibly be any less stable than the block.

---

69. The only mention of fluctuating stand descriptions was made concerning stand redefinition after the Mt. St. Helens eruption. Tr. 1556. From the testimony, it appeared that these were permanent, or at least indefinite, changes, as opposed to normally or regularly occurring adjustments.

To illustrate, the question of whether the stand's constancy is less than or equal to the block's, if stands were divided and transferred *in part*, then the stand in such case changed exactly as the block changed. But if a whole stand was relocated to another block, then the stand in such circumstance would remain even more constant than the block because the block would change while the stand did not. Thus, the stand clearly meets the criteria set in *Westvaco* for making the block the SIP.

Taxpayer avers in response neither that the stand is an ever-changing unit, nor that what defendant has argued is incorrect. Rather, it acknowledges these fluctuations of the block and contends that the *Westvaco* court similarly acknowledged them when it accepted the block as the single identifiable property. For its position, plaintiff simply relies on the *Westvaco* court's statement quoted above, to wit—"The only unit which remains constant and identifiable and has a cost or adjusted basis that is not changed except by elimination of an asset or by an injection of capital is the block." *Westvaco*, 639 F.2d at 717.

But even if we (1) accept plaintiff's contention that the block, with its chameleon-like nature, is equally acceptable, at bar, under the quoted *Westvaco* language as its SIP; (2) ignore our previous finding that the company unquestionably admitted to *identifying* and inventorying its timber by the stand; and (3) disregard the *greater constancy of the stand* over the block as a unit, there exists one remaining hurdle for plaintiff that is insurmountable. Assuming that each party's suggested SIP is equally acceptable, taxpayer cannot escape the long-standing rule of Tax Code interpretation that *deductions are matters of legislative grace and must always be construed narrowly. Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607, *reh'g denied*, 320 U.S. 809, 64 S.Ct. 26, 88 L.Ed. 489 (1943); *Deputy v. Du Pont*, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940); *New Colonial Ice Co. v. Helvering*, 292 U.S. at 440, 54 S.Ct. at 790. Apparently the *Westvaco* court was not unmindful of this long-standing restriction when it held that:

Thus, the single, identifiable property damaged by the casualty is the *standing timber*, merchantable and nonmerchantable, in an *affected area*.

(emphasis added).

Additionally, even plaintiff's valuation expert (Mr. Van Zandt) acknowledged the foregoing inasmuch as, in valuing the loss (*i.e.*, diminution in fair market value), he considered the property *only in the area directly affected* and voluntarily abstained from considering "[t]he impact of the eruption on the regional timber supply...." PX 55.

Furthermore, we observe, on this record, that taxpayer's proffered SIP, *i.e.*, the block, presents potential abuse problems. If, for instance, Weyerhaeuser were permitted to use its blocks as its SIPs and to redefine its blocks at will, it becomes possible to rearrange blocks so that one which had no remaining adjusted basis could be supplied with basis simply by transferring into a zero-basis block, fee timber from a block which is rich in adjusted basis. It would then be arguably possible to take casualty loss deductions with respect to a block that would have been otherwise unrecoverable. Such would constitute the undisputed and impermissible "borrowing of basis." We do not mean to suggest that plaintiff had any improper motive in its reformation of its depletion regions, but we are always bound to consider the conceivable consequences of our findings.

Moreover, allowance of the block as plaintiff's SIP, with an adjusted basis higher than that of the affected stands, would permit immediate and excessive recovery of basis in the timber that would generally not otherwise be recovered except through systematic depletion deductions over a period of at least 30 years or more. That is not to say that, if we found taxpayer's SIP to more appropriately be the block, we would nevertheless choose the stand for this reason. We would not. But as part of our determination, we note the fact that plaintiff *identifies* its timber by the stand, determined its inventory lost by the stand, valued its loss for tax purposes by the stand (the volume damaged only in the affected area) and, therefore, using the stand as the SIP, would most properly match taxpayer's investment lost with

its casualty deduction, taking into account what Weyerhaeuser itself viewed as lost. In other words, even though we find that the timber stand is plaintiff's SIP, and, therefore, its loss deduction is limited by the amount of adjusted basis contained therein, Weyerhaeuser will eventually recover all of the adjusted basis in the entirety of each of its blocks in the future as it harvests and sells its timber. Our decision, therefore, creates only a timing difference for taxpayer's basis recovery, while at the same time grants to plaintiff a bona fide and reasonable casualty loss deduction of substance uncontaminated by borrowed basis. § 1.165–1(b).

At first blush, it would appear, and plaintiff strenuously argues, that *Alcoma*, 239 F.2d 365, rejects this rationale. *Id.* at 369. Specifically, plaintiff claims that a determination that the timber stand is Weyerhaeuser's SIP would violate *Alcoma*'s rejection of the "percentage of basis" rule.[70] But our determination that the timber stand is Weyerhaeuser's single identifiable property and the treatment of basis thereunder is markedly different from the percentage of basis rule explicated in *Alcoma*. That rule required a taxpayer to determine the ratio that (1) the amount of the *reduction* in fair market value of a property resulting from a casualty bears to (2) the fair market value of the property *before* the casualty. That ratio would then be expressed in terms of a percentage, and that percentage would then be applied to the *entire adjusted basis of the SIP*—which was undisputed in *Alcoma*—and the resulting dollar "percentage of basis" would be the maximum amount of deduction allowed. For example, the foregoing formula is illustrated as follows:

| Item | |
| --- | --- |
| FMV of SIP before casualty | $1,571,575 |
| FMV of SIP after casualty | 1,380,075 |
| Diminution in FMV (loss) | $ 191,500 |

$ 191,500

| | |
| --- | --- |
| $1,571,575 = 12.185615% | |
| Adjusted basis | $523,479.77 |
| Loss allowed by IRS | |
| 12.185615% × $523,479.77 = | $ 63,789.23 |
| Loss claimed by taxpayer | |
| (§ 1.165–7(b)(1)) | $191,500.00. |

Such a determination is simply not the case at bar since we *do not* limit plaintiff to a deduction which is a fraction of its adjusted basis in its stand SIP, but instead have merely *determined that the bona fide SIP and its related adjusted basis is smaller than taxpayer believes it to be.* Plaintiff at bar, contrary to the approach attempted in *Alcoma*, will definitely be allowed *the entire adjusted basis* contained in each SIP (*i.e.,* stand) damaged or destroyed in determining the § 1.165–7(b)(1) limitation on the casualty loss deduction. Consequently, we have made our determination based on taxpayer's own inventory identification system and *physical separability*, which the *Alcoma* court itself recognized as a plausible method of SIP determination. *See Alcoma*, 239 F.2d at 368–69.

Against this background, it is clear beyond cavil that plaintiff can glean no comfort from *Westvaco*'s approval of *Alcoma*. There, the Court of Claims "consider[ed the government's] imposition of a fractional, *pro tanto*, or partial allowance of basis ... to be the equivalent of the 'percentage of basis rule' advanced by [the government] over a long period of years." *Westvaco*, 639 F.2d at 715. However, as explicated, *supra*, we do *not* allocate plaintiff's single identifiable property's adjusted basis in the stand and allow it only a percentage of basis. Rather, the distinction here is that we simply disagree with taxpayer as to what the bona fide SIP is, and, since we find that the timber stand is its SIP, and allow a deduction up to *all* of the basis contained therein, where appropriate under § 1.165–7(b)(1), our holding clearly does not violate either *Alcoma* or *Westvaco*.

We have previously stated that the term "single identifiable property" (§ 1.165–7(b)(2)(i)) has not been defined by the regulations, and, indeed, that term is hardly susceptible of other than an *ad hoc* definition. But taxpayer argues, nevertheless, that there exists in the Treasury regulations a definition

---

**70.** While *Alcoma* is a Fifth Circuit case, the Court of Claims' approval of its result makes that

case's rejection of the "percentage of basis"

of "property" [71] relating to the depletion block, and that we should be guided by the same verbiage in determining Weyerhaeuser's single identifiable property for purposes of the casualty losses at bar (§ 1.165–7(b)(2)(i)).[72]

We believe that plaintiff is clearly in error by proffering a "property" definition from the Secretary's depletion regulations and charitably concluding that the meaning of the term "property" in said regulation (§ 1.611–1(d)(1)(ii)) is substantially equivalent to the meaning of the term "single identifiable property" as contemplated in the casualty loss regulations. § 1.165–7(b)(2)(i). While plaintiff tenders *Westvaco* as generally dispositive of the substantive issues here at bar, a close analysis of that case discloses that its thrust was the rejection of the "depletion unit" found to be the single identifiable property in *Rosenthal*, 416 F.2d 491, and *Harper*, 274 F.Supp. 809, *aff'd*, 396 F.2d 223. *Westvaco* clearly held that "the determination of a casualty loss deduction *is restricted to a consideration of the loss and basis provisions* [of the Code only]. *No reference need be made to the depletion provisions.*" *Westvaco*, 639 F.2d at 710 (emphasis added). Thus, when the Commissioner sought to use the depletion unit to *limit* Weyerhaeuser's loss deductions, plaintiff quickly embraced *Westvaco, supra*, to justify the rejection of the depletion unit as a SIP for timber property. Taxpayer now attempts to rely on the very same discredited depletion regulations that it previously rejected when the Commissioner embraced the depletion unit as the SIP; Weyerhaeuser presently regards them as applicable since their flavor has become more palatable to its position. In this court, however, taxpayer may not have its cake and eat it too.

But even if we were to allow plaintiff to "flip flop" in this manner, it is, we believe, in error that its interpretation of those regulations will inescapably lead to the conclusion that the SIP, here at bar, must be the "block" inasmuch as the term single identifiable "property" in § 1.165–7(b)(2)(i) is defined by depletion regulation § 1.611–1(d)(1)(ii). Nothing is further from the truth for the reason that, while the depletion regulation, *supra*, defines "property" to consist of something called a "block," it may also consist of something called a "tract." In the context in which the phrase "tract or block" was used, we do not read those words to generate redundancy. Thus, since they must mean something different, one undoubtedly denotes an area larger in size than the other, and in that context we see that to be the "block." Consequently, the "tract," smaller than the block, logically would range in size not significantly dissimilar to a "tree stand." For these reasons, even if the "property" definition in § 1.611–1(d)(1)(ii) is applicable to the phrase "single identifiable property" in § 1.165–7(b)(2)(i), on the facts at bar, we do not believe that it gives plaintiff any comfort on the issue of what constitutes the "SIP."

For further proof, we need only look to the respective objectives—distinguished from the purposes—of the depletion and loss deductions and the related literal language of the regulations. "[Depletion] formulae are at best rules of thumb which attempt to approximate economic reality ...," *Alcoma*, 239 F.2d at 369, insofar as approximating capital to be charged against revenue. Stated differently, they are merely estimations of the reasonable portion of the total cost of a capital asset that is deemed used up in a given year. For that reason, a taxpayer is permitted to lump various related depletable properties together (*i.e.*, in the case of timber, an economic interest in standing timber in each tract or block representing a separate timber account, Treas.Reg. § 1.611–1(d)(1)(ii)) and deplete them as if they were one property. Treas.Reg. § 1.611–3(d)(1).[73] On the other

---

method binding upon this court. *Westvaco*, 639 F.2d at 715–16.

**71.** "Property" means "(ii) in the case of timber, an economic interest in standing timber in each tract or block representing a separate timber account." § 1.611–1(d)(1)(ii).

**72.** It is indisputable that the depletion and loss regulations are not *in pari materia*, the result being that a word in one section does not have the same meaning in the other.

**73.** While these estimations may result in deductions that are larger or smaller than the actual cost of the property "used up" in any given year, the differences will generally be small enough to

hand, non-personal casualty loss deductions, to be properly claimed, *must conform strictly to the exact property affected* so that only the precise (*i.e.*, single identifiable) investment lost (the true "out of pocket loss") is claimed against revenue. Treas.Reg. § 1.165–7(b)(2)(i).

In other words, with respect to "property" identified and eligible for depletion, the taxpayer must have an economic interest therein and that interest must be represented by a timber account. Conversely, with respect to casualty losses, the regulations provide that a "loss incurred" is identified, established, and determined by *the* SIP *"damaged or destroyed."* That latter phrase, "single identifiable property," is clearly made up of words of *limitation* and is consistent with the explication in *Westvaco*, wherein the court held that—

> ... the single identifiable property *damaged* by the casualty is the standing timber, merchantable and nonmerchantable *in an affected area.*

*Westvaco*, 639 F.2d at 717 (emphasis added). Thus, it is eminently clear that property, for purposes of § 165 incurred casualty losses, is simply that damaged standing timber which is "single [and] identifiable" and is situated in the smallest "affected area." The implication of this latter phrase, we believe, clearly underscores and corroborates the limiting effect of the phrase "single identifiable property damaged," which, in the case at bar, can only be the tree/timber stand(s) (or even in the "tract" as plaintiff suggests in view of § 1.611–1(d)(1)(ii)), as the wealth of probative evidence so shows.

Additionally, we observe that both the depletion regulations and the loss regulations contain a subsection concerning "aggregation" of property.[74] Under the depletion reg-

ulations, this subsection permits the aggregation of property for the purpose of making depletion calculations. But under the loss regulations, a taxpayer must determine his loss incurred *only* with respect to the "single identifiable property" *damaged* or *destroyed.* The phrase is an explicit requirement that only identifiable property damaged or destroyed be referenced for loss purposes. Taxpayer presented much evidence of its formation of depletion blocks according to management or operational boundaries and the fact that it purchases timber property which is then blended into a large depletion block along the same guidelines in accordance with the regulations. But since we see that these circumstances are irrelevant for purposes of its loss calculation, plaintiff's championing of the "property" definition in the depletion regulations is entitled to short shrift.

■ Lastly, on the issue of the appropriate SIP, taxpayer argues that the tree stand cannot be the correct choice because its stands do not have any allocated basis associated with them. Once a tract or other parcel of timberland is introduced into its asset accounts and becomes part of the *depletion block*, plaintiff's contention goes, its related basis is merged into the block's basis and the smaller tract ceases to have any single identifiable or allocable basis. Undoubtedly, Weyerhaeuser is of the opinion that *Westvaco* is dispositive of this issue, wherein it stated that:

> This is not only the identifiable property suffering the damage or destruction, it is the property with an identifiable adjusted *basis for determining loss.* The block reflects the *full* extent of the economic loss measured by a reduction in value; the depletion unit does not.[75]

---

be insignificant and, in any event, will even out to the proper total amount of deductions allowed over time. Furthermore, the cost of the effort of precision in these deductions would *not* exceed the benefit gained, considering that all of minute year-to-year discrepancies will wash out with each other.

**74.** Treas.Reg. § 1.611–3(d) ("Aggregating timber and land for purposes of valuation and accounting"); Treas.Reg. § 1.165–7(b)(2) ("Aggregation of property for computing loss").

**75.** The court was also concerned that using the depletion unit would prevent the plaintiff from taking a loss deduction for its injured immature trees, since such timber is not yet marketable and, therefore, not divisible in terms marketable, or depletion, units. *Westvaco*, 639 F.2d at 720. Our use of the stands should allay those fears since immature stands will have their own identifiable basis.

*Westvaco*, 639 F.2d at 719–20. But as we have repeatedly pointed out, the court's analysis there was *limited* to the block and the depletion unit and, the latter having no identifiable basis, the court logically turned to the "block" as the *only* other SIP option before it. But what was true of the depletion unit there is not necessarily true of the stand. The depletion unit has no identifiable adjusted basis because the unit is expressed in terms of *merchantable units* (cords and board feet). "Cords and board feet are not the units of property normally bought and sold by plaintiff [a vertically integrated forest products company]. It buys tracts of timber...." *Westvaco*, 639 F.2d at 717. And where such property is bought, there necessarily is a cost or other tax basis associated with it at the time of purchase or other acquisition. But whether the tracts in which timber is bought coincides exactly with Weyerhaeuser's stands or not, plaintiff certainly does not generally purchase or acquire timber in whole depletion blocks. That apparent fact alone evidences that tax basis is attributable to units smaller than the block.

Taxpayer claims, however, that it *does not* and *cannot* keep track of its cost basis along stand lines. It further claims that to do so "would not be administratively practical."[76] We have substantial misgivings with respect to plaintiff's self-serving utterance simply because any record can be kept of the most minute detail if there exists a desire and obligation to do so, particularly in this computer age. Plaintiff goes to great lengths to keep inordinately detailed records of a myriad of physical characteristics of its *stands* in its FIRS II inventory system on a standing basis, and so now cannot turn around and determine the tax basis of its own SIP (tree stand) by simply not keeping records on a basis unfavorable to its interests merely because it finds that to be impractical. To allow a taxpayer to successfully aver such a hospitable, self-serving, and transparent excuse as justification for impermissibly optimizing one's deductions would work a disastrous effect on the Treasury and in turn would make a mockery of the revenue laws. If plaintiff were to sell one or more *tree stands*, it certainly would have to cull out the related adjusted basis in order to properly report the gain or loss. More importantly, Treas.Reg. § 1.6001–1 requires a taxpayer to keep and maintain records "sufficient to establish the amount of gross income, deductions, credits, or other matters...." Consistent with the foregoing, ledger and subsidiary accounts should record all additions and subtractions to such accounts as to be in compliance with law and not just keep a running total, as plaintiff would have us believe. Furthermore, every taxpayer bears the heavy burden of *proving entitlement* to a specific deduction by a preponderance of the evidence. *See, e.g., Danville*, 16 Cl.Ct. at 593–94; *Tucker*, 8 Cl.Ct. at 186.

> The facts that plaintiff has the burden of proving the identity of the property, its fair market values, its adjusted basis, ... and that such burden may be "burdensome" or even impossible, are not grounds for foreclosing plaintiff its opportunity to attempt to meet that burden. Plaintiff is entitled to prove, if it can, its actual net "economic advance or setback" for the taxable period. *Taxable income, not computational inconvenience,* is the objective of the tax [Code].

*Westvaco*, 639 F.2d at 716 (emphasis added). Taxpayer, therefore, may not be heard to assert its "inconvenience" argument as a reason supporting its contention that the block is the SIP.

For all of the above reasons, we conclude that plaintiff's timber stand, as identified by plaintiff in its own inventory tracking system, is *the* appropriate single identifiable property *in the case of this taxpayer* for its timber property damaged and/or destroyed by the eruption of Mt. St. Helens and the 319 fires occurring during the years 1980 through 1983.

---

**76.** Moreover, taxpayer claims that to account for casualty losses by the stand, while depleting timber by the block, "would result in a taxpayer claiming either too much or too little cost recovery." Plaintiff gives a hypothetical example to prove its statement. Plaintiff's Memorandum In Response to the Post–Trial Brief for the United States at 66. But the calculation shown by plaintiff is overly simplistic and by no means probative of the fact that it would be impossible to calculate depletion by the block and loss by the stand.

### b. *Valuation Of The Eruption And Fire Timber Losses*

Plaintiff's timber valuation expert, Mr. Edward Van Zandt, valued the timber lost (as required by § 1.165–7(a)(2)(i)) as a result of the Mt. St. Helens eruption and testified at trial as to his professional opinions and determinations. Also, his formal internal opinion memorandum, dated February 14, 1992, detailing the valuation of the SIP involved in the eruption, was admitted into evidence as PX 55. In this report, Mr. Van Zandt concluded that the reduction in fair market value of the timber damaged and destroyed, *i.e.*, the SIP, in the Southwest Washington region resulting from the eruption, was $229,727,000. PX 55. In accordance with Treasury regulations, he valued the timber affected in the eruption area (using MBF volume) within *each stand* as *the* single identifiable properties (and not the region/block), both before and after the casualty. PX 55. In doing so, he reduced the amount of loss, *i.e.*, the difference between before and after value, by the value of the timber expected to be salvaged, again in compliance with the regulations.[77]

As discussed in the previous section, Weyerhaeuser's inventory foresters initially determined the amount of timber volume (MBF) lost (damaged or destroyed) due to the eruption and entered that data into the FIRS II system. Mr. Van Zandt admittedly relied on that FIRS II data in producing his valuation report, applied to the foregoing volumes of affected timber, rates or price values determined by reference to various sources for similar timber, and accounted for any appropriate reductions. His report stated:

> FIRS timber information included volume, age, species and quality. All known transactional evidence for comparable timber was collected for the area surrounding Mt. St. Helens from timber sale agencies, including U.S. Forest Service, Washington State Department of Resources, and Weyerhaeuser Company. The eruption affected timber was then compared against the transactional evidence by broad age classes and species. Differences in logging costs and quality were calculated and applied to the transaction evidence bid values. Using all value indicators developed, a final value was derived. Finally, an allowance for the "Willamette" discount[78] was applied to the final values.

PX 55 at W022664. A similar approach appears to have been taken with respect to valuing regeneration or plantation casualties. *Id.* Therein, his report stated as follows:

> A description of plantation casualty in the eruption area was obtained from FIRS. This included acres, age, stocking and site information. A regeneration value table was used to obtain the CMV on a per acre basis, dependent on the age, stocking and site combination. The table value times the acres resulted in the CMV[79] for a given plantation stand.

*Id.*

Defendant attacks Mr. Van Zandt's testimony and valuation report on the bases that he obtained some of his information from

---

77. The extraordinary cost of the operations to recover such salvage was properly subtracted from the salvage proceeds, thus reducing the amount by which salvage reduced the loss. PX 55.

78. *See Willamette Industries, Inc. v. Commissioner*, 54 T.C.M. (CCH) 616, 629–32, 1987 WL 49148 (1987). Timber owners that elect § 631 treatment of their timber utilize the fair market value of the timber as of the first day of the year in which the timber is cut in order to calculate their gain or loss realized upon the cutting. This fair market value is determined by the prices paid for comparable sales, so bids for other timber made during the same year are relied upon for this purpose. However, when timber is purchased in a long-term contract, so that a bid is made and accepted on a certain date, but the timber purchased is cut and delivered by the timber owner over the course of the next several years, the bid price is actually the amount that the willing buyer would pay in the future, when the money is actually paid and the timber is actually received. Bid prices on long-term contracts, therefore, are not useful in determining current fair value of timber in their original form. In order to reflect current cash value at the bid date, then, the bid price to be paid in the future must be discounted to its present value. Only then does the long-term bid price provide an accurate measure of current fair value for calculating § 631 gains and losses.

79. Current market value.

other Weyerhaeuser personnel (such as tax department employees) and, therefore, did not have personal knowledge of the data upon which he relied, and, thus his credibility is suspect. We reject these attacks for three reasons. First, Mr. Van Zandt was proffered by taxpayer as "an expert in timber valuation from the company's perspective," and not as a fact witness. While fact witnesses must testify from their own personal knowledge, it is neither impermissible nor uncommon for experts to rely upon information supplied them by others in reaching an opinion or conclusion.[80] As would be expected of a valuation expert, Mr. Van Zandt determined the appropriate rates to apply to the volume of damaged timber supplied him by appropriate persons.

Second, defendant attacks the expert's credibility because Mr. Van Zandt stated that he had obtained the total number of "cunits" affected by the Mt. St. Helens casualty from the FIRS system, but on cross examination, admitted that the data had really come from another source. We do not think that this significantly or necessarily impairs Mr. Van Zandt's credibility. In response to questions, defendant developed the true source of the expert's information as follows:

Q. What is page 7 of 7 of ... defendant's Exhibit 374?

A. This is a recap of the information that I used to determine species composition and total volume affected by the blast area. It's a—it's a representation of the FIRS database. The FIRS database went directly into the array that is produced here.

Q. Who gave you this paper?

A. I got it from the tax department.

\* \* \* \* \* \*

Q. Did you do any—did you undertake any activity to check out the number 2667943.8 CCF to determine whether it was accurate?

A. Yes, sir, I did.

Q. And what did you do?

A. I compared this against a number that came from—originated with Terry Pack and subsequently was sent to the tax department, documentation that indicated the amount of cunits that was affected by the blast area.

Tr. at 2068–69. Mr. Van Zandt, therefore, used a source that derived its information from the system he claimed to have used for his relevant data, obtained it from a person within his company that he should have been able to rely on, and made his own check to ensure the data's accuracy. We find Mr. Van Zandt to be credible to this extent.

Lastly, the court has seen innumerable photographs of the damage inflicted upon the region by the volcanic eruption, and even flew over the area for several hours in a helicopter to obtain a first-hand view of the damage and destruction. Through this visual evidence, the court is convinced that the holocaust inflicted on the area by the eruption is massive and that the loss was immense in value, certainly exceeding $100 million. All things considered, even if Mr. Van Zandt were stretching the truth, or simply in error, he could not be so far off that the diminution in fair market value of the Southwest Washington region could be anywhere near the amount that would be less than the adjusted basis of the single identifiable property, no matter which SIP (*i.e.*, tree stands or the block) we determined to be correct. We, therefore, find that plaintiff has proven its claimed timber loss in the Mt. St. Helens region by a preponderance of the evidence and will, therefore, be allowed to deduct, in accordance with our ruling, the lesser of the diminution in fair market value and the total amount of adjusted basis related to *the* SIP as determined by this opinion, *i.e.*, the affected timber stands, as permitted by § 1.165–7(b)(1). This amount is to be stipulated to by the parties.

Mr. Van Zandt prepared similar valuation reports on the alleged losses to mature and plantation (regeneration) timber resulting from 319 forest fires. PXs 53 and 54. With respect to mature timber fires, the Galena Ridge and Rocky Top fires, he determined the § 1.165–7(a)(2)(i) diminution in value, *i.e.*,

---

**80.** For example, doctors, whether testifying or merely making a medical diagnosis, repeatedly rely upon the tests and reports of others, such as radiologists and lab technicians.

the amount of loss deductible, by simply multiplying volume affected times value or rate with respect to each incident. The amount of the loss for the 319 *regeneration* fire casualties was comparably valued by simply multiplying the affected *acres* destroyed or damaged times a pre-determined table-dollar-value per acre. This was plaintiff's methodology in determining diminution (difference in value before and after the fires) in the SIPs damaged/destroyed by the fires. In view of the foregoing, and as previously discussed, plaintiff, of course, *failed* to value the blocks in which it contends the fire casualties in fact occurred, but, simply *and correctly*, we find, valued the specific *tree stands* within which the identifiable *affected* property was situated. § 1.165–7(b)(2)(i).

■ Defendant objected to this methodology for the following reasons:
(i) Mr. Van Zandt was not offered as a professional appraiser, but merely as an expert in timber valuation;
(ii) Mr. Van Zandt claimed knowledge at trial that he did not have;
(iii) Mr. Van Zandt claimed he did work that he did not do; and
(iv) Mr. Van Zandt failed to establish the loss associated with *each* casualty event—but used a composite analysis.

Defendant's objection (i) requires short shrift inasmuch as it appears to be frivolous, if not specious. We find that Mr. Van Zandt sought to do nothing more than testify as an expert in timber valuations and appraising. Contentions (ii) and (iii) go merely to the credibility to which Mr. Van Zandt is entitled respecting his opinion testimony. Moreover, these contentions are not probative of anything inasmuch as defendant "[failed to] offer any [countervailing] evidence concerning the diminution in value of plaintiff's timber due to forest fires." Finally, while technically plaintiff is required to meet the operative requirements of the regulations, here, what plaintiff did was to determine the *acres* damaged from all of the stipulated fires by region/block and year and opined various dollar values per acre as to each. The extension from these factors results, in effect, from plaintiff's position, a determination equal to substantially the same results had the valuation analysis been done on the basis of individual fires instead of on the basis of a composite analysis by regions/blocks.

■ We believe, therefore, that the ultimate results regarding the valuation of the regeneration fire losses, given the volume (*i.e.*, acres, etc.) times the dollar value per acre, are apparently reasonable and, since the results should be substantially the same, we view such omission (*i.e.*, failure to establish each loss to a specific casualty event) to be harmless error. Consequently, as with Mr. Van Zandt's Mt. St. Helens valuation methodology, defendant's objections are entitled to no credence where, as here, it failed to offer any countervailing substantive evidence on the foregoing *valuation* issues. We do not have a conceptual problem with plaintiff's *preliminarily* establishing the block's adjusted basis, even though we have held that the tree stand is *the* SIP, since the greater includes the lesser. As will be discussed, *infra*, we will *require* plaintiff to carve out the related adjusted basis of each tree stand SIP, in order to satisfy § 1.165–7(b)(1) and obviate the obvious problem of impermissible borrowed basis.

Moreover, subsequent to the preparation of the valuation reports on February 12, 1992, the parties stipulated on June 19, 1992, to the *number of fires* and the *total acreage* affected "with respect to the regeneration fire casualty losses." JX 4. It is that stipulation which will control plaintiff's ultimately allowed deduction, since it supplements and appropriately supersedes Mr. Van Zandt's opinion report in pertinent parts. Based on said stipulations, plaintiff's expert recalculated the loss in terms of dollars for the Rocky Top and Galena Ridge fires and the regeneration fires for each region. From the foregoing, we are satisfied that taxpayer has proven its § 1.165–7(a)(2)(i) loss in the amount of $1,236,780 (diminution in fair market value) resulting from the fires.

Plaintiff has determined its loss respecting *regeneration* timber by multiplying acres affected times dollar value per acre. These losses actually occurred within multiple tree stands, contained within specific regions or blocks, which we have previously determined

to be the SIP. Treas.Reg. § 1.165–7(b)(2). While Weyerhaeuser has proven its adjusted basis for the *entirety of each block* in which the affected stands reside, rather than proving its adjusted basis for the appropriate stands, contrary to the regulation's mandate, we are not inclined to deny taxpayer its deduction for this technical non-compliance, since it has indeed suffered a true loss, the monetary parameters of which are vast. In fact, plaintiff has proven both its loss (diminution) in fair market value ($5,457,211) and its basis, if only in the aggregate, and, therefore, need only cull the appropriate lesser stand amounts applicable to the *directly affected stands* from these lump sums to cure its minor defect. Thus, due to the overall complexity of this case and the multiplicity of possible outcomes arising from the many types of property and casualty events, the parties have previously agreed, during this litigation, to stipulate to the amount of the refund due plaintiff, if any, based on the court's findings on each SIP issue. They can now do so by determining the appropriate adjusted basis for each stand affected by the fires and the resulting amount deductible as allowed by § 1.165–7(b)(1).

We, therefore, hold that plaintiff has proven its loss (diminution in fair market value) and *overall* adjusted basis with respect to its SIP damaged and destroyed by the volcanic eruption and its timber property damaged and destroyed by the various fire casualties. Taxpayer will, therefore, be allowed a deduction for the *lesser* of the diminution in fair market value or the adjusted basis *in each timber stand affected* by the aforementioned casualties. As stipulated to by the parties, following the issuance of this opinion, they shall calculate and agree to the appropriate amount of adjusted basis of each affected tree stand and the amount of the deduction

for each casualty shall be as permitted by § 1.165–7(b)(1).

### 3. *Timber Losses—The Southern Pine Beetle Infestation*

Finally, plaintiff also alleges damage to its timber holdings resulting from a third type of casualty, *i.e.*, an epidemic infestation by the southern pine beetle ("SPB"). Taxpayer avers its 1980 casualty loss from beetle infestation to be in the gross amount of $2,062,-960, which was determined by multiplying the 1980 § 631(a) log values for the Mississippi/Alabama region by the volume (50,750 CCF) of damaged and unsalvaged timber. Of the alleged total SPB casualty loss, $619,-885 was attributable to the Mississippi Fee Region No. 42 depletion block, and $1,443,075 of the damage allegedly occurred in the Alabama Fee Region No. 41 depletion block.[81] Taxpayer deducted the full amount of its averred loss on its tax return because that amount ($2,062,960) was less than the adjusted basis in the corresponding depletion block(s), which *plaintiff* hospitably considered to be its SIP when it claimed said deduction.

The IRS denied taxpayer's claimed casualty loss *in toto*, but, nevertheless, allowed an ordinary loss deduction in the total amount of $293,080, consisting of $174,155 for the Mississippi block, and $118,925 for the Alabama depletion block. The Service determined that loss by multiplying the volume of damaged timber by the respective depletion units, *i.e.*, an allocated basis figure per CCF of $11.24/CCF and $3.35/CCF, respectively, for the affected blocks. The difference between Weyerhaeuser's claimed deduction and the amount of non-casualty deduction allowed by the Commissioner, $1,769,880 ($2,062,960 − $293,080), is the amount here in issue.

| | Claimed | Allowed | Amount In Issue |
|---|---|---|---|
| Mississippi Fee Region | $ 619,885 | $174,155 | |
| Alabama Fee Region | 1,443,075 | 118,925 | |
| | $2,062,960 | $293,080 | $1,769,880. |

---

81. The two regions are managed as one, but are considered separate properties for depletion purposes, in accordance with the Treasury regulations, because of the state boundary line running through them. Treas.Reg. § 1.611–3(d)(1).

### a. *The Single Identifiable Property*

■ The specific property that is *the* subject matter of this particular casualty loss (SPB) is exactly the same type of timber property damaged or destroyed by the Mt. St. Helens volcanic eruption and the 319 fires. It is property inventoried through the FIRS system, identified and accounted for in *exactly* the same way as is the rest of taxpayer's timber holdings. We find it unnecessary, therefore, to reiterate all that we have stated previously with regard to what constitutes plaintiff's § 1.165–7(b)(2)(i) *SIP* for purposes of the various casualty losses, *supra.* As with said affected property destroyed by the volcanic eruption and the 319 fires, the single identifiable property allegedly damaged or destroyed with respect to the SPB casualty, if any, is also each affected *timber stand,* as defined by taxpayer's FIRS II system, for the identical reasons explicated, *supra.*

### b. *Valuation Of The Loss From Beetle Infestation*

■ Unlike the preceding casualty losses claimed by plaintiff for the volcanic eruption and fires, we find that there is a fundamental failure of proof on taxpayer's part with respect to the claimed SPB casualty losses. Weyerhaeuser presented testimony of its employees as to both the alleged cause and volume of timber lost in the Mississippi/Alabama ("Miss/Ala")[82] region in 1980, but very little probative documentary or other corroborative evidence from its business records was offered in support of the testimony. Moreover, certain SPB business records were mysteriously destroyed at a point in time when plaintiff well knew it had, or contemplated asserting, a substantial tax refund claim. For reasons discussed *infra,* these facts raise a negative inference as to the credibility and the probative value of the evidence that plaintiff adduced, severely diminishing the weight accorded it by this court in making its factual findings. Furthermore, as to the testimony that was proffered by the taxpayer, we find that its methods of determining the volume of timber allegedly damaged by the SPBs and its hospitable conclusions that all (or practically all) of said losses were in fact caused by SPBs are seriously suspect and highly doubtful. Stated differently, we are not satisfied that plaintiff proved its case by the requisite burden. Accordingly, we deny plaintiff's claim for refund with respect to the alleged SPB losses for the reasons detailed hereinafter.

In 1980, the Mississippi and Alabama State Forestry Commissions ("MFC" and "AFC," respectively) declared SPB epidemics in counties coinciding with the company's timber ownership in that region.[83] Thereafter, in April 1980, taxpayer inspected its properties in such counties for evidence of SPB infestation. Plaintiff's witnesses[84] testified, in that connection, that the company identified timber losses allegedly caused by SPBs through aerial reconnaissance of its timber stands in the Mississippi/Alabama region. Employing helicopters initially, and later in fixed-wing aircraft, taxpayer's employee(s) flew over Weyerhaeuser's property at a height of approximately 1,000 feet. Plaintiff's employee would mark what he thought to be SPB "spots" on previously taken aerial photographs of the same land area (or photocopies thereof), which delineated stand and property ownership boundaries. Said marks purportedly accounted for both the approximate location and size of the spot, based on the observer's *eyeball estimation.* Some of the spots identified from above would then allegedly be confirmed by ground verification

---

82. This is the shorthand term employed by Weyerhaeuser for the region.

83. The Mississippi Forestry Commission defines an SPB epidemic as "one spot of multiple trees per thousand acres." Tr. 1346–49. A "spot" is defined as "a clump of trees which could be one or two or several trees." Tr. 1118. An epidemic according to the Alabama Forestry Commission is "two or more spots ... per thousand acres of pine trees." Tr. 1121.

84. Darrel Maddox was the forest planner in 1980 for the Bruce district in the Mississippi/Alabama region; and Carl Springer was the forest planner in 1980 for the Lamar district in the same region.

on a sampling basis.[85]

Taxpayer then used "dot grids" to determine the estimated volume of timber contained within *the spots delineated on the photos.* This was averred notwithstanding the fact that plaintiff admitted through Mr. Maddox that trees infested by *SPB cannot* be identified from the air. These grids were simply a series of dots on transparent overlays, allegedly created on the same scale as the aerial photographs of the timberland. *Each dot represented an acre or a fraction thereof.* When the "dot" grid was placed atop the photograph, the dots falling *inside* the alleged beetle spot marks were counted and the volume of timber allegedly lost was calculated based upon the estimated amounts of cunits or board feet per acre.

We reject plaintiff's method of determining both the *cause and the volume* of its timber allegedly lost to SPB infestation as unreasonably speculative and insufficiently conclusive and precise to reliably establish its loss by a preponderance of the evidence, as required. First, taxpayer purports to definitively identify the destructive mischief of the southern pine beetle by the yellowing pine needles seen during bird's-eye aerial observations (1,000 feet) of its property.[86] However, when Weyerhaeuser conducted its reconnaissance, even it was unsure and conjectural as to the true cause of any of the signs of damage witnessed. Pertinent to the foregoing, Mr. Maddox testified about the observation performed by another company employee as follows:

Q. Mr. Maddox, we were talking about the use of the aerial photographs, and I wonder if you could tell us again how the aerial photographs were used by Mr. Bailey, so we can pick up where we left off.

A. All right. He took the photos, aerial photos of the area that he was going to fly with him in the aircraft. On those photos was a clear mylar overcoating. And when he saw a pine beetle spot, *or what he thought was a pine beetle spot,* he so noted on that photo as to the approximate location.

Tr. at 1179 (emphasis added). Moreover, on cross-examination, Mr. Maddox and Mr. Springer admitted to various *other possible explanations for the yellowing pine trees that taxpayer appears to have mechanically claimed as SPB casualty losses.*[87] These included black turpentine beetles, ips beetles, disease, and lightning storms. Furthermore, black turpentine and ips beetles were present on taxpayer's land and killed Weyerhaeuser trees in the area in 1980.[88] Additionally, since lightning storms also occurred in the Lamar district every year and caused tree

---

85. Ground verification consisted of looking around the base of suspected infested trees for dead beetles and wood dust or shavings, and inspecting the tree for the unique "S" shaped egg galleries in which young beetles hatch and grow.

Mr. Maddox, earlier in his testimony, stated that it was easier to identify infested trees from the air because the only signs visible at ground level are dead beetles and wood shavings. We take this to mean that the SPB resides in the *upper portion of trees,* at altitudes which exceed human sight capabilities. Later in his direct examination, Mr. Maddox stated that most spots were inspected for egg galleries. Tr. 1264. The two statements would seem to be incongruous and mutually exclusive, for, if the beetles' home is indeed a lofty one, then the egg galleries could not be examined; if the egg galleries could be examined, then infested trees could be identified by means other than imprecise aerial observation, and aerial observation is then merely a convenient shortcut to calculating an infestation casualty loss claim for taxpayer.

86. The discoloration of the needles is a function of the tree's sickness or death from any cause, and not necessarily SPBs in particular. Tr. 1181, 1263–64, 1272–73.

87. It is significant to observe that, when taxpayer listed the locations of what it perceived to be SPBs, it *failed* to verify that the true cause *of those particular spots* were, *in fact,* SPBs. Tr. 1264. Losses in the same geographic area from causes other than SPBs—such as black turpentine and ips beetles, disease, and lightning storms—which plaintiff did not and/or could not claim as casualty losses, were not calculated separately from its alleged SPB losses and, therefore, would have been erroneously included in the SPB casualty loss claims. At the very least, plaintiff did not testify that such analyses were made and an appropriate adjustment was made for losses caused by *other than* the SPB.

88. Mr. Maddox testified that they personally check hundreds of spots. On closer questioning, however, he conceded that he could not verify the number of spots actually checked or the number that *he* personally checked. Tr. 1276.

deaths, it is impossible to distinguish between the timber damage occasioned by the different beetles and other causes. In this connection, the court finds the following testimony of Mr. Springer to be probative:

Q. ... In Mississippi–Alabama do you experience lightning storms every summer?

A. Yes.

Q. Do you know, on average, about—ball park number—how many lightning storms are experienced in the Lamar district?

A. No; I don't have a figure.

\* \* \* \* \* \*

Q. With respect to the 2,000 spots that were reported for 1980 in the Lamar district, isn't it true that you do not know how many of those spots were attributable to black turpentine beetles?

A. That's true; yes, sir.

Q. Isn't it true that you do not know how many of those 2,000 spots were attributable to Ips?

A. That's true.

Q. Isn't it true that you do not know how many of those 2,000 spots were attributable to lightning storms?

A. That's true.

Q. Isn't it true that you do not know how many of those 2,000 spots were attributable to short-leaf disease?

A. That's true.

Tr. 1352–53. Thus, given all of the foregoing, any definitive conclusion as to the real cause(s) for the yellowing of the pine needles, particularly from an aerial view, is clearly conjectural. This is particularly true for someone who is not an entomologist. Moreover, Mr. Maddox further admitted that 1980 was *the first time* in his 26 years as a forester that he encountered SPBs. And he has encountered them only once since 1980, and that was in 1985–86.

Second, the accuracy of the spots is limited by the accuracy of the observer marking them on the photographic copies. This significant limitation on the efficacy of plaintiff's methodology is magnified further by the fact that such spots are marked while in a moving aircraft. Mr. Maddox has candidly admitted that these circumstances magnify the clear possibility or likelihood of error:

Q. Now, in estimating the size of the spot, would it not be—would not it be difficult for the person in the airplane to make an accurate shape on the paper that he had on top of a photograph that he had on his lap, while the airplane was moving?

A. Well, it would've been relatively hard to draw a straight line, yes, sir, while the aircraft was in motion.

Q. Would it be true that, to the extent that the shape and the size of the mark on the paper on the photograph on the lap in the airplane that's in motion, to the extent that's wrong, then any estimate of the size of the spot will also be wrong?

A. There is that possibility; yes, sir.

Tr. 1273. By the most obvious logic, therefore, if the shape and size of the mark and, therefore, the estimate of the spot size is overly generous, *i.e.,* in error, then so too will plaintiff's calculation of volume damaged and, undoubtedly, its casualty loss claim in all probability will also be in error. In considering this additional shortcoming of taxpayer's technique, we note that the company's dot grids, which are placed atop the marked photographs, are made on scales of up to one dot representing an entire acre. Considering the vastness of plaintiff's timber region and the value of the timber, if each of plaintiff's spots were off by several dots or even by only one dot, the loss claimed by the company would be greatly overinflated, considering that the spots listed for the tax year in issue number in the thousands.[89] Additionally, a "spot" can be "a clump of trees which could be one, or two or several trees." Tr. 1118. The more petite the spots, the more onerous the task of accurately marking the affected area on a photograph depicting an area vast enough to allow for identifica-

**89.** We are not unmindful of the argument of the law of averages, *i.e.,* that the inaccuracies in the spot markings will probably result in too much lost timber claimed in some spots and not enough in others, but the court cannot award income tax refunds on the basis of mathematical hope. It is hornbook law that deductions are a matter of grace and not of right and are to be strictly construed. *Interstate Transit Lines v. Commissioner,* 319 U.S. at 593, 63 S.Ct. at 1281.

tion of multiple stands and property boundaries.[90] Also, since the dot grid overlays are made on the same scale as the photographs, where one dot equals a whole or fractional acre, it would be virtually impossible to correctly identify one or even two dead trees (*i.e.*, a "spot") beneath a dot representing a whole acre.

The court questioned Mr. Maddox regarding its concern about the accuracy of the dot grid system as follows:

THE COURT: Well, the question in the Court's mind is how accurate is that dot in relationship to the spot that you observed from above?

\* \* \* \* \* \*

THE WITNESS: Your Honor, we feel it's within a plus or ten—plus or minus 10 percent.

THE COURT: You feel, on what basis?

THE WITNESS: From my experience.

THE COURT: Have you done any scientific analyses to confirm that, quote, "feeling"?

THE WITNESS: *Not in this particular operation, we did not.*

Tr. 1184–85 (emphasis added). Even if we were to accept Mr. Maddox's bald, unsupported, untested estimated "feeling" of the dot grid's accuracy, which we do not, the court would still be constrained to reject taxpayer's claim on the grounds that it has failed to prove its loss by the requisite standard—more probable than not. Plaintiff's total claim for alleged SPB losses was $2,062,960, and the amount in issue at bar is $1,769,880. Based on Mr. Maddox's self-serving undocumented assessment above, plaintiff's claim could be at least $176,988 ($1,796,880 × 10%) in error. While taxpayer may be willing to accept the risk of conceding 10% of his claimed refund, a modest amount, to assure the receipt of the 90%, nevertheless, the court is not willing to accept rank guesses, in lieu of reliable proof.

90. Since stands can contain hundreds of acres, the herculean task of denoting two damaged trees with precision is manifest.

91. As noted previously, Mr. Maddox's professed experience is limited to two encounters with

Plaintiff avers, on the other hand, that these shortcomings of its methods (aerial inspection even though one cannot determine from the air whether the damage was caused by SPB, ips beetles, or black turpentine beetles) are mitigated by confirmation of spot causation through ground verification. In this connection, Weyerhaeuser employees would venture out to aerially-identified "spots" and look for demonstrative evidence of SPB infestation as well as other beetle presence. Not all "spots" were checked, but this procedure, combined with the declaration of an epidemic, gave Mr. Maddox great confidence in his apparent *assumption* that the SPB spot was the *sole* causation of plaintiff's timber damage to the exclusion of the ips beetles, the black turpentine beetles, or other causes. And when inquiry was made whether the volume of damage attributable to the SPB was separate from other causes, the following occurred:

Q. . . . what did you calculate it separately from?

A. Well, sir, when you had an epidemic of Southern pine beetles in the area, there was a high probability that that is what killed the trees. Like I said awhile ago, we went out in most of those spots and actually verified that. Now, I'm not saying there wasn't some trees around the fringe that had been killed from other beetles, but 99 percent of those trees in those spots were killed by Southern pine beetles—not all of them, no.

Q. That's your opinion. Isn't that true?

A. Well, it's based on some—several years of observation.[91]

THE COURT: How do you arrive at 99 percent, sir?

THE WITNESS: Well, that's an estimate, sir.

THE COURT: Based on what, sir?

THE WITNESS: Going out and checking those spots on the ground.

SPBs in 26 years as a forester and, 1980, the tax year at issue in the instant case, is the first of the two. His second exposure came in 1985–86. Tr. 1108, 1123.

THE COURT: Did you check 100 percent of the area or did you do a sampling?

THE WITNESS: A sampling of it.

THE COURT: And how extensive was your sampling?

THE WITNESS: Well, that depended on the size of the spot. It was usually a 10 or 20 percent sampling of it.

BY MR. SQUIRES:

Q. How many? How many samples did you do in your study?

A. To verify the—

Q. The 99 percent estimate.

A. I'd have—it would be an estimate. But like I said, we verified the spots on the ground.

Q. I asked you, sir, how many samples did you take in order to conclude that there was a 99 percent probability that these were caused by Southern pine beetles?

A. Fifty to 60 percent of the spots.

Q. ... how many spots did you check?

A. Hundreds.

\* \* \* \* \* \*

Q. And did you prepare workpapers on your analysis?

A. No, sir, we did not.

\* \* \* \* \* \*

Q. How many trees did you individually check in each spot?

A. At least somewhere—two or three trees, up to ten trees. It would ... vary ... based on the size of the spot.

\* \* \* \* \* \*

Q. Are there, to your knowledge, any workpapers by anyone who participated in this study?

A. No, sir.

Q. Were there ever any workpapers by anybody who participated in this study?

A. Yes, sir.

Q. What happened to them?

A. They were destroyed or thrown away.

When asked on cross-examination when such workpapers were prepared, Mr. Maddox stated—between "April through October" of 1980. But when asked—"When were those records destroyed?" Mr. Maddox stated—"I don't know." Tr. 1274–78.

While the mere declaration of an epidemic may, at first blush, ostensibly give credence to Mr. Maddox's belief that the greatest portion of damage was done to plaintiff's timber by SPBs,[92] the nature of the two operative definitions with respect to such an event, *i.e.*, "two or more spots per thousand acres," and "one spot of multiple trees per thousand acres," lessens the likelihood that the belief is correct and reduces it to a mere hunch. Hunches, or speculations, if you will, pursuant to tax law, are not sufficient to carry plaintiffs' heavy burden(s) in this court. Neither, in this case, is the so-called and superficial "ground verification" of alleged SPB infestation done by Weyerhaeuser. This is particularly true in the absence of corroborative workpapers which appear to have been mysteriously destroyed at a time when the corporation had substantial reasons to believe that they would be critical in establishing the bona fides of a refund claim.

According to the above-quoted testimony, 50–60% of the total spots aerially identified (more than 2,000) were checked by taxpayer, *i.e.*, between 1,000 and 1,200. However, only 10–20% of each spot was inspected in Weyerhaeuser's sampling process. As a matter of simple math, that means that plaintiff allegedly confirmed the presence of SPBs in only 5–12% [93] of the total area it claims to have been damaged or destroyed by SPB infestation. We regard this undocumented and purported corroboration as highly suspect and wholly lacking in any meaningful credibility and probative value. This conclusion is even more compelling when, taken in conjunction with (i) the potentially small areas of SPB presence under the definitions of epi-

---

**92.** Considering scientific definitions aside, the term "epidemic" connotes or conjures up images of *widespread* or *mass affliction*, something more than the record definition for an "epidemic" and a "spot."

**93.** 10% of 50% equals 5%. 20% of 60% equals 12%.

**134**

demic and spot; and (ii) the destruction of and the failure to prepare the corroborative sampling workpapers. Additionally, compelling to this conclusion is the admitted fact that one cannot determine from an airplane at 1,000 feet the true cause(s) of the spots, and the admitted fact that they do not know "how many of [the total] spots were attributable to [*causes other than the SPB*]." Tr. 1352–53.

In his direct testimony, Mr. Maddox averred what he considered to be two reasonable grounds for placing substantial reliance on the accuracy of the aerial observation and dot grid system in determining the volume of timber allegedly damaged by the SPB. First, the reasoning goes, Weyerhaeuser has used the results obtained from this process in the past to update its FIRS inventory to reflect the amount of timber allegedly lost from SPBs. This, he argues, lends a certain air of inherent credibility to taxpayer's procedure, since the very functioning of the company hinges upon the availability of accurate inventory accounts. Our response to the foregoing is that he assumes a fact that has not been established. Second, taxpayer has used the dot grids to determine the amounts that it paid cutting contractors to fell its timber. The contractors would be paid based on a certain rate per acre of timber cut. The fact that Weyerhaeuser bases a regularly recurring cash outflow process on the precision of the dot grids, he further argues, similarly buttresses plaintiff's claim that its method is reasonably accurate. However, we are not convinced that these undocumented, self-serving assertions can suffice for corroborative purposes in buttressing plaintiff's quantum of proof.

We note that when Weyerhaeuser contracts to have its timber cut and measures the area in which it will be done using the dot grids, it does so for large harvest settings covering many acres and often crossing stand boundaries. This fact may lend to the increased utility of the dot grid method in that circumstance since the scale of the grids (*i.e.,* a dot being equal to up to one whole acre) is eminently more suited to the measurement of such expansive areas, as opposed to smaller ones. In contrast, when used to measure

allegedly infested areas, the dot grids may be measuring an area decidedly smaller than an acre—*as little as two trees,* and possibly one tree. Accordingly, Weyerhaeuser's method is not nearly as appropriate for proving its volume loss at bar as plaintiff would have the court believe.

More importantly, we cannot accept taxpayer's hospitable assertion that its dot grid method must necessarily be sufficiently accurate to prove its volume of loss since Weyerhaeuser rests its financial and record-keeping results on same. In every business, entities make management decisions on what information it will track, how detailed the information will be, and how it will go about tracking the data. Such questions are generally resolved based on the marginal utility of the information being considered, *i.e.,* how much will it cost to retain this data, to what extent will its retention serve the entity's needs, and will the benefit of retaining it exceed its costs. These inquiries are known as cost/benefit analyses.

In deciding to use its dot grids to measure its cutting contractor payments and update its FIRS inventory, plaintiff has concluded that its estimations of acreage felled or destroyed made through its grid system are accurate enough for the company to function. Any discrepancies between estimated and real volumes are offset by the minimized cost of its procedures. To be more precise would cost Weyerhaeuser more than would be gained through exact inventory records, contractor payments, and loss claims.

This court, however, does not deal in cost/benefit analyses; but rather, it deals in appropriate quantums of proof in the process of dispensing justice. Notwithstanding the favorable attributes to plaintiff of its system, we cannot be swayed to complicity by the dot grid's private utility and seemingly oracle-like predictions. We, therefore, reject plaintiff's proffer of its method as reasonably and accurately depicting its volume of timber loss stemming solely from the SPB.

Lastly, and of greater significance, we are constrained to address taxpayer's failure to produce any of its records or other workpapers in support of its employees' testimony regarding its alleged SPB casualty loss

claim. As we stated at the beginning of the Discussion section of this opinion, a taxpayer bears the *heavy* burden of proving entitlement to a particular tax deduction. *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7–8 (Fed.Cir.1990). Such proof requires a probative evidentiary showing, *i.e.*, by a preponderance, made with heavy reliance on the taxpayer's records. Indeed, and in this connection, it is a basic and fundamental rule of federal tax law that taxpayers are *required to keep and maintain records* "sufficient to establish the amount of gross income, deductions, credits, or other matters...." Treas. Reg. § 1.6001–1. Where records in the hands of a taxpayer mysteriously disappear or are destroyed by taxpayer when they are known to be needed for future litigation, a negative inference is compelled and is appropriate, giving rise to the reasonable presumption that, if such records were offered and received into evidence, the information contained therein would have been *unfavorable* to the taxpayer. *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir.1987); *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1567, 118 L.Ed.2d 212 (1992); *Pressey v. Patterson*, 898 F.2d 1018, 1024 (5th Cir.1990).

Plaintiff failed to produce any hard copy documentation underlying or supporting the alleged SPB volume losses recorded in the FIRS system and claimed as casualty deductions. Neither the workpapers of the employees who allegedly confirmed the losses by ground verification (Maddox, *et al.*) nor any of the inventory update worksheets were retained by plaintiff for evidence at trial to prove the details of its claim. Such documents were destroyed by the company at some unspecified time alleged to have been five to seven years after creation, and according to perceived but unproduced record retention policies.

Notwithstanding the alleged company record retention policy, we fail to see how taxpayer could have destroyed any such basic corporate records given the obvious existence of a substantial federal tax audit/refund issue. Plaintiff's audited return years (1980 through 1982, inclusive, and 1983) by the IRS were completed in 1986 and 1988, respective-

ly. Knowing that it might have to litigate these issues in either the Tax Court, the District Court, or the Court of Federal Claims, we are led to believe that no person in plaintiff's employ took steps to safeguard the records that would logically be needed to prove its prima facie case. This omission is surprising in the face of the testimony of Mr. Stancato, vice president and corporate controller, that Weyerhaeuser has a policy to maintain records *until any related litigation is complete.* Weyerhaeuser obviously is not an unsophisticated entity in such basic and routine tax matters. To the contrary, it is a highly-proficient, multinational corporation and, undoubtedly, a Fortune 100 company. Neither are plaintiff's management level employees devoid of basic common and professional sense in these matters. Accordingly, we are not convinced, on this record, that plaintiff could have realistically believed that its "spotted" photographs, overlays, and summary inventory records could, *ipso facto*, suffice as *probative* evidence of its timber volume lost allegedly due solely to SPB infestation.

When the court questioned Mr. Zubowicz regarding the existence of detailed and primary corporate records, probative of the alleged SPB casualty, the following colloquy ensued:

THE COURT: Is the Court correct in understanding, Mr. Zubowicz, that your testimony has been that there is no backup, detailed backup for your statement in plaintiff's Exhibit 46, that across Mississippi and Alabama this pest destroyed nearly 51,000 cunits?

THE WITNESS: Yes, sir.

THE COURT: There is no backup?

THE WITNESS: Currently, there is no backup; yes, sir.

THE COURT: What do you mean, "currently,"? I'm talking about—

THE WITNESS: Well, I mean that right today there is no backup.

THE COURT: Because the detail records have been destroyed?

THE WITNESS: Yes.

THE COURT: Is there a written policy with respect to the appropriateness of destroying records by the company?

THE WITNESS: Related to inventory information?

THE COURT: Is there any written policy relating to anything, including inventory records, relative to destruction of records within the ordinary course of the company's business?

THE WITNESS: I would assume that there is, but I am unaware of that.

THE COURT: Have you ever read any such ·policies?

THE WITNESS: I don't remember reading any such policies.

THE COURT: Do you know whether any such policies exist?

THE WITNESS: Again, I'm unaware that—

THE COURT: You don't know; that's your testimony.

THE WITNESS: I don't know; yes.

THE COURT: Is that correct?

THE WITNESS: Correct.

THE COURT: All right. Did you see any such backup records destroyed relative to the 51,000 cunits?

THE WITNESS: I did not personally observe any destruction of those documents.

THE COURT: Do you know who destroyed them?

THE WITNESS: No, sir, I do not.

THE COURT: Do you know who had them when you last saw them?

THE WITNESS: They were in a storage box in one of our storage facilities.

THE COURT: Under whose custody and control?

THE WITNESS: Miss/Ala region, probably someone related to office—

THE COURT: Pardon?

THE WITNESS: Miss/Ala region, someone related to office supplies. I don't know exactly who that person was, who was related to—

THE COURT: What year was this, sir?

THE WITNESS: This was in 1986, 1987.

THE COURT: Who had the authority to send such records to the storage facility?

THE WITNESS: I could do that.

THE COURT: Not whether—did you send such records to storage?

THE WITNESS: Yes, I did, sir.

THE COURT: And you sent them to the storage facility for what purpose?

THE WITNESS: For storage.

THE COURT: And not destruction?

THE WITNESS: Correct; and our boxes were labeled with destroy dates. We personally label them, saying that this information within this box would be in the 1–1–87, 1–1–89, 1–1–91—

THE COURT: And you did that?

THE WITNESS: Yes, I did that personally.

THE COURT: You put those dates on there?

THE WITNESS: Personally; yes, sir.

THE COURT: How would you know what the appropriate dates to put on there when you've never seen the—

THE WITNESS: Well, that's—

THE COURT: —policy statements relative to the company's policy on destroying records?

THE WITNESS: Well, we had—

THE COURT: I'm not talking about "we," I'm talking about you.

THE WITNESS: Okay. I put what I thought was the logical destroy date. I just put that on there, sir.

THE COURT: What—how would you determine a logical destruction date, knowing there was established policies of the company, and not reviewing the policies of the company?

THE WITNESS: I probably would have— I would have—

THE COURT: No, no; it's not—

THE WITNESS: I did talk to some to my counterparts, and maybe got an impression that a five- to seven-year timeframe was sufficient enough.

THE COURT: Who did you talk to?

THE WITNESS: I would imagine it would have been someone in the corporate—

THE COURT: No, no, no; don't imagine. Who did you talk to, as you best recollect?

THE WITNESS: Best recollect would have been Walt Reede.

THE COURT: Not "would have been"; who did you talk to, sir?

THE WITNESS: Walt. I remember Walt Reede.

THE COURT: Who is Walt Reede?

THE WITNESS: He is in the corporate inventory operations.

THE COURT: Is he still employed by Weyerhaeuser?

THE WITNESS: Yes.

THE COURT: And where is he situated? Corporate headquarters?

THE WITNESS: Yes; at WWC, our Washington—

THE COURT: And you talked to him with respect to what?

THE WITNESS: What would—what would be a logical date for these records to be maintained, these hard copy documents.

THE COURT: Did you know that there was established written policy with respect to destruction of corporate records?

THE WITNESS: No, I—no.

THE COURT: I thought that was your prior testimony, that there was—you understood that there—

THE WITNESS: Oh; well, I would imagine, yes indeed, that there was, but I don't remember ever seeing that or ever seeing anything written, a written policy.

THE COURT: Did you not know at that time that there was written policy relative to the destruction of corporate records? Wasn't your previous testimony to the Court's question in the affirmative?

THE WITNESS: I said I believe—I understood that there—yes, there was written—

THE COURT: And—

THE WITNESS: I would image there would have been; yes.

THE COURT: Believing that there was or there were such policies at that time, you put a destruction date on there without visiting the policy. Is that correct?

THE WITNESS: Yes.

THE COURT: All right.

THE WITNESS: That's would have been—is a good assumption.

Tr. 1615–21.

Against the foregoing background of Mr. Zubowicz's incredulous testimony, *i.e.*, he sent pertinent primary workpapers to storage with a destruction date believing that there was a company written policy relative to the destruction of records without familiarizing himself with that policy and at a time when it was highly likely that tax litigation stemming from a recent audit was imminent, strains credulity. This is particularly true when said testimony is juxtaposed against that of Mr. Stancato, vice president and corporate controller of plaintiff, who testified as follows regarding corporate record retention policies:

Q. ... do you have a system so that the documentation once made can be retrieved?

A. We have a records retention policy within the company which is set up to give guidance to all of our people relative to the various forms of records that we would retain, whether it be for legal, tax or financial reporting purposes. So that is the guidance that each of them work against.

\* \* \* \* \* \*

Q. Now if you've got some documentation which is relevant to some litigation, does Weyerhaeuser have a policy to maintain those records until the litigation is complete?

A. Yes, we do.

Q. And does the controller and various people who report to the controller have some function with respect to maintenance of documentation with respect to litigation and taxes ...?

A. Yes, we do, but it only is applicable to those pieces of information which have financial or tax reporting implications.

Tr. 3624–26. Taking all of the aforesaid regarding record retention into consider-

ation, we are constrained to draw a negative inference from taxpayer's destruction of workpaper records of hard copy data obviously vital to its defense in audit and its burden in the prosecution of its refund claim respecting the SPB (*i.e.*, if they were available, the evidence would be unfavorable). For all of the above reasons, we find that plaintiff has failed to rebut the presumptive correctness of the Commissioner's determination and, thus, has also failed to meet its burden of proving its alleged SPB losses, *i.e.*, volume, by a preponderance of the evidence. Accordingly, we deny plaintiff's claim for SPB losses allegedly suffered in 1980.

### 4. *The § 1053 Issue*

■ Generally, the adjusted basis of property used to determine gain or loss is determined with reference to cost. *See generally* 26 U.S.C. §§ 1001(a), 1011(a), 1012, 1016. However, if the property in issue is acquired *before* March 1, 1913, basis is determined differently depending upon whether *gain* or *loss* is recognized. In such instance, basis for determining *gain* is the greater of the fair market value of the property as of March 1, 1913, or adjusted cost. 26 U.S.C. §§ 1053, 1011, 1012, 1016; Treas.Reg. § 1.1053–1(a). On the other hand, basis for determining *loss is adjusted cost,* regardless of the March 1, 1913 value. *See* 26 U.S.C. § 1053; Treas.Reg. § 1.1053–1(b). Defendant contends that I.R.C. § 1053 limits plaintiff's permissible casualty loss deductions for the old growth timber stands (acquired before March 1, 1913) in the Mt. St. Helens tree farm [94] to their *cost* basis appropriately adjusted, exclusive of any pre-March 1, 1913 appreciation. Plaintiff, conversely, contends that § 1053 is inapplicable to timber property basis determinations for losses.

■ We begin our analysis from the starting point of I.R.C. § 165. Plaintiff would have us look to § 631,[95] *i.e.*, election to treat cuttings as a sale, and the regulations thereunder to resolve this issue, but that would clearly be improper since plaintiff is not claiming a loss from a § 631 election to treat a cutting as a deemed sale of timber. *See infra.* Rather, it is simply claiming a casualty loss deduction under § 165 and applicable regulations, thus the latter section is clearly the genesis of our analysis.

In claiming a loss under I.R.C. § 165(a), "the basis for determining the amount of the deduction for *any* loss [is] the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." 26 U.S.C. § 165(b) (emphasis added); *see also* Treas.Reg. § 1.165–1(c)(1). Furthermore, Treas.Reg. § 1.165–1 states that:

> The amount of loss allowable as a deduction under section 165(a) *shall not exceed the amount prescribed by § 1.1011–1* as the adjusted basis for determining the loss from the sale or other disposition of the property involved.... To determine the allowable loss in the case of property acquired *before* March 1, 1913, see also paragraph (b) of § 1.1053–1.

Treas.Reg. § 1.165–1(c)(1) (emphasis added). The loss provisions expressly refer to § 1011 and Treas.Reg. § 1.1011–1, and it is clear beyond cavil, and apparently undisputed by the parties, that § 1011 and its regulations implicate § 1053, so that it is incumbent upon a taxpayer properly computing gain or loss to give it due consideration. Riding the coattails of § 1011 in the grand scheme of the gain and loss calculations, § 1053 and its related regulations are clear and unequivocal:

> § 1053. Property acquired *before* March 1, 1913.

> In the case of property acquired *before* March 1, 1913, if the basis otherwise determined under this subtitle, adjusted (for the period before March 1, 1913) as provided in section 1016, is less than the fair market value of the property as of March 1, 1913, then *the basis for determining gain shall be such fair market value....*

26 U.S.C. § 1053, § 1.1053–1(a) (emphasis added).

---

94. With respect to the § 1053 issue, only the Mt. St. Helens old growth tree stands are in issue because those are the only stands with a cost basis acquired *prior* to March 1, 1913.

95. *See* Appendix A for pertinent portions of § 631.

§ 1.1053–1 Property acquired *before* March 1, 1913.

\* \* \* \* \* \*

(b) *Basis for determining loss.* In the case of property acquired before March 1, 1913, the basis as of March 1, 1913, for determining *loss* is the basis determined in accordance with part II (section 1011 and following), subchapter O, chapter 1 of the Code ... *without reference to the fair market value as of March 1, 1913.*

Treas.Reg. § 1.1053–1(b) (emphasis added).

 While this path through the Code that we have been obliged to follow is circuitous, it is at the same time definite and clearly directed. Section 165 mandates reference to § 1011 when determining basis for "*any*" loss." Section 1011 undoubtedly involves § 1053. Moreover, similar to § 165, the language of § 1053 and its regulations are patently clear, absolute, and unambiguous in its requirement that *loss* be calculated from the starting point of historical cost basis. Both speak to "property acquired before March 1, 1913," without limitation of that phrase or exclusion of any particular type of property. The phrase is obviously broadly inclusive, and it is well settled that clear, unequivocal, and unambiguous Treasury regulations should be accorded their plain meaning. *Chicago Milwaukee Corp. v. United States,* 29 Fed.Cl. 777, 781 n. 7 (1993) (citing *Long v. United States,* 10 Cl.Ct. 46, 54 (1986), *aff'd,* 824 F.2d 976 (Fed.Cir.1987)). It is, therefore, apparent that § 1053 applies to all types of property, including plaintiff's timberland.

From a purely logical standpoint, therefore, plaintiff's position is clearly devoid of merit, for it places the proverbial cart before the horse. When determining basis for any particular property, the place to begin is invariably the cost of such property. 26 U.S.C. §§ 1011, 1012. By the good grace of Congress, if a taxpayer has purchased property *prior* to March 1, 1913, it may "step-up" its basis to the fair market value of the property at that date, *but only for the purpose of calculating gain.* § 1.1053–1(a). The obvious purpose of such gratuity is to obviate a tax on the property for any increase in value at March 1, 1913, over the pre–1913 cost basis. Implicit therein is the undeniable fact that basis remains as *cost* of the property, but a taxpayer may avail himself of a specific increase therein in the limited circumstances of determining gain. Plaintiff apparently seeks to reverse the scheme of the Code, because it suggests that its basis for pre-March 1, 1913 acquired property, for *all* purposes, is now the stepped-up basis and not adjusted cost and, therefore, it does not have to "eliminate" the pre-March 1, 1913 appreciation from its basis in order to calculate *loss.* We thoroughly reject plaintiff's theory as contrary to the clear and obvious intendment of the Code.

 Taxpayer also contends that § 631 provides for computation of *both* gain and loss on timber property based upon the stepped-up basis (March 1, 1913 fair market value) used for depletion. The language of the Code states that "*gain or loss* to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber...." *Id.* Plaintiff is correct in its statement, but is out-of-bounds as to how far that provision operates. Section 631 permits a timber owner to treat a cutting of timber as a sale and, thereby, recognize a capital gain instead of ordinary income at the time of such cutting.[96] 26 U.S.C. § 631(a). The starting point for adjusted basis for depletion of timber is March 1, 1913 fair market value.[97] Plaintiff

---

**96.** Congress bestowed this benefit upon timber owners in order to promote the timber industry. *Dyalwood, Inc. v. United States,* 588 F.2d 467, 469 (5th Cir.1979); *United States v. Brown Wood Preserving Co.,* 275 F.2d 525, 527–28 (6th Cir. 1960).

**97.** Congress has expressly granted the Secretary authority to promulgate regulations pertaining to depletion. 26 U.S.C. § 611(a). Accordingly, the depletion regulations are "legislative regulations" and, as such, they have the force and effect of law. *Chicago Milwaukee Corp.,* 29 Fed. Cl. at 781 n. 7 (citing *Idaho First Nat'l Bank v. Commissioner,* 997 F.2d 1285, 1289 n. 7 (9th Cir.1993)).

Under the depletion regulations, timber may only be depleted using cost depletion, as opposed to percentage depletion. Treas.Reg. § 1.611–1. The basis of property used for cost depletion of

is, therefore, correct in its assertion that loss is also calculated using the stepped-up basis used for depletion purposes, but it is correct *only* with respect to losses resulting from deemed sales stemming from the cutting of timber. Under § 631, these losses from cutting would be § 1231 capital losses used to offset capital gains resulting from cutting. Use of the stepped-up basis for these losses is permitted.

Casualty losses, conversely, reduce ordinary income.[98] Therefore, if taxpayer were correct in its assumption here, it would be taking a loss against ordinary income using a stepped-up basis that is reserved only for the limited circumstance of determining capital gain or loss under § 1231 resulting from timber cutting under § 631.[99] Weyerhaeuser cannot have the best of both tax worlds, wherein it may use an elevated depletion and capital gains basis to determine ordinary income losses that are supposed to be calculated using cost-derived basis.

For all of the above reasons, we hold that plaintiff must use its adjusted cost basis, without any pre-March 1, 1913 appreciation, as the basis in determining its loss on the destruction of its old growth stands as a result of the Mt. St. Helens eruption.

### 5. The § 631 Casualty Gain Issue

■ Defendant warmly contends that plaintiff has not suffered casualty losses be-cause the casualty events that have affected the subject property herein have caused plaintiff to realize "casualty gains" with respect to the same SIP. The government also urges that "realization of a gain from a casualty event necessarily precludes the allowance of loss with respect to the same casualty as it affects the same property."[100] Defendant's position stems from the fact that plaintiff realized § 631 gains by the mere cutting of damaged but not destroyed timber during salvage operations. Plaintiff, conversely, avers that the respective transactions (*i.e.*, the casualties and the salvage cutting) are separate and distinct to the effect that Weyerhaeuser can have both gain and loss with respect to the same property arising from the same casualty event. Plaintiff is correct, in this connection, that both gain and loss may be *realized* accordingly, but whether a taxpayer will *recognize* gain, loss, or both depends on the amounts of each, the underlying cause of the gain or loss, and the years in which they are recognized.

When a property is affected by a casualty, the resulting loss is first calculated as the difference between the fair market value of the property before and after the casualty. Treas.Reg. § 1.165–7(b). Any amount of salvage *value* (as opposed to proceeds) remaining in the property would reduce the loss. Treas.Reg. § 1.165–1(c)(4). The amount of loss is then compared to the adjusted basis in the property, with the lesser being the per-

---

property is "the adjusted basis provided in section 1011 for the purpose of determining the gain upon sale or other disposition of such property." 26 U.S.C. § 612. As we have already seen, *supra*, the basis for determining gain upon sale or other disposition is the greater of adjusted cost or fair market value at March 1, 1913. 26 U.S.C. § 1053. Therefore, the basis of property for depletion under I.R.C. § 611 is the greater of adjusted cost or March 1, 1913 fair market value.

98. *See* Treas.Reg. § 1.1231–1(e)(3). Where recognized casualty losses exceed casualty gains, the losses offset ordinary income and are not considered losses to which § 1231 applies. *Id.* It follows naturally, then, that §§ 1011 and 1053 control to determine the basis for determining the amount of such loss even for timber property, for even though gains and losses from cutting timber are § 1231 gains and losses determined with reference to taxpayer's stepped-up basis, its casualty losses are not within § 1231, so the step-up in basis does not apply.

99. Plaintiff maintains that Congress intended there to be parity between different types of timber dispositions when it adopted § 631. But the material on which taxpayer relies referred only to cutting of timber, not any other loss types, and, as we well know, a disposition of timber and a casualty loss of same are markedly different events. *Westvaco*, 639 F.2d at 711 n. 45; *see* S.Rep. No. 1079, 78th Cong., 2d Sess. 52–53 (1943). Congress may have intended parity between treatment of gains and losses resulting from cutting and sales of timber, but nothing indicates the legislature's intent to extend the use of stepped-up basis to all types of losses.

100. Defendant further states that, according to generally accepted accounting principles, a taxpayer cannot have both gain and loss arising from a single casualty event affecting a single property.

missible loss taken into account. Treas.Reg. § 1.165–7(b). Any insurance received is subtracted from the loss to arrive at the allowable deduction. Treas.Reg. § 1.165–7(b)(3). If the insurance proceeds or other compensation received for the loss *exceeds* the amount of the loss, a gain is recognized by the taxpayer in an amount equal to such excess. *See Alexander v. Commissioner,* 49 T.C.M. (CCH) 327, 330, 1984 WL 15294 (1984). This would generate a casualty gain.

If, however, no form of compensation (or compensation in an amount *less* than the loss) is received, a loss is recognized and a deduction allowed. To the extent that a loss is recognized, the basis in the property (SIP) is reduced. 26 U.S.C. § 1016(a)(1). Thereafter, if the property is sold for its salvage value, gain will be recognized to the extent that the proceeds exceed the remaining basis.[101] In that circumstance, the sale does not convert the casualty loss into a casualty gain, but rather, there is a gain from a subsequent and separate closed and completed transaction which may or may not be a casualty gain. That is so because the receipt of the salvage proceeds upon sale of the damaged property is not "insurance or other compensation" referred to in the Code and regulations as being part of the loss calculation or transaction.

■ The regulation states that "[i]n determining the amount of loss actually sustained for purposes of section 165(a), proper adjustment shall be made for any *salvage value* and for any insurance or other compensation received." Treas.Reg. § 1.165–1(c)(4) (emphasis added). It does not expressly direct consideration of salvage proceeds in determining the loss sustained, and salvage proceeds are clearly not "insurance." Nor can the words "other compensation" be reasonably construed as including salvage proceeds within their intended meaning. Said regulation, addressing in what year a deduction may be taken, refers to such things as reimbursement, claims, recovery, settlement, adjudication, insurance, and neg-

ligence. These terms are consistent with receipt of funds from an outside source and having the purpose of making the suffering party whole; they are not consistent with receipt of funds in exchange for property in a salvage transaction. *See Forward Communications Corp. v. United States,* 221 Ct.Cl. 582, 611–12, 608 F.2d 485, 501 (1979) ("The bar in section 165(a) against a loss deduction thus applies only if the taxpayer has an existing legal right of recovery from some source.") ("The statute does not bar a deduction ... merely because the taxpayer is able to effect an offsetting gain on a different although contemporaneous transaction."); *see also Shanahan v. Commissioner,* 63 T.C. 21, 23, 1974 WL 2744 (1974) ("Under the rule of *ejusdem generis* the general words 'other compensation' are to be construed in a manner consistent with the specific meaning of the word 'insurance'...."). Therefore, salvage *proceeds* received upon sale of the affected property are not part of the closed and completed loss transaction under § 165 and the regulations, but rather constitute the fruits of a separate transaction.

Upon occurrence of the subject casualties herein, Weyerhaeuser realized and recognized losses to its timber measured by the reduction in the timber's fair market value resulting from the casualties. Plaintiff properly accounted for salvage value of its affected timber in calculating its loss, *i.e.,* plaintiff reduced the amount of estimated loss by the salvage value of the affected timber. After the respective casualties, Weyerhaeuser cut or sold whatever affected timber that was still standing and had retained any value in order to salvage it. Upon cutting and/or selling these trees, plaintiff realized gain by virtue of § 631. The losses resulting from casualties and the gains resulting from subsequent cutting and/or sale of the salvageable timber were separate events for tax purposes. But while these gains from salvage operations were not part of the original loss transaction, they were still gains from involuntary conversion [102] (casualty gains) because

---

**101.** Obviously, if the loss exceeds the basis of the property, the entire basis will be "used up" by the loss, leaving the basis as zero. Upon the salvage sale, all of the proceeds will constitute gain since there will be no remaining basis with which to reduce the gain. *See* 26 U.S.C. § 1001.

**102.** Involuntary conversion means "the conversion of property into money or other property as

the cutting of the affected timber was necessitated by the casualties and not a product of the company's choice.[103] Since both the casualty losses and the salvage gains resulted from involuntary conversion, if they are recognized in the same period, they must be netted against each other, and the greater of the gains or losses will be recognized. Treas.Reg. § 1.1231–1(e)(3). If they are recognized in different periods, then each will be fully recognized in the appropriate period and to the extent allowed by the Code and the regulations.[104]

Plaintiff did not recognize any gain in the casualty years because the Service granted taxpayer permission to defer recognition of these gains under I.R.C. § 1033, and plaintiff satisfied that section's requirements.[105] Since these gains were not *recognized* in the years that the casualty losses were recognized, they do not offset, or "net" against the losses. Taxpayer, therefore, as a result of the casualties, recognized only losses in the tax years at bar, undiminished by any gains *realized* as a result of the salvage operations necessitated by the casualties in the first instance. Thus, we hold that Weyerhaeuser may deduct its losses to the extent allowed under the Code and regulations and pursuant to this opinion, and the deferred gains from salvage operations will not be recognized until the timber purchased or grown through reforestation is cut or otherwise disposed of.

## CONCLUSION

Plaintiff's logging road systems and Woods Railroad each, as a whole, constitute single identifiable properties within the meaning of Treas.Reg. § 1.165–7(b)(2)(i) because they are unitary assets identified as such for both operational and tax purposes. Plaintiff has met its burden of proving its loss sustained to these assets as a result of the Mt. St. Helens eruption in 1980 by evidencing its cost to repair as provided in § 1.165–7(a)(2)(ii). Plaintiff is, therefore, entitled to a refund of the full amounts in issue with respect to each SIP damaged or destroyed inasmuch as plaintiff properly claimed as a deduction the lesser of the loss incurred or the adjusted basis of each respective asset.

For Weyerhaeuser's timber property, although plaintiff manages its timberlands essentially by a combination of the region and stands, we hold that each timber stand, on this record, is a single identifiable property within the meaning of Treas.Reg. § 1.165–7(b)(2), *for this plaintiff.* The regulations explicitly call for the identification of *the* "single identifiable property," in connection with a casualty event, and that is precisely what the timber stand is in Weyerhaeuser's scheme of timber recognition. Our determination on the facts of this case, therefore, violates neither *Westvaco* nor *Alcoma.* The *Westvaco* court considered the SIP question to be a factual issue or at least a mixed question of fact and law, and limited its determination of the depletion block, as the SIP, to that taxpayer before it. While we have reached a different conclusion for this plaintiff, we have, nevertheless, been true to the logic and rationale of that case. Moreover, our decision clearly does not violate *Alcoma* because we do not limit plaintiff's deduction to a fraction or percentage of its true basis in *the SIP* affected, *i.e.,* the stand.

---

a result of complete or partial destruction...." Treas.Reg. § 1.1231–1(e)(1).

**103.** Indeed, the salvage gains, by definition, must have been casualty gains because the recognition of said gains was deferred by Weyerhaeuser under I.R.C. § 1033, *see* text *infra,* and only gains from involuntary conversion may be so deferred under that section.

**104.** Assuming no other casualty gains or losses in those periods necessitate netting.

**105.** When property is involuntarily converted, if a gain is realized as a result thereof, the Code gratuitously allows the recognition of that gain to be deferred indefinitely to the extent that the gain *is* reinvested in other property similar and relat-

ed in service for the purpose of replacing the converted property. 26 U.S.C. § 1033(a)(2)(A). The deferred gain will not be recognized until the replacement property is later sold or otherwise disposed of, because the deferred gain is subtracted from the basis of the replacement property, thereby increasing the gain realized when the replacement property is ultimately sold. *See id.* Taxpayer conducted its salvage operations during the years 1980 through 1982, inclusive, and *realized* § 631 gains in those years and in 1983. Weyerhaeuser reinvested its salvage proceeds primarily in reforestation expenditures and purchases of timber and timberland, and thereby satisfied the § 1033 deferral requirements.

Rather, we hold only that the stand SIP is a smaller one than plaintiff believes it to be, and allow it to recover *all* of its basis contained therein to the extent that the proven loss equals or exceeds the related adjusted basis of each stand.

With respect to the St. Helens eruption and the 319 forest fires, plaintiff has met its burden of proving its losses. Plaintiff is, therefore, entitled to a casualty loss deduction *of the lesser* of the loss attributable to each of the affected tree stands, and the adjusted basis of each of those same *timber stands directly affected by said casualties*. Since plaintiff has offered proof only as to the adjusted basis of the depletion blocks, and the parties have agreed to stipulate to the amount of refund due based on the court's findings, the parties shall stipulate as to *the adjusted basis of all of the related and affected stands* in each casualty, by means appropriate under the Code and regulations and mutually agreeable, in order to stipulate to the deductions and refund(s), if any, due taxpayer.

Plaintiff has failed in its burden of proof regarding its alleged losses resulting from the southern pine beetle infestation. The methods employed by taxpayer in determining the volume of timber affected and identifying the cause of the alleged loss, including the sufficiency of its confirmation procedures with respect to same, were wholly inadequate to satisfy this court as the finder of fact. Accordingly, taxpayer is *not* entitled to a refund of any taxes paid, in satisfaction of the deficiency assessed, with respect to its alleged SPB losses.

For the losses claimed with respect to the old growth stands in Weyerhaeuser's Mt. St. Helens region, plaintiff shall determine its adjusted basis by excluding any and all pre-March 1, 1913 appreciation, in accordance with I.R.C. § 1053. Taxpayer's reliance on I.R.C. § 631 as evidence of the fact that timber owners may avail themselves of the March 1, 1913 step-up in basis for all purposes, including calculation of loss, is clearly misplaced. Plaintiff is, therefore, subject to Code § 1053 and applicable regulations in determining its adjusted basis limitation in the Mt. St. Helens old growth stands.

Lastly, plaintiff did not *recognize* "casualty gains" by virtue of the casualties that it suffered and the subsequent cutting and/or selling of whatever salvageable timber remained. Although such cutting and/or selling resulted in § 631 gains being *realized* by Weyerhaeuser, those gains resulted from closed and completed transactions separate and independent of the pre-occurring casualties. Those gains stemming from involuntary conversions were then properly deferred, with the permission of the Service, under I.R.C. § 1033, and, by virtue thereof, were not *recognized* in any of the loss years at issue herein. Since the gains were *realized but not recognized* in the years that the casualty losses were realized *and* recognized, they cannot offset those losses. Rather, they may constitute income (or offset other losses) in the year(s) that they are eventually recognized, in accordance with appropriate provisions of the Code and regulations. Taxpayer is, therefore, entitled to recognize its casualty losses in full to the extent permitted under the Code and regulations and consistent with the opinion of this court herein.

In accordance with this court's order of June 23, 1994, the parties shall file with the court, within 30 days of the issuance of this opinion, their stipulations of the amount of refund due plaintiff, if any, consistent with this court's opinion herein respecting the casualty loss issues. The stipulation shall also state the amount(s) of all other refunds to which plaintiff is entitled, if any, including but not limited to those relating to the DISC issues. Upon the filing of said stipulation, the court will thereafter order the Clerk to forthwith enter judgment accordingly.

IT IS SO ORDERED.

## APPENDIX A

Internal Revenue Code Sec. 165, DEDUCTIONS FOR LOSSES, provides, in pertinent parts, as follows:

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for de-

termining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

Treasury Regulation § 1.165–1, Losses, provides, in pertinent parts, as follows:

(a) Allowance of deduction. ... any loss actually sustained during the taxable year and not made good by insurance or some other form of compensation shall be allowed as a deduction subject to any provision of the internal revenue laws which prohibits or limits the amount of the deduction....

(b) Nature of loss allowable. To be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and ... actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss.

(c) Amount deductible. (1) The amount of the loss allowable as a deduction under section 165(a) shall not exceed the amount prescribed by § 1.1011–1 as the adjusted basis for determining the loss from the sale or other disposition of the property involved.... To determine the allowable loss in the case of property acquired before March 1, 1913, see also paragraph (b) of § 1.1053–1.

\*　　\*　　\*　　\*　　\*　　\*

(4) In determining the amount of loss actually sustained for purposes of section 165(a), proper adjustment shall be made for any salvage value and for any insurance or other compensation received.

(d) Year of deduction. (1) A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained.... as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year....

Treasury Regulation § 1.165–7, Casualty losses, provides, in pertinent parts, as follows:

(a) In general—(1) Allowance of deduction. Except as otherwise provided ... any loss arising from fire, storm, shipwreck, or other casualty is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained....

\*　　\*　　\*　　\*　　\*　　\*

(2) Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as a well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property.

(ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.

\*　　\*　　\*　　\*　　\*　　\*

(b) Amount deductible—(1) General rule. In the case of any casualty loss ..., the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either—

(i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or

(ii) The amount of the adjusted basis prescribed in § 1.1011–1 for determining the loss from the sale or other disposition of the property involved....

(2) Aggregation of property for computing loss. (i) A loss incurred in a trade or business or in any transaction entered into for profit shall be determined under subparagraph (1) of this paragraph by reference to

the single, identifiable property damaged or destroyed....

Internal Revenue Code Sec. 631, GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE, provides, in pertinent part, as follows:

(a) ELECTION TO CONSIDER CUTTING AS SALE OR EXCHANGE.—If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 1 year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor....

Treasury Regulation § 1.631–1, Election to consider cutting as sale or exchange, provides, in pertinent part, as follows:

(a) Effect of election.—(1) Section 631(a) provides an election to certain taxpayers to treat the difference between the actual cost or other basis of certain timber cut during the taxable year and its fair market value as standing timber on the first day of such year as gain or loss from a sale or exchange under section 1231. Thereafter, any subsequent gain or loss shall be determined in accordance with paragraph (e) of this section.

\* \* \* \* \* \*

(e) Computation of subsequent gain or loss.—(1) In case the products of the timber are sold after cutting, either in the form of logs or lumber or in the form of manufactured products, the income from such actual sales shall be considered ordinary income. When the election under section 631(a) is in effect, the cost of standing timber cut during the taxable year is determined as if the taxpayer had purchased such timber on the first day of the taxable year. Thus, in determining the cost of the products so sold, the cost of the timber shall be the fair market value on the first day of the taxable year in which the standing timber was cut, in lieu of the actual cost or other basis of such timber.

Internal Revenue Code Sec. 1033, INVOLUNTARY CONVERSIONS, provides, in pertinent parts, as follows:

(a) GENERAL RULE.—If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—

(1) CONVERSION INTO SIMILAR PROPERTY.—Into property similar or related in service or use to the property so converted, no gain shall be recognized.

(2) CONVERSION INTO MONEY.—Into money or into property not similar or related in service or use to the converted property, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) Nonrecognition of gain.—If the taxpayer[,] ... for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted ... at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion ... exceeds the cost of such other property or such stock....

Treasury Regulation § 1.1033(a)–1, Involuntary conversion; nonrecognition of gain, provides, in pertinent part, as follows:

(a) In general. Section 1033 applies to cases where property is compulsorily or involuntarily converted. An "involuntary conversion" may be the result of the destruction of property in whole or in part, the theft of property, the seizure of property, the requisition or condemnation of property, or the threat or imminence of requisition or condemnation of property. An "involuntary conversion" may be a conversion into similar

property or into money or into dissimilar property. Section 1033 provides that, under certain specified circumstances, any gain which is realized from an involuntary conversion shall not be recognized. In cases where property is converted into other property similar or related in service or use to the converted property, no gain shall be recognized regardless of when the disposition of the converted property occurred and regardless of whether or not the taxpayer elects to have the gain not recognized. In other types of involuntary conversion cases, however, the proceeds arising from the disposition of the converted property must (within the time limits specified) be reinvested in similar property in order to avoid recognition of any gain realized. Section 1033 applies only with respect to gains; losses from involuntary conversions are recognized or not recognized without regard to this section.

Treasury Regulation § 1.1231–1, Gains and losses from the sale or exchange of certain property used in the trade or business, provides, in pertinent parts, as follows:

(d) *Extent to which gains and losses are taken into account.* All gains and losses to which section 1231 applies must be taken into account in determining whether and to what extent the gains exceed the losses. For the purpose of this computation, the provisions of section 1211 limiting the deduction of capital losses do not apply, and no losses are excluded by that section. With that exception, gains are included in the computations under section 1231 only to the extent that they are taken into account in computing gross income, and losses are included only to the extent that they are taken into account in computing taxable income. The following are examples of gains and losses not included in the computations under section 1231:

\* \* \* \* \* \*

(4) Gains and losses which are not recognized under section 1002, such as those to which sections 1031 through 1036, relating to common nontaxable exchanges, apply.

(e) *Involuntary conversion* ...

\* \* \* \* \* \*

(3) *Exclusion of gains and losses from certain involuntary conversions.* Notwith-

standing the provisions of subparagraph (1) of this paragraph, if for any taxable year beginning after December 31, 1969, the recognized losses from the involuntary conversion as a result of fire, storm, shipwreck, or other casualty, or from theft, of any property used in the trade or business or of any capital asset held for more than 1 year (6 months for taxable years beginning before 1977; 9 months for taxable years beginning in 1977) exceed the recognized gains from the involuntary conversion of any such property as a result of fire, storm, shipwreck, or other casualty, or from theft, such gains and losses are not gains and losses to which section 1231 applies and shall not be taken into account in applying the provisions of this section. The net loss, in effect, will be treated as an ordinary loss. This subparagraph shall apply whether such property is uninsured, partially insured, or totally insured and, in the case of a capital asset held for more than 1 year (6 months for taxable years beginning before 1977; 9 months for taxable years beginning in 1977), whether the property is property used in the trade or business, property held for the production of income, or a personal asset.

Internal Revenue Code Sec. 1053, PROPERTY ACQUIRED BEFORE MARCH 1, 1913, provides as follows:

In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subtitle, adjusted (for the period before March 1, 1913) as provided in section 1016, is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value. In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date.

Treasury Regulation § 1.1053–1, Property acquired before March 1, 1913, provides, in pertinent parts, as follows:

(a) *Basis for determining gain.* In the case of property acquired before March 1, 1913, the basis as of March 1, 1913, for determining gain is the cost of other basis, adjusted as provided in section 1016 and

other applicable provisions of chapter 1 of the Code, or its fair market value as of March 1, 1913, whichever is greater.

(b) *Basis for determining loss.* In the case of property acquired before March 1, 1913, the basis as of March 1, 1913, for determining loss is the basis determined in accordance with part II (section 1011 and following), subchapter O, chapter 1 of the Code, or other applicable provisions of chapter 1 of the Code, without reference to the fair market value as of March 1, 1913.

## APPENDIX B

Figure 1.4-4 OPERATING REGIONS

LAND and TIMBER REGIONS